UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT
MAY 25 2017
RECEIVED

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT
FILED MAY 25 2017
CLERK

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

CHESAPEAKE BAY FOUNDATION, INC., and POTOMAC RIVERKEEPER, INC.

Petitioners,

v.

UNITED STATES ENVIRONMENTAL PRROTECTION AGENCY and SCOTT PRUITT, Administrator, U.S. Environmental Protection Agency,

Respondents.

No.: 17-1136

ORIGINAL

**PETITION FOR REVIEW**

Pursuant to Clean Water Act § 509(b)(1)(E) and (F), 33 U.S.C. § 1369(b)(1)(E) and (F), Rule 15 of the Federal Rules of Appellate Procedure, and D.C. Circuit Rule 15, the Chesapeake Bay Foundation, Inc. and Potomac Riverkeeper, Inc. hereby petition this Court for review of the final action taken by Respondents at 82 Fed. Reg. 6,534 (Jan. 19, 2017) and titled "Final National Pollution Discharge Elimination System (NPDES) General Permit for Stormwater Discharges from Construction Activities." That notice is attached hereto as Exhibit A. The General Permit for Discharges from Construction Activities ("Permit"), omitting for the sake of economy Appendices A-L which consist of approximately 236 pages, is attached hereto as Exhibit B. The Permit and all its appendices are available to the public electronically at https://www.epa.gov/npdes/epas-

2017-construction-general-permit-cgp-and-related-documents (last visited May 24, 2017).

DATED: May 25, 2017

Respectfully submitted,

PAUL W. SMAIL
JON A. MUELLER
Chesapeake Bay Foundation, Inc.
6 Herndon Ave.
Annapolis, MD 21403
(443) 482-2153
psmail@cbf.org
jmueller@cbf.org

*Counsel for Petitioners*
*Chesapeake Bay Foundation, Inc.*
*and Potomac Riverkeeper, Inc.*

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT
MAY 25 2017
RECEIVED

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT
FILED MAY 25 2017
CLERK

**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | |
|---|---|
| CHESAPEAKE BAY FOUNDATION, INC., and POTOMAC RIVERKEEPER, INC.<br><br>Petitioners,<br><br>v.<br><br>UNITED STATES ENVIRONMENTAL PRROTECTION AGENCY and SCOTT PRUITT, Administrator, U.S. Environmental Protection Agency,<br><br>Respondents. | No.: 17-1136 |

ORIGINAL

**RULE 26.1 DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rule 26.1, Chesapeake Bay Foundation, Inc. ("CBF"), and Potomac Riverkeeper, Inc. ("PRK"), make the following disclosures:

**Chesapeake Bay Foundation, Inc.**

CBF is a non-profit corporation organized under the laws of the State of Maryland. CBF is dedicated to protecting the Chesapeake Bay and its tributary rivers and streams by improving water quality and reducing pollution.

CBF does not have any parent corporations, and no publicly held corporation owns 10% or more of its stock.

**Potomac Riverkeeper, Inc.**

PRK is a non-profit corporation organized under the laws of the State of Maryland. PRK is dedicated to the protection of water quality in the Potomac River, the preservation of the health of aquatic life in the Potomac and its tributaries, and the preservation of scenic and recreational resources throughout the Potomac River watershed.

PRK does not have any parent corporations, and no publicly held corporation owns 10% or more of its stock.

DATED: May 25, 2017

Respectfully submitted,

PAUL W. SMAIL
JON A. MUELLER
Chesapeake Bay Foundation, Inc.
6 Herndon Ave.
Annapolis, MD 21403
(443) 482-2153
psmail@cbf.org
jmueller@cbf.org

*Counsel for Petitioners*
*Chesapeake Bay Foundation, Inc.*
*and Potomac Riverkeeper, Inc.*

# CERTIFICATE OF SERVICE

I hereby certify that on this 25th day of May, 2017, a copy of the foregoing **Petition for Review** and **Rule 26.1 Disclosure Statement** was served on the following by U.S. Mail, first class postage prepaid:

The Honorable Scott Pruitt, Administrator
United States Environmental Protection Agency
EPA Headquarters 1101A
1200 Pennsylvania Avenue, NW
Washington, DC 20460

The Honorable Jeff Sessions
Attorney General of the United States
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C. 20530-0001

Correspondence Control Unit
Office of General Counsel (2311)
United States Environmental Protection Agency
1200 Pennsylvania Avenue, NW
Washington, DC 20460

Paul W. Smail

# Exhibit A

ballast water, and on deck drainage discharges. Discharges of seawater and freshwater which have been used to pressure test existing pipelines and piping, to which treatment chemicals have been added, are proposed to be subject to limitations on free oil, concentration of treatment chemicals, and acute toxicity. New facilities withdrawing cooling water greater than 2 million gallons per day (MGD) are required to have the best technology available for minimizing fish/shellfish impingement mortality and entrainment caused by cooling water intake structures. Pursuant to the electronic reporting rule published in the **Federal Register** (80 FR 64063), a new electronic reporting requirement is added to the proposed permit.

### Other Legal Requirements

State certification under section 401 of the CWA; consistency with the Texas Coastal Management Program; and compliance with National Environmental Policy Act, Endangered Species Act, Magnuson-Stevens Fishery Conservation and Management Act, Historic Preservation Act, Paperwork Reduction Act, and Regulatory Flexibility Act requirements are discussed in the fact sheet to the proposed permit.

Dated: December 28, 2016.

**William K. Honker,**

*Director, Water Division, EPA Region 6.*

[FR Doc. 2017–01082 Filed 1–18–17; 8:45 am]

BILLING CODE 6560–50–P

## ENVIRONMENTAL PROTECTION AGENCY

[EPA–HQ–OW–2015–0828; FRL–9958–68–OW]

## Final National Pollutant Discharge Elimination System (NPDES) General Permit for Stormwater Discharges From Construction Activities

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Notice of final permit issuance.

**SUMMARY:** All ten EPA Regions today are issuing the 2017 National Pollutant Discharge Elimination System (NPDES) general permit for stormwater discharges from construction activities to waters of the United States, also referred to as the "2017 Construction General Permit (CGP)." The 2017 CGP replaces the existing general permit (the "2012 CGP") covering stormwater discharges from construction activities that expires on February 16, 2017. EPA is issuing this permit for five (5) years, during which time the permit will make available coverage to eligible operators in all areas of the country where EPA is the NPDES permitting authority. This **Federal Register** notice describes the 2017 CGP in general and provides a summary of the significant changes from the 2012 CGP.

**DATES:** The 2017 CGP will become effective on February 16, 2017. This effective date will provide dischargers with the immediate opportunity to comply with Clean Water Act requirements in light of the expiration of the 2012 CGP at midnight on February 16, 2017. In accordance with 40 CFR part 23, specifically 23.2, this permit shall be considered issued for the purpose of judicial review on January 25, 2017. Under section 509(b) of the Clean Water Act, judicial review of this general permit can be requested by filing a petition for review in the United States Court of Appeals within 120 days after the permit is considered issued. Under section 509(b)(2) of the Clean Water Act, this permit may not be challenged later in civil or criminal proceedings to enforce this permit. In addition, this permit may not be challenged in any other agency proceedings. Deadlines for submittal of notices of intent are provided in Part 1.4.3 of the permit. The permit also provides additional dates for compliance with the terms of the permit.

**FOR FURTHER INFORMATION CONTACT:** For further information on the permit, contact the appropriate EPA Regional office listed in Section I.C of this notice, or Emily Halter, EPA Headquarters, Office of Water, Office of Wastewater Management at tel.: 202–564–3324 or email: *halter.emily@epa.gov.*

**SUPPLEMENTARY INFORMATION:** This section is organized as follows:

### Table of Contents

I. General Information
A. Does this action apply to me?
B. How can I get copies of these documents and other related information?
C. Who are the EPA regional contacts for this permit?
II. Background of Permit
III. Summary of the Final 2017 CGP
A. Technology-Based Effluent Limits
B. Water Quality-Based Effluent Limits (WQBELs)
C. Summary of Significant Permit Changes from the 2012 CGP
IV. Implementation Assistance
V. Analysis of Economic Impacts
VI. Executive Order 12866: Regulatory Planning and Review and Executive Order 13563: Improving Regulation and Regulatory Review
VII. Executive Order 12898: Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations
VIII. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments

## I. General Information

*A. Does this action apply to me?*

1. Entities Covered by This Permit

This permit covers the following entities, as categorized in the North American Industry Classification System (NAICS):

TABLE 1—ENTITIES COVERED BY THIS PERMIT

| Category | Examples of affected entities | North American Industry Classification System (NAICS) code |
|---|---|---|
| Industry | Construction site operators disturbing one (1) or more acres of land, or less than one (1) acre but part of a larger common plan of development or sale if the larger common plan will ultimately disturb one (1) acre or more, and performing the following activities: | |
| | Construction of Buildings | 236 |
| | Heavy and Civil Engineering Construction | 237 |

EPA does not intend the preceding table to be exhaustive, but provides it as a guide for readers regarding the types of activities that EPA is now aware of that could potentially be affected by this action. Other types of entities not listed in the table could also be affected. To determine whether your site is covered by this action, you should carefully examine the definition of "construction activity" and "small construction activity" in existing EPA regulations at 40 CFR 122.26(b)(14)(x) and 122.26(b)(15), respectively. If you have questions regarding the applicability of this action to a particular entity, consult one of the persons listed for technical information in the preceding **FOR FURTHER INFORMATION CONTACT** section.

2. Construction Projects for Which Operators Are Eligible for Permit Coverage

Coverage under this permit is available to operators of eligible projects located in those areas where EPA is the permitting authority. A list of eligible areas is included in Appendix B of the permit. Eligibility for permit coverage is limited to operators of "new sites," operators of "existing sites," "new operators of permitted sites," and operators of "emergency-related projects." A "new site" is a site where construction activities commenced on or after February 16, 2017. An "existing site" is a site where construction activities commenced prior to February 16, 2017. A "new operator of a permitted site" is an operator that through transfer of ownership and/or operation replaces the operator of an already permitted construction site that is either a "new site" or an "existing site." An "emergency-related project" is a project initiated in response to a public emergency *(e.g., mud slides, earthquake, extreme flooding conditions, disruption in essential public services),* for which the related work requires immediate authorization to avoid imminent endangerment to human health or the environment, or to reestablish public services.

3. Geographic Coverage

This permit makes coverage available to eligible operators for stormwater discharges from construction activities that occur in areas not covered by an approved state NPDES program. The areas of geographic coverage of this permit are listed in Appendix B, and include the states of New Hampshire, Massachusetts, New Mexico, and Idaho as well as most Indian country lands, and areas in selected states operated by a federal operator. Permit coverage is also available to eligible operators in Puerto Rico, the District of Columbia, and the Pacific Island territories, among others.

*B. How can I get copies of these documents and other related information?*

1. *Docket.* EPA has established an official public docket for this action under Docket ID No. EPA–HQ–OW–2015–0828. The official public docket is the collection of materials that is available for public viewing at the Water Docket in the EPA Docket Center, (EPA/DC) WJC West Building, Room 3334, 1301 Constitution Ave. NW., Washington, DC 20460. Although all documents in the docket are listed in an index, some information is not publicly available, *i.e.,* Confidential Business Information (CBI) or other information whose disclosure is restricted by statute. Publicly available docket materials are available in hard copy at the EPA Docket Center Public Reading Room, open from 8:30 a.m. to 4:30 p.m., Monday through Friday, excluding legal holidays. The telephone number for the Public Reading Room is (202) 566–1744 and the telephone number for the Water Docket is (202) 566–2426.

2. *Electronic Access.* You may access this **Federal Register** notice electronically through the United States government on-line source for Federal regulations at *http://www.regulations.gov.*

Electronic versions of this permit and fact sheet are available on EPA's NPDES Web site at *https://www.epa.gov/npdes/stormwater-discharges-construction-activities.*

An electronic version of the public docket is available through the EPA's electronic public docket and comment system, EPA Dockets. You may use EPA Dockets at *http://www.regulations.gov* to view public comments, access the index listing of the contents of the official public docket, and to access those documents in the public docket that are available electronically. For additional information about EPA's public docket, visit the EPA Docket Center homepage at *https://www.epa.gov/dockets.* Although not all docket materials may be available electronically, you may still access any of the publicly available docket materials through the Docket Facility identified in Section I.B.1.

*C. Who are the EPA regional contacts for this permit?*

For EPA Region 1, contact Suzanne Warner at tel.: (617) 918–1383 or email at *warner.suzanne@epa.gov.*

For EPA Region 2, contact Stephen Venezia at tel.: (212) 637–3856 or email at *venezia.stephen@epa.gov,* or for Puerto Rico, contact Sergio Bosques at tel.: (787) 977–5838 or email at *bosques.sergio@epa.gov.*

For EPA Region 3, contact Carissa Moncavage at tel.: (215) 814–5798 or email at *moncavage.carissa@epa.gov.*

For EPA Region 4, contact Michael Mitchell at tel.: (404) 562–9303 or email at *mitchell.michael@epa.gov.*

For EPA Region 5, contact Brian Bell at tel.: (312) 886–0981 or email at *bell.brianc@epa.gov.*

For EPA Region 6, contact Suzanna Perea at tel.: (214) 665–7217 or email at: *perea.suzanna@epa.gov.*

For EPA Region 7, contact Mark Matthews at tel.: (913) 551–7635 or email at: *matthews.mark@epa.gov.*

For EPA Region 8, contact Amy Clark at tel.: (303) 312–7014 or email at: *clark.amy@epa.gov.*

For EPA Region 9, contact Eugene Bromley at tel.: (415) 972–3510 or email at *bromley.eugene@epa.gov.*

For EPA Region 10, contact Margaret McCauley at tel.: (206) 553–1772 or email at *mccauley.margaret@epa.gov.*

**II. Background of Permit**

The Clean Water Act ("CWA") establishes a comprehensive program "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. 1251(a). The CWA also includes the objective of attaining "water quality which provides for the protection and propagation of fish, shellfish and wildlife and * * * recreation in and on the water." 33 U.S.C. 1251(a)(2)). To achieve these goals, the CWA requires EPA to control discharges of pollutants from point sources through the issuance of NPDES permits.

The Water Quality Act of 1987 (WQA) added section 402(p) to the CWA, which directed EPA to develop a phased approach to regulate stormwater discharges under the NPDES program. 33 U.S.C. 1342(p). EPA published a final regulation in the **Federal Register**, often called the "Phase I Rule," on November 16, 1990, establishing permit application requirements for, among other things, "storm water discharges associated with industrial activity." See 55 FR 47990. EPA defines the term "storm water discharge associated with industrial activity" in a comprehensive manner to cover a wide variety of facilities. See *id.* Construction activities, including activities that are part of a larger common plan of development or sale, that ultimately disturb at least five acres of land and have point source discharges to waters of the U.S. were included in the definition of "industrial activity" pursuant to 40 CFR 122.26(b)(14)(x). The second rule

implementing section 402(p), often called the "Phase II Rule," was published in the **Federal Register** on December 8, 1999. It requires NPDES permits for discharges from construction sites disturbing at least one acre but less than five acres, including sites that are part of a larger common plan of development or sale that will ultimately disturb at least one acre but less than five acres, pursuant to 40 CFR 122.26(b)(15)(i). See 64 FR 68722. EPA is issuing this permit under the statutory and regulatory authority cited above.

NPDES permits for construction stormwater discharges are required under Section 402(a)(1) of the CWA to include conditions to meet technology-based effluent limits established under Section 301 and, where applicable, Section 306. Effluent Limitations Guidelines (ELGs) and New Source Performance Standards (NSPS) are technology-based effluent limitations that are based on the degree of control that can be achieved using various levels of pollutant control technology as defined in Subchapter III of the CWA.

Once a new national standard is established in accordance with these sections, NPDES permits must incorporate limits based on such technology-based standards. See CWA sections 301 and 306, 33 U.S.C. 1311 and 1316, and 40 CFR 122.44(a)(1). On December 1, 2009, EPA published final regulations establishing technology-based ELGs and NSPSs for the Construction & Development (C&D) point source category, which became effective on February 1, 2010. See 40 CFR part 450, and 74 FR 62996 (December 1, 2009). The Construction & Development Rule, or "C&D rule," was amended on March 6, 2014 to satisfy EPA's agreements pursuant to a settlement of litigation that challenged the 2009 rule. See 79 FR 12661. All NPDES construction stormwater NPDES permits issued by EPA or states after this date must incorporate the requirements in the C&D rule.

## III. Summary of the Final 2017 CGP

The final 2017 CGP is substantially similar to the 2012 CGP. It includes effluent limitations *(i.e., requirements for erosion and sediment and pollutant prevention controls)* and requirements for self-inspections, corrective actions, staff training, development of a stormwater pollution prevention plan (SWPPP), and permit conditions applicable to construction sites in specific states, Indian country lands, and territories. Additionally, the appendices provide forms for the submittal of a Notice of Intent (NOI), Notice of Termination (NOT), Low Erosivity Waiver (LEW), as well as step-by-step procedures for determining eligibility with respect to the protection of threatened and endangered species and historic properties, and for complying with the permit's natural buffer requirements.

### *A. Technology-Based Effluent Limits*

As stated above, all NPDES construction permits issued by EPA or states after March 6, 2014 must incorporate the requirements in the C&D rule, as amended. The non-numeric effluent limitations in the C&D rule are designed to prevent the mobilization and discharge of sediment and sediment-bound pollutants, such as metals and nutrients, and to prevent or minimize exposure of stormwater to construction materials, debris, and other sources of pollutants on construction sites. In addition, these non-numeric effluent limitations reduce the generation of dissolved pollutants. Soil on construction sites can contain a variety of pollutants such as nutrients, pesticides, herbicides, and metals. These pollutants may be present naturally in the soil, such as arsenic or selenium, or they may have been contributed by previous activities on the site, such as agriculture or industrial activities. These pollutants, once mobilized by stormwater, can detach from the soil particles and become dissolved pollutants. Once dissolved, these pollutants would not be removed by down-slope sediment controls. Source control through minimization of soil erosion is therefore the most effective way of controlling the discharge of these pollutants.

The non-numeric effluent limits in the C&D rule, upon which the technology-based requirements in the permit are based, include the following:

• *Erosion and Sediment Controls*—Permittees are required to design, install and maintain effective erosion controls and sediment controls to minimize the discharge of pollutants. At a minimum, such controls must be designed, installed and maintained to:

1. Control stormwater volume and velocity to minimize soil erosion in order to minimize pollutant discharges;
2. Control stormwater discharges, including both peak flowrates and total stormwater volume, to minimize channel and streambank erosion and scour in the immediate vicinity of discharge points;
3. Minimize the amount of soil exposed during construction activity;
4. Minimize the disturbance of steep slopes;
5. Minimize sediment discharges from the site. The design, installation and maintenance of erosion and sediment controls must address factors such as the amount, frequency, intensity and duration of precipitation, the nature of resulting stormwater discharge, and soil characteristics, including the range of soil particle sizes expected to be present on the site;
6. Provide and maintain natural buffers around waters of the United States, direct stormwater to vegetated areas and maximize stormwater infiltration to reduce pollutant discharges, unless infeasible;
7. Minimize soil compaction. Minimizing soil compaction is not required where the intended function of a specific area of the site dictates that it be compacted; and
8. Unless infeasible, preserve topsoil. Preserving topsoil is not required where the intended function of a specific area of the site dictates that the topsoil be disturbed or removed.

• *Soil Stabilization Requirements*—Permittees are required to, at a minimum, initiate soil stabilization measures immediately whenever any clearing, grading, excavating or other earth disturbing activities have permanently ceased on any portion of the site, or temporarily ceased on any portion of the site and will not resume for a period exceeding 14 calendar days. In arid, semiarid, and drought-stricken areas where initiating vegetative stabilization measures immediately is infeasible, alternative stabilization measures must be employed as specified by the permitting authority. Stabilization must be completed within a period of time determined by the permitting authority. In limited circumstances, stabilization may not be required if the intended function of a specific area of the site necessitates that it remain disturbed.

• *Dewatering Requirements*—Permittees are required to minimize the discharge of pollutants from dewatering trenches and excavations. Discharges are prohibited unless managed by appropriate controls.

• *Pollution Prevention Measures*—Permittees are required to design, install, implement, and maintain effective pollution prevention measures to minimize the discharge of pollutants. At a minimum, such measures must be designed, installed, implemented and maintained to:

1. Minimize the discharge of pollutants from equipment and vehicle washing, wheel wash water, and other wash waters. Wash waters must be treated in a sediment basin or alternative control that provides

equivalent or better treatment prior to discharge;

2. Minimize the exposure of building materials, building products, construction wastes, trash, landscape materials, fertilizers, pesticides, herbicides, detergents, sanitary waste and other materials present on the site to precipitation and to stormwater. Minimization of exposure is not required in cases where the exposure to precipitation and to stormwater will not result in a discharge of pollutants, or where exposure of a specific material or product poses little risk of stormwater contamination (such as final products and materials intended for outdoor use); and

3. Minimize the discharge of pollutants from spills and leaks and implement chemical spill and leak prevention and response procedures.

• *Prohibited Discharges*—The following discharges from C&D sites are prohibited:

1. Wastewater from washout of concrete, unless managed by an appropriate control;

2. Wastewater from washout and cleanout of stucco, paint, form release oils, curing compounds and other construction materials;

3. Fuels, oils, or other pollutants used in vehicle and equipment operation and maintenance; and

4. Soaps or solvents used in vehicle and equipment washing.

• *Surface Outlets*—When discharging from basins and impoundments, permittees are required to utilize outlet structures that withdraw water from the surface, unless infeasible.

The fact sheet details how EPA has incorporated these requirements into the final 2017 CGP. The discussion in the fact sheet includes a summary of each provision and the agency's rationale for articulating the provision in this way.

### *B. Water Quality-Based Effluent Limits (WQBELs)*

EPA's regulations at 40 CFR 122.44(d)(1) require permitting authorities to include additional or more stringent permit requirements when necessary to achieve water quality standards. The 2012 CGP contained several provisions to protect water quality and the 2017 CGP includes those same provisions. The permit includes a narrative WQBEL requiring that discharges be controlled as necessary to meet applicable water quality standards. Failure to control discharges in a manner that meets applicable water quality standards is a violation of the permit.

In addition to the narrative WQBEL, the permit contains related provisions that act together to further protect water quality. Many of these provisions were also included in the 2012 CGP. For example, the permit requires operators to implement stormwater control measures and to take corrective action in response to any exceedance of applicable water quality standards. To provide further protection, the permit also requires more stringent site inspection frequencies and stabilization deadlines for constructions sites that discharge to sensitive waters, such as those waters that are impaired for sediment or nutrients, which are parameters typically associated with stormwater discharges from construction sites, or waters identified by a state, tribe, or EPA as requiring enhanced protection under antidegradation requirements. Additionally, EPA received CWA Section 401 certifications for the 2017 CGP. Some of these certifications include additional water quality-based conditions that are required by states, Indian country lands, and territories, that become legally binding permit limits and conditions in specific geographic areas where the permit is available.

A new water quality protection established in the 2017 CGP is a modified approach to site stabilization deadlines based on the concept of phasing construction disturbances, where sites that disturb more than five (5) acres total over the course of a construction project are required to stabilize within a more stringent timeframe if they do not limit disturbances to five (5) acres or less at any one time. This modified approach is summarized below and is discussed in more detail in the fact sheet.

### *C. Summary of Significant Permit Changes From the 2012 CGP*

The 2017 CGP includes several new or modified requirements, which are summarized below and discussed in more detail in the fact sheet. The final 2017 CGP and the fact sheet can be found at *https://www.epa.gov/npdes/stormwater-discharges-construction-activities.*

1. *Streamlining of the permit*—EPA streamlined and simplified language throughout the 2017 CGP to present requirements in a generally more clear and readable manner. This structure should enhance the operators' understanding of and compliance with the permit's requirements. For example, EPA moved language that was not necessary in the permit into the relevant appendix or to the fact sheet. Although the permit has been streamlined from prior permits, most of the requirements remain unchanged.

2. *Revisions consistent with the C&D ELG, as amended*—EPA made minor revisions to the technology-based effluent limits in the permit to incorporate the March 6, 2014 amendments to the Construction and Development Effluent Guidelines and Standards (the "C&D rule") at 40 CFR part 450 (see section III.A. of this notice on Technology-Based Effluent Limits). The 2012 CGP already incorporated the original C&D rule requirements and the 2017 CGP includes the necessary revisions to the language based on the rule amendments but does not add any new requirements. These revisions include clarifying the applicability of requirements to control erosion caused by discharges, providing additional details on areas where buffers are required, and clarifying requirements for soil stabilization, preservation of topsoil and pollution prevention measures.

3. *Authorized non-stormwater discharges*—Non-stormwater discharges of external building washdown waters containing hazardous substances, such as paint or caulk containing polychlorinated biphenyl (PCBs) are not authorized in the 2017 CGP. Non-stormwater discharges are required to comply with any applicable effluent limitation requirements in Parts 2 and 3 of the permit. Part 1.2.2.

4. *Notice of permit coverage*—Consistent with the 2012 CGP, operators must post a sign or other notice of permit coverage at a safe, publicly accessible location in close proximity to the construction site. In the 2017 CGP, this notice must also include information informing the public on how to contact EPA to obtain a copy of the SWPPP and how to contact EPA if stormwater pollution is observed in the discharge. EPA is requiring these additions to make the longstanding process of obtaining a SWPPP more readily known to the public and to improve transparency of the process to report possible violations. Part 1.5.

5. *Stockpiles and land clearing debris piles*—EPA changed the requirement for temporary stabilization for stockpiles or land clearing debris piles from "where practicable" to requiring cover or appropriate temporary stabilization for all inactive piles that will be unused for 14 or more days, consistent with the temporary stabilization deadlines in Part 2.2.14 of the 2017 CGP. EPA made this change to ensure pollutants are minimized from these piles, but is clarifying that the requirement only

applies where these piles are not actively being used. Part 2.2.5.

6. *Stabilization deadlines*—The 2017 CGP establishes a modified approach to the stabilization deadlines, which is based on the concept of phasing construction disturbances. Sites that disturb five (5) acres or less must complete stabilization within a 14-calendar day timeframe, which is the same timeframe that applied to sites in the 2012 CGP. For sites that disturb more than five (5) acres over the course of a construction project, operators can choose between completing stabilization within a 14-calendar day timeframe if they limit disturbances to five (5) acres or less at any one time, or within a 7-calendar day timeframe if they do not limit disturbances to five (5) acres or less at any one time. The intent of this approach is to provide an incentive to disturb less land at any given period of time by providing longer stabilization timeframes if the disturbance is kept below a threshold level. The deadline for sites discharging to sensitive waters remains unchanged (within 7 calendar days), and the exceptions for sites in arid, semi-arid, and drought-stricken areas and for operators affected by circumstances beyond their control also remain unchanged. Part 2.2.14.

7. *Construction and domestic waste*—The 2017 CGP requires operators to keep waste container lids closed when not in use and at the end of the business day for those containers that are actively used throughout the day, or, for waste containers that do not have lids, to provide cover or a similarly effective means to minimize the discharge of pollutants. EPA made this change to minimize the exposure of these waste materials to precipitation and stormwater, and to make the requirements for construction and domestic waste consistent with the cover requirements for most other types of materials and wastes in the CGP. Part 2.3.3.

8. *Discharge limitations for sites discharging to sensitive waters*—In order to ensure that discharges meet water quality standards, EPA added a requirement in the 2017 CGP to implement controls on sites discharging to polychlorinated biphenyl-(PCB) impaired waters to minimize the exposure of building materials containing PCBs to precipitation and stormwater. This provision applies to the demolition of structures with at least 10,000 square feet of floor space built or renovated before January 1, 1980. EPA also added a requirement to document information about the demolition location and associated pollutants in the SWPPP. Part 3.2.

9. *Notice of Intent (NOI)*—In the 2017 CGP, EPA added three questions to the NOI form (Appendix J). These questions are:

- The type of construction site (select one or more of 9 options);
- A yes/no question asking if there is demolition of a structure with at least 10,000 square feet of floor space that was built or renovated before January 1, 1980; and
- A yes/no question asking whether the predevelopment land use was used for agriculture.

## IV. Implementation Assistance

Following issuance of the 2017 CGP, EPA plans to provide further assistance to construction operators, state permitting authorities, and other interested parties on various aspects of this new permit. The following activities or documents are planned:

- *National Webcast*—EPA will host a webcast in February of 2017 that will provide an overview of the 2017 CGP and an opportunity for participants to ask questions. EPA anticipates offering more webcasts covering the same material or more specific aspects of the permit. The agency will announce details of all webcasts on the CGP Web site at *https://www.epa.gov/npdes/stormwater-discharges-construction-activities.*
- *Small Residential Lot SWPPP Template*—EPA will also be providing an updated template that small residential lot builders can use to develop a streamlined SWPPP that is consistent with the minimum requirements of the permit.
- *Inspection and Corrective Action Report Templates*—EPA will also be providing updated template forms that construction site operators can use to document inspections completed pursuant to the permit's requirements in Part 4 and in preparing corrective action reports pursuant to the permit's requirements in Part 5.

EPA will consider additional outreach to support the 2017 CGP based on the level of interest and demand.

## V. Analysis of Economic Impacts

EPA expects the economic impact on entities that will likely seek coverage under this permit, including small businesses, to be minimal. A copy of EPA's economic analysis, titled "Cost Impact Analysis for the 2017 Construction General Permit (CGP)," is available in the docket for this permit. The economic impact analysis indicates that while there may be some incremental increase in the costs of complying with the 2017 CGP over the 2012 CGP, these costs will not have a significant economic impact on a substantial number of small entities.

This analysis evaluates the cost implications of the key changes to the permit. Each change is examined in light of the 2012 CGP's requirements, where applicable. The objective of this examination is to show where or to what extent the 2017 CGP includes requirements that impose an incremental increase in costs on operators above and beyond costs that are already accounted for in the 2012 CGP, which incorporated the C&D rule and defines the baseline of costs to which operators are currently subject.

The C&D rule baseline costs estimate the cost of compliance for all construction activities required to obtain NPDES permit coverage to implement the stormwater controls required by the Effluent Limitations Guideline. While the C&D rule applies to permitted construction activities under the NPDES program nationwide, the 2017 CGP provides coverage to a sub-set of those activities in areas not covered by an approved state NPDES program, which accounts for approximately 5–6 percent of the construction stormwater permitted universe under the NPDES program.

Calculating the total cost of EPA's construction stormwater program under the 2017 CGP is challenging for several reasons. NPDES general permits, such as the CGP, are issued to no one operator in particular, with multiple operators obtaining coverage under the general permit after it is issued. Therefore, the 2017 CGP has an inherently unknown permitted universe at the time of permit issuance. EPA can estimate that approximately 25,000 operators will seek coverage under the 2017 CGP during its five-year life span, based on data from previous CGPs.

However, the total cost calculation is dependent on many other factors and assumptions that are difficult to estimate or extrapolate for the entire CGP permitted universe. Although many operators under the CGP share similar operations and discharge properties, the variables that would need to be accounted for in estimating the total cost of compliance vary widely across individual construction sites, for example, total area and duration that land is disturbed, slope, climate and precipitation patterns, soil type, topography, and previous land use. In addition, factors such as labor and material costs vary across the country. Given that EPA does not know and does not collect data on all of the specific operator characteristics necessary to make an accurate estimate, EPA is not able to estimate the total cost of

compliance with EPA's CGP at this time. EPA's practice instead is to calculate the incremental change in burden with each permit reissuance and, where applicable, provide estimates of some known costs that can be used to calculate the estimated total cost of a specific permit change.

Part 3.2 has a new requirement in the 2017 CGP for operators discharging to waters impaired for PCBs. Buildings and structures originating or remodeled between the years of 1950–1979 often contain PCBs in materials such as caulk and paint. Without proper controls, the demolition of such structures can cause PCBs to be released into the environment and discharged into waters of the U.S. during storm events. To address this concern, EPA has added a new provision that requires controls to be implemented to minimize exposure of PCB-containing building materials to precipitation and stormwater, and to ensure that such materials are disposed in compliance with applicable state, federal, and local laws. The requirement is limited to the demolition of buildings or structures with at least 10,000 square feet of floor space built or renovated before January 1, 1980 on sites that discharge to waters with known impairments for PCBs.

Over 4,500 water bodies are currently listed in the PCB-polluted category, making this the sixth-highest water pollution cause nationwide. This includes 81,610 miles of rivers and streams, 3,204,534 acres of lakes and ponds, and 400,094 square miles of bays and estuaries that are impaired for PCBs. EPA does not currently have data on the number of construction projects subject to EPA's CGP that involve demolition of a structure with at least 10,000 square feet of floor space built or renovated before January 1, 1980 on sites that discharge to waters impaired for PCBs. Therefore, at this time, EPA does not have an estimate for the number of operators that will be affected by this new requirement. However, EPA added a new question on the NOI form asking about the prevalence of demolition of a structure with at least 10,000 square feet of floor space that was built or renovated before January 1, 1980. When reissuing this permit, EPA will review the data submitted on the NOI forms as well as information on the implementation of this requirement, as necessary, to determine whether to revise the applicability of the requirement or associated cost impact analysis.

## VI. Executive Order 12866: Regulatory Planning and Review and Executive Order 13563: Improving Regulation and Regulatory Review

Under Executive Order 12866 (58 FR 51735, October 4, 1993), this action is a "significant regulatory action." Accordingly, EPA submitted this action to the Office of Management and Budget (OMB) for review under Executive Orders 12866 and 13563 (76 FR 3821, January 21, 2011) and any changes made in response to OMB recommendations have been documented in the docket for this action.

## VII. Executive Order 12898: Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations

Executive Order (EO) 12898 (59 FR 7629 (Feb. 16, 1994)) establishes federal executive policy on environmental justice. Its main provision directs federal agencies, to the greatest extent practicable and permitted by law, to make environmental justice part of their mission by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of their programs, policies, and activities on minority populations and low-income populations in the United States.

EPA has determined that the 2017 CGP will not have disproportionately high and adverse human health or environmental effects on minority or low-income populations because the requirements in the permit apply equally to all construction projects that disturb one or more acres in areas where EPA is the permitting authority, and the erosion and sediment control provisions increase the level of environmental protection for all affected populations.

## VIII. Executive Order 13175: Consultation and Coordination With Indian Tribal Governments

In compliance with Executive Order 13175, EPA consulted with tribal officials to gain an understanding of and, where necessary, address the tribal implications of the permit. In the course of this consultation, EPA conducted the following activities:

- August 5, 2015—EPA mailed notification letters to all Tribal leaders, initiating consultation and coordination on the draft 2017 CGP. The consultation period was from August 17, 2015 to October 13, 2015.
- August 11, 2015—EPA presented a brief overview of the 2012 CGP and information regarding the upcoming consultation to the National Tribal Caucus.
- August 12, 2015—EPA presented a brief overview of the 2012 CGP and information regarding the upcoming consultation to the National Tribal Water Council.
- September 22, 2015—EPA held a consultation teleconference call; 18 Tribes were represented. EPA responded to the general questions raised on the call.
- On October 14, 2015, EPA received one set of comments from a Tribe in the State of Washington. EPA evaluated and considered the comments during the finalization of the 2017 CGP; EPA responded to the formal comments submitted in writing during the comment period in the Agency's final action.
- EPA will provide email notification to Tribes of today's final 2017 CGP.

EPA also notes that as part of the finalization of 2017 CGP, it completed the Section 401 certification procedures with all applicable tribes where the 2017 CGP applies (see Appendix B).

**Authority:** Clean Water Act, 33 U.S.C. 1251 *et seq.*

Dated: January 11, 2017.

**Deborah Szaro,**

*Acting Regional Administrator, EPA Region 1.*

Dated: January 11, 2017.

**Javier Laureano,**

*Director, Clean Water Division, EPA Region 2.*

Dated: January 11, 2017.

**Jose C. Font,**

*Acting Director, Caribbean Environmental Protection Division, EPA Region 2.*

Dated: January 11, 2017.

**Dominique Lueckenhoff,**

*Acting Director, Water Protection Division, EPA Region 3.*

Dated: January 11, 2017.

**César A. Zapata,**

*Deputy Director, Water Protection Division, EPA Region 4.*

Dated: January 11, 2017.

**Christopher Korleski,**

*Director, Water Division, EPA Region 5.*

Dated: January 11, 2017.

**William K. Honker,**

*Director, Water Division, EPA Region 6.*

Dated: January 11, 2017.

**Karen Flournoy,**

*Director, Water, Wetlands, and Pesticides Division, EPA Region 7.*

Dated: January 11, 2017.

**Darcy O'Connor,**

*Assistant Regional Administrator, Office of Water Protection, EPA Region 8.*

Dated: January 11, 2017.

**Kristin Gullatt,**

*Deputy Director, Water Division, EPA Region 9.*

Dated: January 11, 2017.

**Daniel D. Opalski,**

*Director, Office of Water and Watersheds, EPA Region 10.*

[FR Doc. 2017–01231 Filed 1–18–17; 8:45 am]

BILLING CODE 6560–50–P

## ENVIRONMENTAL PROTECTION AGENCY

**[EPA–HQ–OAR–2016–0181; FRL–9958–63–OAR]**

## California State Nonroad Engine Pollution Control Standards; Evaporative Emission Standards and Test Procedures for Off-Highway Recreational Vehicles (OHRVs); Notice of Decision

**AGENCY:** Environmental Protection Agency.

**ACTION:** Notice of decision.

**SUMMARY:** The Environmental Protection Agency ("EPA") is granting the California Air Resources Board ("CARB") its request for an authorization of its amendments to its Off-Highway Recreational Vehicle regulation ("OHRV Amendments"). The OHRV Amendments establish new evaporative emission standards and test procedures for 2018 and subsequent model year OHRVs. The California OHRV category encompasses a wide variety of vehicles, including off-road motorcycles, all-terrain vehicles ("ATVs"), off-road sport and utility vehicles, sand cars, and golf carts. This decision is issued under the authority of the Clean Air Act ("CAA" or "Act").

**DATES:** Petitions for review must be filed by March 20, 2017.

**ADDRESSES:** EPA has established a docket for this action under Docket ID EPA–HQ–OAR–2016–0181. All documents relied upon in making this decision, including those submitted to EPA by CARB, are contained in the public docket. Publicly available docket materials are available either electronically through *www.regulations.gov* or in hard copy at the Air and Radiation Docket in the EPA Headquarters Library, EPA West Building, Room 3334, located at 1301 Constitution Avenue NW., Washington, DC. The Public Reading Room is open to the public on all federal government working days from 8:30 a.m. to 4:30 p.m.; generally, it is open Monday through Friday, excluding holidays. The telephone number for the Reading Room is (202) 566–1744. The Air and Radiation Docket and Information Center's Web site is *http://www.epa.gov/oar/docket.html.* The electronic mail (email) address for the Air and Radiation Docket is: *a-and-r-Docket@epa.gov,* the telephone number is (202) 566–1742, and the fax number is (202) 566–9744. An electronic version of the public docket is available through the federal government's electronic public docket and comment system. You may access EPA dockets at *http://www.regulations.gov.* After opening the *www.regulations.gov* Web site, enter EPA–HQ–OAR–2016–0181 in the "Enter Keyword or ID" fill-in box to view documents in the record. Although a part of the official docket, the public docket does not include Confidential Business Information ("CBI") or other information whose disclosure is restricted by statute.

EPA's Office of Transportation and Air Quality ("OTAQ") maintains a Web page that contains general information on its review of California waiver and authorization requests. Included on that page are links to prior waiver **Federal Register** notices, some of which are cited in today's notice. The page can be accessed at *http://www.epa.gov/otaq/cafr.htm.*

**FOR FURTHER INFORMATION CONTACT:** David Dickinson, Attorney-Advisor, Transportation Climate Division, Office of Transportation and Air Quality, U.S. Environmental Protection Agency, 1200 Pennsylvania Avenue, (6405J), NW., Washington, DC 20460. Telephone: (202) 343–9256. Fax: (202) 343–2800. Email: *Dickinson.David@epa.gov.*

## I. Background

CARB first adopted exhaust emission standards and test procedures applicable to OHRVs and the engines used in OHRVs in 1994, and EPA authorized California to enforce such standards and test procedures in 1996.[1] CARB subsequently adopted amendments to the OHRV regulation in 1996, 1999, 2003, and 2007, and EPA determined those amendments either fell within the scope of previously granted authorizations or met the criteria for a new authorization.[2]

In 2002, EPA adopted regulations that established both exhaust and evaporative emission standards for nonroad recreational vehicles and engines, including off-road motorcycles and ATVs.[3] EPA's evaporative emission standards applied to 2008 and subsequent model year nonroad recreational vehicles, and established a fuel tank permeation limit of 1.5 grams per square meter per day (g/m2/day) and a fuel hose permeation limit of 15 g/m2/day. Correspondingly, CARB's 2007 amendments to their OHRV regulation set forth, among other provisions, evaporative emission standards for new 2008 and subsequent model year OHRVs that are identical to the federal evaporative emission standards for 2008 and subsequent model year nonroad vehicles. In 2014, CARB adopted the OHRV Amendments that establish a new test procedure and evaporative emission standard of 1.0 gram per day (g/day) of total organic gas (TOG) for a 3-day diurnal period.[4]

### A. CARB's Authorization Request

In a letter dated February 26, 2016, CARB submitted to EPA its request pursuant to section 209(e) of the CAA, regarding authorization of its OHRV Amendments.[5] The CARB Board approved the OHRV Amendments on July 25, 2013 (by Resolution 13–33).[6] The OHRV Amendments were approved by California's Office of Administrative Law (OAL) on December 17, 2014 and became operative state law on April 1, 2015.

The OHRV Amendments differ from preexisting OHRV requirements because they impose a 1.0 g/day evaporative emissions standard for the complete OHRV fuel system. Previously the OHRV regulation only required fuel tanks and fuel hoses to meet specific permeation standards. The OHRV Amendments comprehensively address all potential sources of evaporative emissions, including running losses (evaporative emissions generated during vehicle operation), hot soak (evaporative emission generated directly after vehicle operation), and diurnal losses (evaporative emissions generated during long term storage). The OHRV

[1] 61 FR 69093 (December 3, 1996).

[2] 65 FR 69673 (November 20, 2000) [1996 amendments]; 79 FR 6584 (February 14, 2014) [1999, 2003, and 2007 amendments].

[3] 67 FR 68242 (November 8, 2002). The terms "off-road" and "nonroad" are used interchangeably, generally CARB uses the term off-road and EPA uses the term nonroad.

[4] CARB's regulatory text enacted by the OHRV Amendments (which EPA is authorizing by this action), is set forth in California Code of Regulations, Title 13, sections 2416, 2417, 2418, 2419, 2419.1, 2419.2, 3419.3, and 2419.4. A full description of the OHVR Amendments is found in CARB's Authorization Request Support Document, 2014 Amendments to Evaporative Emissions Control Requirements for Off Highway Recreational Vehicles, dated February 26, 2016 ("Authorization Request Support Document") at EPA–HQ–OAR–2016–0181–0002.

[5] Authorization Request Support Document.

[6] CARB Resolution 13–33, July 25, 2013, EPA–HQ–OAR–2016–0181–0006.

# Exhibit B

**National Pollutant Discharge Elimination System**
**General Permit for Discharges from**
**Construction Activities**

In compliance with the provisions of the Clean Water Act, 33 U.S.C. §1251 et. seq., (hereafter CWA), as amended by the Water Quality Act of 1987, P.L. 100-4, "operators" of construction activities (defined in Appendix A) that meet the requirements of Part 1.1 of this National Pollutant Discharge Elimination System (NPDES) general permit, are authorized to discharge pollutants in accordance with the effluent limitations and conditions set forth herein. Permit coverage is required from the "commencement of construction activities" (see Appendix A) until one of the conditions for terminating CGP coverage has been met (see Part 8.2).

This permit becomes effective on **February 16, 2017**.

This permit and the authorization to discharge expire at 11:59pm, **February 16, 2022.**

Signed and issued this 11th day of January 2017

Deborah Szaro,
Acting Regional Administrator, EPA Region 1

Signed and issued this 11th day of January 2017

Javier Laureano, Ph.D.,
Director, Clean Water Division, EPA Region 2

Signed and issued this 11th day of January 2017

Jose C. Font,
Acting Director, Caribbean Environmental Protection Division, EPA Region 2.

Signed and issued this 11th day of January 2017

Dominique Lueckenhoff,
Acting Director, Water Protection Division, EPA Region 3

Signed and issued this 11th day of January 2017

César A. Zapata,
Deputy Director, Water Protection Division, EPA Region 4

Signed and issued this 11th day of January 2017

Christopher Korleski,
Director, Water Division, EPA Region 5

Signed and issued this 11th day of January 2017

William K. Honker, P.E.,
Director, Water Division, EPA Region 6

Signed and issued this 11th day of January 2017

Karen Flournoy,
Director, Water, Wetlands, and Pesticides Division, EPA Region 7

Signed and issued this 11th day of January 2017

Darcy O'Connor,
Assistant Regional Administrator, Office of Water Protection, EPA Region 8

Signed and issued this 11th day of January 2017

Kristin Gullatt
Deputy Director, Water Division, EPA Region 9

Signed and issued this 11th day of January 2017

Daniel D. Opalski,
Director, Office of Water and Watersheds, EPA Region 10

CONTENTS

**1 How to Obtain Coverage Under the Construction General Permit (CGP) .......... 1**
1.1 Eligibility Conditions .......... 1
1.2 Types of Discharges Authorized .......... 2
1.3 Prohibited Discharges .......... 4
1.4 Submitting your Notice of Intent (NOI) .......... 4
1.5 Requirement to Post a Notice of Your Permit Coverage .......... 6
**2 Technology-Based Effluent Limitations .......... 6**
2.1 General Stormwater Control Design, Installation, and Maintenance Requirements .......... 7
2.2 Erosion and Sediment Control Requirements .......... 8
2.3 Pollution Prevention Requirements .......... 14
2.4 Construction Dewatering Requirements .......... 18
**3 Water Quality-Based Effluent Limitations .......... 18**
3.1 General Effluent Limitation to Meet Applicable Water Quality Standards .......... 18
3.2 Discharge Limitations for Sites Discharging to Sensitive Waters .......... 19
**4 Site Inspection Requirements .......... 20**
4.1 Person(s) Responsible for Inspecting Site .......... 20
4.2 Frequency of Inspections. .......... 20
4.3 Increase in Inspection Frequency for Sites Discharging to Sensitive Waters .......... 20
4.4 Reductions in Inspection Frequency .......... 21
4.5 Areas that MUST Be Inspected .......... 22
4.6 Requirements for Inspections .......... 22
4.7 Inspection Report .......... 23
4.8 Inspections By EPA .......... 23
**5 Corrective Actions .......... 24**
5.1 Conditions Triggering Corrective Action. .......... 24
5.2 Corrective Action Deadlines .......... 24
5.3 Corrective Action Required by EPA .......... 25
5.4 Corrective Action Report .......... 25
**6 Staff Training Requirements .......... 25**
**7 Stormwater Pollution Prevention Plan (SWPPP) .......... 26**
7.1 General Requirements .......... 26
7.2 SWPPP Contents .......... 26
7.3 On-Site Availability of Your SWPPP .......... 32
7.4 SWPPP Modifications .......... 33

**8 How to Terminate Coverage** ..... **33**
8.1 Minimum Information Required in NOT ..... 33
8.2 Conditions for Terminating CGP Coverage ..... 34
8.3 How to Submit Your NOT ..... 34
8.4 Deadline for Submitting the NOT ..... 34
8.5 Effective Date of Termination of Coverage ..... 35
**9 Permit Conditions Applicable to Specific States, Indian Country Lands, or Territories** ..... **35**
**Appendix A: Definitions and Acronyms** ..... **A-1**
**Appendix B: Permit Areas Eligible for Coverage and EPA Regional Addresses** ..... **B-1**
**Appendix C: Small Construction Waivers and Instructions** ..... **C-1**
**Appendix D: Eligibility Procedures Relating to Threatened & Endangered Species Protection.** **D-1**
**Appendix E: Historic Property Screening Process** ..... **E-1**
**Appendix F: List of Tier 3, Tier 2, and Tier 2.5 Waters** ..... **F-1**
**Appendix G: Buffer Requirements** ..... **G-1**
**Appendix H: 2-Year, 24-Hour Storm Frequencies** ..... **H-1**
**Appendix I: Standard Permit Conditions** ..... **I-1**
**Appendix J: Notice of Intent (NOI) Form and Instructions** ..... **J-1**
**Appendix K: Notice of Termination (NOT) Form and Instructions** ..... **K-1**
**Appendix L: Suggested Format for Request for Chemical Treatment** ..... **L-1**

# 1 HOW TO OBTAIN COVERAGE UNDER THE CONSTRUCTION GENERAL PERMIT (CGP)

To be covered under this permit, you must meet the eligibility conditions and follow the requirements for obtaining permit coverage in this Part.

## 1.1 ELIGIBILITY CONDITIONS

**1.1.1** You are an "operator" of a construction site for which discharges will be covered under this permit. For the purposes of this permit and in the context of stormwater discharges associated with construction activity, an "operator" is any party associated with a construction project that meets either of the following two criteria:

a. The party has operational control over construction plans and specifications, including the ability to make modifications to those plans and specifications *(e.g., in most cases this is the owner of the site)*; or

b. The party has day-to-day operational control of those activities at a project that are necessary to ensure compliance with the permit conditions *(e.g., they are authorized to direct workers at a site to carry out activities required by the permit; in most cases this is the general contractor (as defined in Appendix A) of the project)*.

Where there are multiple operators associated with the same project, all operators must obtain permit coverage.[1] Subcontractors generally are not considered operators for the purposes of this permit.

**1.1.2** Your site's construction activities:

a. Will disturb one or more acres of land, or will disturb less than one acre of land but are part of a common plan of development or sale that will ultimately disturb one or more acres of land; or

b. Have been designated by EPA as needing permit coverage under 40 CFR 122.26(a)(1)(v) or 40 CFR 122.26(b)(15)(ii);

**1.1.3** Your site is located in an area where EPA is the permitting authority (see Appendix B);

**1.1.4** Discharges from your site are not:

a. Already covered by a different NPDES permit for the same discharge; or

b. In the process of having coverage under a different NPDES permit for the same discharge denied, terminated, or revoked.[2, 3]

**1.1.5** You are able to demonstrate that you meet one of the criteria listed in Appendix D with respect to the protection of species that are federally listed as endangered or threatened under the Endangered Species Act (ESA) and federally designated critical habitat;

---

[1] If the operator of a "construction support activity" (see Part 1.2.1c) is different than the operator of the main site, that operator must also obtain permit coverage. See Part 7.1 for clarification on the sharing of liability between and among operators on the same site and for conditions that apply to developing a SWPPP for multiple operators associated with the same site.

[2] Parts 1.1.4a and 1.1.4b do not include sites currently covered under the 2012 CGP that are in the process of obtaining coverage under this permit, nor sites covered under this permit that are transferring coverage to a different operator.

[3] Notwithstanding a site being made ineligible for coverage under this permit because it falls under the description of Parts 1.1.4a or 1.1.4b, above, EPA may waive the applicable eligibility requirement after specific review if it determines that coverage under this permit is appropriate.

**1.1.6** You have completed the screening process in Appendix E relating to the protection of historic properties; and

**1.1.7** You have complied with all requirements in Part 9 imposed by the applicable state, Indian tribe, or territory in which your construction activities and/or discharge will occur.

**1.1.8** For "new sources" (as defined in Appendix A) only:

a. EPA has not, prior to authorization under this permit, determined that discharges from your site will cause, have the reasonable potential to cause, or contribute to an excursion above any applicable water quality standard. Where such a determination is made prior to authorization, EPA may notify you that an individual permit application is necessary. However, EPA may authorize your coverage under this permit after you have included appropriate controls and implementation procedures designed to bring your discharge into compliance with this permit, specifically the requirement to meet water quality standards. In the absence of information demonstrating otherwise, EPA expects that compliance with the requirements of this permit, including the requirements applicable to such discharges in Part 3, will result in discharges that will not cause, have the reasonable potential to cause, or contribute to an excursion above any applicable water quality standard.

b. Discharges from your site to a Tier 2, Tier 2.5, or Tier 3 water[4] will not lower the water quality of the applicable water. In the absence of information demonstrating otherwise, EPA expects that compliance with the requirements of this permit, including the requirements applicable to such discharges in Part 3.2, will result in discharges that will not lower the water quality of such waters.

**1.1.9** If you plan to add "cationic treatment chemicals" (as defined in Appendix A) to stormwater and/or authorized non-stormwater prior to discharge, you may not submit your Notice of Intent (NOI) unless and until you notify your applicable EPA Regional Office (see Appendix L) in advance and the EPA Regional Office authorizes coverage under this permit after you have included appropriate controls and implementation procedures designed to ensure that your use of cationic treatment chemicals will not lead to discharges that cause an exceedance of water quality standards.

## 1.2 TYPES OF DISCHARGES AUTHORIZED[5]

**1.2.1** The following stormwater discharges are authorized under this permit provided that appropriate stormwater controls are designed, installed, and maintained (see Parts 2 and 3):

a. Stormwater discharges, including stormwater runoff, snowmelt runoff, and surface runoff and drainage, associated with construction activity under 40 CFR 122.26(b)(14) or 122.26(b)(15)(i);

[4] Note: Your site will be considered to discharge to a Tier 2, Tier 2.5, or Tier 3 water if the first water to which you discharge is identified by a state, tribe, or EPA as a Tier 2, Tier 2.5, or Tier 3 water. For discharges that enter a storm sewer system prior to discharge, the first water of the U.S. to which you discharge is the waterbody that receives the stormwater discharge from the storm sewer system. See list of Tier 2, Tier 2.5, and Tier 3 waters in Appendix F.

[5] See "Discharge" as defined in Appendix A. Note: Any discharges not expressly authorized in this permit cannot become authorized or shielded from liability under CWA section 402(k) by disclosure to EPA, state, or local authorities after issuance of this permit via any means, including the Notice of Intent (NOI) to be covered by the permit, the SWPPP, or during an inspection.

b. Stormwater discharges designated by EPA as needing a permit under 40 CFR 122.26(a)(1)(v) or 122.26(b)(15)(ii);

c. Stormwater discharges from construction support activities *(e.g., concrete or asphalt batch plants, equipment staging yards, material storage areas, excavated material disposal areas, borrow areas)* provided that:

   i. The support activity is directly related to the construction site required to have permit coverage for stormwater discharges;

   ii. The support activity is not a commercial operation, nor does it serve multiple unrelated construction sites;

   iii. The support activity does not continue to operate beyond the completion of the construction activity at the site it supports; and

   iv. Stormwater controls are implemented in accordance with Part 2 and Part 3 for discharges from the support activity areas.

d. Stormwater discharges from earth-disturbing activities associated with the construction of staging areas and the construction of access roads conducted prior to active mining.

**1.2.2** The following non-stormwater discharges associated with your construction activity are authorized under this permit provided that, with the exception of water used to control dust and to irrigate vegetation in stabilized areas, these discharges are not routed to areas of exposed soil on your site and you comply with any applicable requirements for these discharges in Parts 2 and 3:

a. Discharges from emergency fire-fighting activities;

b. Fire hydrant flushings;

c. Landscape irrigation;

d. Water used to wash vehicles and equipment, provided that there is no discharge of soaps, solvents, or detergents used for such purposes;

e. Water used to control dust;

f. Potable water including uncontaminated water line flushings;

g. External building washdown, provided soaps, solvents, and detergents are not used, and external surfaces do not contain hazardous substances (as defined in Appendix A) *(e.g., paint or caulk containing polychlorinated biphenyls (PCBs))*;

h. Pavement wash waters, provided spills or leaks of toxic or hazardous substances have not occurred (unless all spill material has been removed) and where soaps, solvents, and detergents are not used. You are prohibited from directing pavement wash waters directly into any water of the U.S., storm drain inlet, or stormwater conveyance, unless the conveyance is connected to a sediment basin, sediment trap, or similarly effective control;

i. Uncontaminated air conditioning or compressor condensate;

j. Uncontaminated, non-turbid discharges of ground water or spring water;

k. Foundation or footing drains where flows are not contaminated with process materials such as solvents or contaminated ground water; and

l. Construction dewatering water discharged in accordance with Part 2.4.

**1.2.3** Also authorized under this permit are discharges of stormwater listed above in Part 1.2.1, or authorized non-stormwater discharges listed above in Part 1.2.2, commingled with a discharge authorized by a different NPDES permit and/or a discharge that does not require NPDES permit authorization.

## 1.3 PROHIBITED DISCHARGES[6]

**1.3.1** Wastewater from washout of concrete, unless managed by an appropriate control as described in Part 2.3.4;

**1.3.2** Wastewater from washout and cleanout of stucco, paint, form release oils, curing compounds, and other construction materials;

**1.3.3** Fuels, oils, or other pollutants used in vehicle and equipment operation and maintenance;

**1.3.4** Soaps, solvents, or detergents used in vehicle and equipment washing or external building washdown; and

**1.3.5** Toxic or hazardous substances from a spill or other release.

To prevent the above-listed prohibited non-stormwater discharges, operators must comply with the applicable pollution prevention requirements in Part 2.3.

## 1.4 SUBMITTING YOUR NOTICE OF INTENT (NOI)

All "operators" (as defined in Appendix A) associated with your construction site, who meet the Part 1.1 eligibility requirements, and who seek coverage under this permit, must submit to EPA a complete and accurate NOI in accordance with the deadlines in **Table 1** prior to commencing construction activities.

**Exception:** If you are conducting construction activities in response to a public emergency *(e.g., mud slides, earthquake, extreme flooding conditions, widespread disruption in essential public services)*, and the related work requires immediate authorization to avoid imminent endangerment to human health, public safety, or the environment, or to reestablish essential public services, you may discharge on the condition that a complete and accurate NOI is submitted within 30 calendar days after commencing construction activities (see Table 1) establishing that you are eligible for coverage under this permit. You must also provide documentation in your Stormwater Pollution Prevention Plan (SWPPP) to substantiate the occurrence of the public emergency.

### 1.4.1 Prerequisite for Submitting Your NOI

You must develop a SWPPP consistent with Part 7 before submitting your NOI for coverage under this permit.

### 1.4.2 How to Submit Your NOI

You must use EPA's NPDES eReporting Tool (NeT) to electronically prepare and submit your NOI for coverage under the 2017 CGP, unless you received a waiver from your EPA Regional Office.

To access NeT, go to https://www.epa.gov/npdes/stormwater-discharges-construction-activities#ereporting.

[6] EPA includes these prohibited non-stormwater discharges here as a reminder to the operator that the only non-stormwater discharges authorized by this permit are at Part 1.2.2. Any unauthorized non-stormwater discharges must be covered under an individual permit or alternative general permit.

Waivers from electronic reporting may be granted based on one of the following conditions:

a. If your operational headquarters is physically located in a geographic area (*i.e., ZIP code or census tract*) that is identified as under-served for broadband Internet access in the most recent report from the Federal Communications Commission; or

b. If you have limitations regarding available computer access or computer capability.

If the EPA Regional Office grants you approval to use a paper NOI, and you elect to use it, you must complete the form in Appendix J.

### 1.4.3 Deadlines for Submitting Your NOI and Your Official Date of Permit Coverage

Table 1 provides the deadlines for submitting your NOI and the official start date of your permit coverage, which differ depending on when you commence construction activities.

***Table 1 NOI Submittal Deadlines and Official Start Date for Permit Coverage.***

| Type of Operator | NOI Submittal Deadline[7] | Permit Authorization Date[8] |
|---|---|---|
| **Operator of a new site** (*i.e., a site where construction activities commence on or after February 16, 2017*) | At least 14 calendar days before commencing construction activities. | 14 calendar days after EPA notifies you that it has received a complete NOI, unless EPA notifies you that your authorization is delayed or denied. |
| **Operator of an existing site** (*i.e., a site with 2012 CGP coverage where construction activities commenced prior to February 16, 2017*) | No later than **May 17, 2017**. | |
| **New operator of a permitted site** (*i.e., an operator that through transfer of ownership and/or operation replaces the operator of an already permitted construction site that is either a "new site" or an "existing site"*) | At least 14 calendar days before the date the transfer to the new operator will take place. | |
| **Operator of an "emergency-related project"** (*i.e., a project initiated in response to a public emergency (e.g., mud slides, earthquake, extreme flooding conditions, disruption in essential public services), for which the related work requires immediate authorization to avoid imminent endangerment to human health or the environment, or to reestablish essential public services*) | No later than 30 calendar days after commencing construction activities. | You are considered provisionally covered under the terms and conditions of this permit immediately, and fully covered 14 calendar days after EPA notifies you that it has received a complete NOI, unless EPA notifies you that your authorization is delayed or denied. |

[7] If you miss the deadline to submit your NOI, any and all discharges from your construction activities will continue to be unauthorized under the CWA until they are covered by this or a different NPDES permit. EPA may take enforcement action for any unpermitted discharges that occur between the commencement of construction activities and discharge authorization.

[8] Discharges are not authorized if your NOI is incomplete or inaccurate or if you are not eligible for permit coverage.

### 1.4.4 Modifying your NOI

If after submitting your NOI you need to correct or update any fields, you may do so by submitting a "Change NOI" form using NeT. Waivers from electronic reporting may be granted as specified in Part 1.4.1. If the EPA Regional Office has granted you approval to submit a paper NOI modification, you may indicate any NOI changes on the same NOI form in Appendix J.

When there is a change to the site's operator, the new operator must submit a new NOI, and the previous operator must submit a Notice of Termination (NOT) form as specified in Part 8.3.

### 1.4.5 Your Official End Date of Permit Coverage

Once covered under this permit, your coverage will last until the date that:

a. You terminate permit coverage consistent with Part 8; or

b. You receive permit coverage under a different NPDES permit or a reissued or replacement version of this permit after expiring on February 16, 2022; or

c. You fail to submit an NOI for coverage under a revised or replacement version of this permit before the deadline for existing construction sites where construction activities continue after this permit has expired.

## 1.5 REQUIREMENT TO POST A NOTICE OF YOUR PERMIT COVERAGE

You must post a sign or other notice of your permit coverage at a safe, publicly accessible location in close proximity to the construction site. The notice must be located so that it is visible from the public road that is nearest to the active part of the construction site, and it must use a font large enough to be readily viewed from a public right-of-way.[9] At a minimum, the notice must include:

a. The NPDES ID (*i.e., permit tracking number assigned to your NOI*);

b. A contact name and phone number for obtaining additional construction site information;

c. The Uniform Resource Locator (URL) for the SWPPP (if available), or the following statement: "If you would like to obtain a copy of the Stormwater Pollution Prevention Plan (SWPPP) for this site, contact the EPA Regional Office at [*include the appropriate CGP Regional Office contact information found at https://www.epa.gov/npdes/contact-us-stormwater#regional*];" and

d. The following statement "If you observe indicators of stormwater pollutants in the discharge or in the receiving waterbody, contact the EPA through the following website: https://www.epa.gov/enforcement/report-environmental-violations."

# 2 TECHNOLOGY-BASED EFFLUENT LIMITATIONS

You must comply with the following technology-based effluent limitations in this Part for all authorized discharges.[10]

[9] If the active part of the construction site is not visible from a public road, then place the notice of permit coverage in a position that is visible from the nearest public road and as close as possible to the construction site.

[10] For each of the effluent limits in Part 2, as applicable to your site, you must include in your SWPPP (1) a

## 2.1 GENERAL STORMWATER CONTROL DESIGN, INSTALLATION, AND MAINTENANCE REQUIREMENTS

You must design, install, and maintain stormwater controls required in Parts 2.2 and 2.3 to minimize the discharge of pollutants in stormwater from construction activities. To meet this requirement, you must:

**2.1.1 Account for the following factors in designing your stormwater controls:**

a. The expected amount, frequency, intensity, and duration of precipitation;

b. The nature of stormwater runoff and run-on at the site, including factors such as expected flow from impervious surfaces, slopes, and site drainage features. You must design stormwater controls to control stormwater volume, velocity, and peak flow rates to minimize discharges of pollutants in stormwater and to minimize channel and streambank erosion and scour in the immediate vicinity of discharge points; and

c. The soil type and range of soil particle sizes expected to be present on the site.

**2.1.2 Design and install all stormwater controls in accordance with good engineering practices, including applicable design specifications.**[11]

**2.1.3 Complete installation of stormwater controls by the time each phase of construction activities has begun.**

a. By the time construction activity in any given portion of the site begins, install and make operational any downgradient sediment controls (*e.g., buffers, perimeter controls, exit point controls, storm drain inlet protection*) that control discharges from the initial site clearing, grading, excavating, and other earth-disturbing activities.[12]

b. Following the installation of these initial controls, install and make operational all stormwater controls needed to control discharges prior to subsequent earth-disturbing activities.

**2.1.4 Ensure that all stormwater controls are maintained and remain in effective operating condition during permit coverage and are protected from activities that would reduce their effectiveness.**

a. Comply with any specific maintenance requirements for the stormwater controls listed in this permit, as well as any recommended by the manufacturer.[13]

---

description of the specific control(s) to be implemented to meet the effluent limit; (2) any applicable design specifications; (3) routine maintenance specifications; and (4) the projected schedule for its (their) installation/implementation. See Part 7.2.6.

[11] Design specifications may be found in manufacturer specifications and/or in applicable erosion and sediment control manuals or ordinances. Any departures from such specifications must reflect good engineering practices and must be explained in your SWPPP. You must also comply with any additional design and installation requirements specified for the effluent limits in Parts 2.2 and 2.3.

[12] Note that the requirement to install stormwater controls prior to each phase of construction activities for the site does not apply to the earth disturbance associated with the actual installation of these controls. Operators should take all reasonable actions to minimize the discharges of pollutants during the installation of stormwater controls.

[13] Any departures from such maintenance recommendations made by the manufacturer must reflect good engineering practices and must be explained in your SWPPP.

b. If at any time you find that a stormwater control needs routine maintenance, you must immediately initiate the needed maintenance work, and complete such work by the close of the next business day.

c. If at any time you find that a stormwater control needs repair or replacement, you must comply with the corrective action requirements in Part 5.

## 2.2 EROSION AND SEDIMENT CONTROL REQUIREMENTS

You must implement erosion and sediment controls in accordance with the following requirements to minimize the discharge of pollutants in stormwater from construction activities.

### 2.2.1 Provide and maintain natural buffers and/or equivalent erosion and sediment controls when a water of the U.S. is located within 50 feet of the site's earth disturbances.

a. **Compliance Alternatives.** For any discharges to waters of the U.S. located within 50 feet of your site's earth disturbances, you must comply with one of the following alternatives:

i. Provide and maintain a 50-foot undisturbed natural buffer; or

ii. Provide and maintain an undisturbed natural buffer that is less than 50 feet and is supplemented by erosion and sediment controls that achieve, in combination, the sediment load reduction equivalent to a 50-foot undisturbed natural buffer; or

iii. If infeasible to provide and maintain an undisturbed natural buffer of any size, implement erosion and sediment controls to achieve the sediment load reduction equivalent to a 50-foot undisturbed natural buffer.

See Appendix G, Part G.2 for additional conditions applicable to each compliance alternative.

b. **Exceptions.** See Appendix G, Part G.2 for exceptions to the compliance alternatives.

### 2.2.2 Direct stormwater to vegetated areas and maximize stormwater infiltration and filtering to reduce pollutant discharges, unless infeasible.

### 2.2.3 Install sediment controls along any perimeter areas of the site that will receive pollutant discharges.[14]

a. Remove sediment before it has accumulated to one-half of the above-ground height of any perimeter control.

b. **Exception.** For areas at "linear construction sites" (as defined in Appendix A) where perimeter controls are infeasible *(e.g., due to a limited or restricted right-of-way)*, implement other practices as necessary to minimize pollutant discharges to perimeter areas of the site.

### 2.2.4 Minimize sediment track-out.

a. Restrict vehicle use to properly designated exit points;

b. Use appropriate stabilization techniques[15] at all points that exit onto paved roads.

[14] Examples of perimeter controls include filter berms, silt fences, vegetative strips, and temporary diversion dikes.

[15] Examples of appropriate stabilization techniques include the use of aggregate stone with an underlying geotextile or non-woven filter fabric, and turf mats.

i. **Exception**: Stabilization is not required for exit points at linear utility construction sites that are used only episodically and for very short durations over the life of the project, provided other exit point controls[16] are implemented to minimize sediment track-out;

c. Implement additional track-out controls[17] as necessary to ensure that sediment removal occurs prior to vehicle exit; and

d. Where sediment has been tracked-out from your site onto paved roads, sidewalks, or other paved areas outside of your site, remove the deposited sediment by the end of the same business day in which the track-out occurs or by the end of the next business day if track-out occurs on a non-business day. Remove the track-out by sweeping, shoveling, or vacuuming these surfaces, or by using other similarly effective means of sediment removal. You are prohibited from hosing or sweeping tracked-out sediment into any stormwater conveyance, storm drain inlet, or water of the U.S.[18]

**2.2.5 Manage stockpiles or land clearing debris piles composed, in whole or in part, of sediment and/or soil:**

a. Locate the piles outside of any natural buffers established under Part 2.2.1 and away from any stormwater conveyances, drain inlets, and areas where stormwater flow is concentrated;

b. Install a sediment barrier along all downgradient perimeter areas;[19]

c. For piles that will be unused for 14 or more days, provide cover[20] or appropriate temporary stabilization (consistent with Part 2.2.14);

d. You are prohibited from hosing down or sweeping soil or sediment accumulated on pavement or other impervious surfaces into any stormwater conveyance, storm drain inlet, or water of the U.S.

**2.2.6 Minimize dust.** On areas of exposed soil, minimize the generation of dust through the appropriate application of water or other dust suppression techniques.

**2.2.7 Minimize steep slope disturbances.** Minimize the disturbance of "steep slopes" (as defined in Appendix A).

---

[16] Examples of other exit point controls include preventing the use of exit points during wet periods; minimizing exit point use by keeping vehicles on site to the extent possible; limiting exit point size to the width needed for vehicle and equipment usage; using scarifying and compaction techniques on the soil; and avoiding establishing exit points in environmentally sensitive areas (*e.g., karst areas; steep slopes).*

[17] Examples of additional track-out controls include the use of wheel washing, rumble strips, and rattle plates.

[18] Fine grains that remain visible *(i.e., staining)* on the surfaces of off-site streets, other paved areas, and sidewalks after you have implemented sediment removal practices are not a violation of Part 2.2.4.

[19] Examples of sediment barriers include berms, dikes, fiber rolls, silt fences, sandbags, gravel bags, or straw bale.

[20] Examples of cover include tarps, blown straw and hydroseeding.

**2.2.8 Preserve native topsoil, unless infeasible.**[21]

**2.2.9 Minimize soil compaction.**[22] In areas of your site where final vegetative stabilization will occur or where infiltration practices will be installed:

a. Restrict vehicle and equipment use in these locations to avoid soil compaction; and

b. Before seeding or planting areas of exposed soil that have been compacted, use techniques that rehabilitate and condition the soils as necessary to support vegetative growth.

**2.2.10 Protect storm drain inlets.**

a. Install inlet protection measures that remove sediment from discharges prior to entry into any storm drain inlet that carries stormwater flow from your site to a water of the U.S., provided you have authority to access the storm drain inlet;[23] and

b. Clean, or remove and replace, the protection measures as sediment accumulates, the filter becomes clogged, and/or performance is compromised. Where there is evidence of sediment accumulation adjacent to the inlet protection measure, remove the deposited sediment by the end of the same business day in which it is found or by the end of the following business day if removal by the same business day is not feasible.

**2.2.11 Minimize erosion of stormwater conveyance channels and their embankments, outlets, adjacent streambanks, slopes, and downstream waters.** Use erosion controls and velocity dissipation devices[24] within and along the length of any stormwater conveyance channel and at any outlet to slow down runoff to minimize erosion.

**2.2.12 If you install a sediment basin or similar impoundment:**

a. Situate the basin or impoundment outside of any water of the U.S. and any natural buffers established under Part 2.2.1;

b. Design the basin or impoundment to avoid collecting water from wetlands;

c. Design the basin or impoundment to provide storage for either:

i. The calculated volume of runoff from a 2-year, 24-hour storm (see Appendix H); or

ii. 3,600 cubic feet per acre drained.

---

[21] Stockpiling topsoil at off-site locations, or transferring topsoil to other locations, is an example of a practice that is consistent with the requirements in Part 2.2.8. Preserving native topsoil is not required where the intended function of a specific area of the site dictates that the topsoil be disturbed or removed. For example, some sites may be designed to be highly impervious after construction, and therefore little or no vegetation is intended to remain, or may not have space to stockpile native topsoil on site for later use, in which case, it may not be feasible to preserve topsoil.

[22] Minimizing soil compaction is not required where the intended function of a specific area of the site dictates that it be compacted.

[23] Inlet protection measures can be removed in the event of flood conditions or to prevent erosion.

[24] Examples of velocity dissipation devices include check dams, sediment traps, riprap, and grouted riprap at outlets.

d. Utilize outlet structures that withdraw water from the surface of the sediment basin or similar impoundment, unless infeasible;[25]

e. Use erosion controls and velocity dissipation devices to prevent erosion at inlets and outlets; and

f. Remove accumulated sediment to maintain at least one-half of the design capacity and conduct all other appropriate maintenance to ensure the basin or impoundment remains in effective operating condition.

**2.2.13 If using treatment chemicals** (*e.g., polymers, flocculants, coagulants*):

a. **Use conventional erosion and sediment controls before and after the application of treatment chemicals.** Chemicals may only be applied where treated stormwater is directed to a sediment control *(e.g., sediment basin, perimeter control)* before discharge.

b. **Select appropriate treatment chemicals.** Chemicals must be appropriately suited to the types of soils likely to be exposed during construction and present in the discharges being treated *(i.e., the expected turbidity, pH, and flow rate of stormwater flowing into the chemical treatment system or area)*.

c. **Minimize discharge risk from stored chemicals.** Store all treatment chemicals in leak-proof containers that are kept under storm-resistant cover and surrounded by secondary containment structures *(e.g., spill berms, decks, spill containment pallets)*, or provide equivalent measures designed and maintained to minimize the potential discharge of treatment chemicals in stormwater or by any other means *(e.g., storing chemicals in a covered area, having a spill kit available on site and ensuring personnel are available to respond expeditiously in the event of a leak or spill)*.

d. **Comply with state/local requirements.** Comply with applicable state and local requirements regarding the use of treatment chemicals.

e. **Use chemicals in accordance with good engineering practices and specifications of the chemical provider/supplier.** Use treatment chemicals and chemical treatment systems in accordance with good engineering practices, and with dosing specifications and sediment removal design specifications provided by the provider/supplier of the applicable chemicals, or document in your SWPPP specific departures from these specifications and how they reflect good engineering practice.

f. **Ensure proper training.** Ensure that all persons who handle and use treatment chemicals at the construction site are provided with appropriate, product-specific training. Among other things, the training must cover proper dosing requirements.

g. **Perform additional measures specified by the EPA Regional Office for the authorized use of cationic chemicals.** If you have been authorized to use cationic chemicals at your site pursuant to Part 1.1.9, you must perform all additional measures as conditioned by your authorization to ensure that the use of such chemicals will not cause an exceedance of water quality standards.

[25] The circumstances in which it is infeasible to design outlet structures in this manner are rare. Exceptions may include areas with extended cold weather, where using surface outlets may not be feasible during certain time periods (although they must be used during other periods). If you determine that it is infeasible to meet this requirement, you must provide documentation in your SWPPP to support your determination, including the specific conditions or time periods when this exception will apply.

**2.2.14 Stabilize exposed portions of the site.** Implement and maintain stabilization measures (*e.g., seeding protected by erosion controls until vegetation is established, sodding, mulching, erosion control blankets, hydromulch, gravel*) that minimize erosion from exposed portions of the site in accordance with Parts 2.2.14a and 2.2.14b.

a. **Stabilization Deadlines:**[26]

| Total Amount of Land Disturbance Occurring At Any One Time[27] | Deadline |
|---|---|
| i. **Five acres or less (≤5.0)**<br>**Note: this includes sites disturbing more than five acres (>5.0) total over the course of a project, but that limit disturbance at any one time *(i.e., phase the disturbance)* to five acres or less (≤5.0)** | • Initiate the installation of stabilization measures immediately[28] in any areas of exposed soil where construction activities have permanently ceased or will be temporarily inactive for 14 or more calendar days;[29] and<br>• Complete the installation of stabilization measures as soon as practicable, but no later than 14 calendar days after stabilization has been initiated.[30] |

[26] EPA may determine, based on an inspection carried out under Part 4.8 and corrective actions required under Part 5.3, that the level of sediment discharge on the site makes it necessary to require a faster schedule for completing stabilization. For instance, if sediment discharges from an area of exposed soil that is required to be stabilized are compromising the performance of existing stormwater controls, EPA may require stabilization to correct this problem.

[27] Limiting disturbances to five (5) acres or less at any one time means that at no time during the project do the cumulative earth disturbances exceed five (5) acres. The following examples would qualify as limiting disturbances at any one time to five (5) acres or less:

1. The total area of disturbance for a project is five (5) acres or less.
2. The total area of disturbance for a project will exceed five (5) acres, but the operator ensures that no more than five (5) acres will be disturbed at any one time through implementation of stabilization measures. In this way, site stabilization can be used to "free up" land that can be disturbed without exceeding the five (5)-acre cap to qualify for the 14-day stabilization deadline. For instance, if an operator completes stabilization of two (2) acres of land on a five (5)-acre disturbance, then two (2) additional acres could be disturbed while still qualifying for the longer 14-day stabilization deadline.

[28] The following are examples of activities that would constitute the immediate initiation of stabilization:

1. Prepping the soil for vegetative or non-vegetative stabilization as long as seeding, planting, and/or installation of non-vegetative stabilization products takes place as soon as practicable, but no later than one (1) calendar day of completing soil preparation;
2. Applying mulch or other non-vegetative product to the exposed area;
3. Seeding or planting the exposed area;
4. Starting any of the activities in # 1 – 3 on a portion of the entire area that will be stabilized; and
5. Finalizing arrangements to have stabilization product fully installed in compliance with the deadlines for completing stabilization.

[29] The requirement to initiate stabilization immediately is triggered as soon as you know that construction work on a portion of the site is temporarily ceased and will not resume for 14 or more days, or as soon as you know that construction work is permanently ceased. In the context of this provision, "immediately" means as soon as practicable, but no later than the end of the next business day, following the day when the construction activities have temporarily or permanently ceased.

[30] If vegetative stabilization measures are being implemented, stabilization is considered "installed" when all activities necessary to seed or plant the area are completed. If non-vegetative stabilization measures are being implemented, stabilization is considered "installed" when all such measures are implemented or applied.

| | |
|---|---|
| ii. **More than five acres (>5.0)** | • Initiate the installation of stabilization measures immediately[31] in any areas of exposed soil where construction activities have permanently ceased or will be temporarily inactive for 14 or more calendar days;[32] and<br>• Complete the installation of stabilization measures as soon as practicable, but no later than seven (7) calendar days after stabilization has been initiated.[33] |

iii. **Exceptions:**

**(a) Arid, semi-arid, and drought-stricken areas** (as defined in Appendix A). If it is the seasonally dry period or a period in which drought is occurring, and vegetative stabilization measures are being used:

(i) Immediately initiate and, within 14 calendar days of a temporary or permanent cessation of work in any portion of your site, complete the installation of temporary non-vegetative stabilization measures to the extent necessary to prevent erosion;

(ii) As soon as practicable, given conditions or circumstances on the site, complete all activities necessary to seed or plant the area to be stabilized; and

(iii) If construction is occurring during the seasonally dry period, indicate in your SWPPP the beginning and ending dates of the seasonally dry period and your site conditions. Also include the schedule you will follow for initiating and completing vegetative stabilization.

**(b) Operators that are affected by unforeseen circumstances[34] that delay the initiation and/or completion of vegetative stabilization:**

(i) Immediately initiate and, within 14 calendar days, complete the installation of temporary non-vegetative stabilization measures to prevent erosion;

(ii) Complete all soil conditioning, seeding, watering or irrigation installation, mulching, and other required activities related to the planting and initial establishment of vegetation as soon as conditions or circumstances allow it on your site; and

(iii) Document in the SWPPP the circumstances that prevent you from meeting the deadlines in Part 2.2.14a and the schedule you will follow for initiating and completing stabilization.

**(c) Discharges to a sediment- or nutrient-impaired water or to a water that is identified by your state, tribe, or EPA as Tier 2, Tier 2.5, or Tier 3 for antidegradation purposes.** Complete stabilization as soon as

[31] See footnote 27

[32] See footnote 28

[33] See footnote 29

[34] Examples include problems with the supply of seed stock or with the availability of specialized equipment and unsuitability of soil conditions due to excessive precipitation and/or flooding.

practicable, but no later than seven (7) calendar days after stabilization has been initiated.

b. **Final Stabilization Criteria** (for any areas not covered by permanent structures):

i. Establish uniform, perennial vegetation *(i.e., evenly distributed, without large bare areas)* that provides 70 percent or more of the cover that is provided by vegetation native to local undisturbed areas; and/or

ii. Implement permanent non-vegetative stabilization measures[35] to provide effective cover.

iii. **Exceptions:**

**(a)** **Arid, semi-arid, and drought-stricken areas** (as defined in Appendix A). Final stabilization is met if the area has been seeded or planted to establish vegetation that provides 70 percent or more of the cover that is provided by vegetation native to local undisturbed areas within three (3) years and, to the extent necessary to prevent erosion on the seeded or planted area, non-vegetative erosion controls have been applied that provide cover for at least three years without active maintenance.

**(b)** **Disturbed areas on agricultural land that are restored to their preconstruction agricultural use.** The Part 2.2.14b final stabilization criteria does not apply.

***(c)*** **Areas that need to remain disturbed.** In limited circumstances, stabilization may not be required if the intended function of a specific area of the site necessitates that it remain disturbed, and only the minimum area needed remains disturbed *(e.g., dirt access roads, utility pole pads, areas being used for storage of vehicles, equipment, materials)*.

## 2.3 POLLUTION PREVENTION REQUIREMENTS[36]

You must implement pollution prevention controls in accordance with the following requirements to minimize the discharge of pollutants in stormwater and to prevent the discharge of pollutants from spilled or leaked materials from construction activities.

### 2.3.1 For equipment and vehicle fueling and maintenance:

a. Provide an effective means of eliminating the discharge of spilled or leaked chemicals, including fuels and oils, from these activities;[37]

---

[35] Examples of permanent non-vegetative stabilization measures include riprap, gravel, gabions, and geotextiles.

[36] Under this permit, you are not required to minimize exposure for any products or materials where the exposure to precipitation and to stormwater will not result in a discharge of pollutants, or where exposure of a specific material or product poses little risk of stormwater contamination (such as final products and materials intended for outdoor use).

[37] Examples of effective means include:

- Locating activities away from waters of the U.S. and stormwater inlets or conveyances so that stormwater coming into contact with these activities cannot reach waters of the U.S.;
- Providing secondary containment (*e.g., spill berms, decks, spill containment pallets*) and cover where appropriate; and
- Having a spill kit available on site and ensuring personnel are available to respond expeditiously in the event of a leak or spill.

b. If applicable, comply with the Spill Prevention Control and Countermeasures (SPCC) requirements in 40 CFR part 112 and Section 311 of the CWA;

c. Ensure adequate supplies are available at all times to handle spills, leaks, and disposal of used liquids;

d. Use drip pans and absorbents under or around leaky vehicles;

e. Dispose of or recycle oil and oily wastes in accordance with other federal, state, tribal, or local requirements; and

f. Clean up spills or contaminated surfaces immediately, using dry clean up measures (do not clean contaminated surfaces by hosing the area down), and eliminate the source of the spill to prevent a discharge or a continuation of an ongoing discharge.

**2.3.2 For equipment and vehicle washing:**

a. Provide an effective means of minimizing the discharge of pollutants from equipment and vehicle washing, wheel wash water, and other types of wash waters;[38]

b. Ensure there is no discharge of soaps, solvents, or detergents in equipment and vehicle wash water; and

c. For storage of soaps, detergents, or solvents, provide either (1) cover *(e.g., plastic sheeting, temporary roofs)* to minimize the exposure of these detergents to precipitation and to stormwater, or (2) a similarly effective means designed to minimize the discharge of pollutants from these areas.

**2.3.3 For storage, handling, and disposal of building products, materials, and wastes:**

a. *For building materials and building products*[39], provide either (1) cover (*e.g., plastic sheeting, temporary roofs*) to minimize the exposure of these products to precipitation and to stormwater, or (2) a similarly effective means designed to minimize the discharge of pollutants from these areas.

b. *For pesticides, herbicides, insecticides, fertilizers, and landscape materials*:

   i. In storage areas, provide either (1) cover (*e.g., plastic sheeting, temporary roofs*) to minimize the exposure of these chemicals to precipitation and to stormwater, or (2) a similarly effective means designed to minimize the discharge of pollutants from these areas; and

   ii. Comply with all application and disposal requirements included on the registered pesticide, herbicide, insecticide, and fertilizer label (see also Part 2.3.5).

c. *For diesel fuel, oil, hydraulic fluids, other petroleum products, and other chemicals*:

   i. Store chemicals in water-tight containers, and provide either (1) cover *(e.g., plastic sheeting, temporary roofs)* to minimize the exposure of these containers to precipitation and to stormwater, or (2) a similarly effective means designed to minimize the discharge of pollutants from these areas *(e.g., having a spill kit available on site and ensuring personnel are available to respond expeditiously in*

[38] Examples of effective means include locating activities away from waters of the U.S. and stormwater inlets or conveyances and directing wash waters to a sediment basin or sediment trap, using filtration devices, such as filter bags or sand filters, or using other similarly effective controls.

[39] Examples of building materials and building products typically present at construction sites include asphalt sealants, copper flashing, roofing materials, adhesives, concrete admixtures, and gravel and mulch stockpiles.

*the event of a leak or spill)*, or provide secondary containment *(e.g., spill berms, decks, spill containment pallets)*; and

ii. Clean up spills immediately, using dry clean-up methods where possible, and dispose of used materials properly. You are prohibited from hosing the area down to clean surfaces or spills. Eliminate the source of the spill to prevent a discharge or a furtherance of an ongoing discharge.

d. *For hazardous or toxic wastes:*[40]

i. Separate hazardous or toxic waste from construction and domestic waste;

ii. Store waste in sealed containers, which are constructed of suitable materials to prevent leakage and corrosion, and which are labeled in accordance with applicable Resource Conservation and Recovery Act (RCRA) requirements and all other applicable federal, state, tribal, or local requirements;

iii. Store all outside containers within appropriately-sized secondary containment (*e.g., spill berms, decks, spill containment pallets*) to prevent spills from being discharged, or provide a similarly effective means designed to prevent the discharge of pollutants from these areas *(e.g., storing chemicals in a covered area, having a spill kit available on site)*;

iv. Dispose of hazardous or toxic waste in accordance with the manufacturer's recommended method of disposal and in compliance with federal, state, tribal, and local requirements;

v. Clean up spills immediately, using dry clean-up methods, and dispose of used materials properly. You are prohibited from hosing the area down to clean surfaces or spills. Eliminate the source of the spill to prevent a discharge or a furtherance of an ongoing discharge; and

vi. Follow all other federal, state, tribal, and local requirements regarding hazardous or toxic waste.

e. *For construction and domestic wastes:*[41]

i. Provide waste containers *(e.g., dumpster, trash receptacle)* of sufficient size and number to contain construction and domestic wastes;

ii. Keep waste container lids closed when not in use and close lids at the end of the business day for those containers that are actively used throughout the day. For waste containers that do not have lids, provide either (1) cover *(e.g., a tarp, plastic sheeting, temporary roof)* to minimize exposure of wastes to precipitation, or (2) a similarly effective means designed to minimize the discharge of pollutants *(e.g., secondary containment)*;

iii. On business days, clean up and dispose of waste in designated waste containers; and

iv. Clean up immediately if containers overflow.

---

[40] Examples of hazardous or toxic waste that may be present at construction sites include paints, caulks, sealants, fluorescent light ballasts, solvents, petroleum-based products, wood preservatives, additives, curing compounds, and acids.

[41] Examples of construction and domestic waste include packaging materials, scrap construction materials, masonry products, timber, pipe and electrical cuttings, plastics, styrofoam, concrete, demolition debris; and other trash or building materials.

f. *For sanitary waste*, position portable toilets so that they are secure and will not be tipped or knocked over, and located away from waters of the U.S. and stormwater inlets or conveyances.

**2.3.4 For washing applicators and containers used for stucco, paint, concrete, form release oils, curing compounds, or other materials:**

a. Direct wash water into a leak-proof container or leak-proof and lined pit designed so that no overflows can occur due to inadequate sizing or precipitation;

b. Handle washout or cleanout wastes as follows:

   i. Do not dump liquid wastes in storm sewers or waters of the U.S.;

   ii. Dispose of liquid wastes in accordance with applicable requirements in Part 2.3.3; and

   iii. Remove and dispose of hardened concrete waste consistent with your handling of other construction wastes in Part 2.3.3; and

c. Locate any washout or cleanout activities as far away as possible from waters of the U.S. and stormwater inlets or conveyances, and, to the extent feasible, designate areas to be used for these activities and conduct such activities only in these areas.

**2.3.5 For the application of fertilizers:**

a. Apply at a rate and in amounts consistent with manufacturer's specifications, or document in the SWPPP departures from the manufacturer specifications where appropriate in accordance with Part 7.2.6.b.ix;

b. Apply at the appropriate time of year for your location, and preferably timed to coincide as closely as possible to the period of maximum vegetation uptake and growth;

c. Avoid applying before heavy rains that could cause excess nutrients to be discharged;

d. Never apply to frozen ground;

e. Never apply to stormwater conveyance channels; and

f. Follow all other federal, state, tribal, and local requirements regarding fertilizer application.

**2.3.6 Emergency Spill Notification Requirements**

Discharges of toxic or hazardous substances from a spill or other release are prohibited, consistent with Part 1.3.5. Where a leak, spill, or other release containing a hazardous substance or oil in an amount equal to or in excess of a reportable quantity established under either 40 CFR 110, 40 CFR 117, or 40 CFR 302 occurs during a 24-hour period, you must notify the National Response Center (NRC) at (800) 424-8802 or, in the Washington, DC metropolitan area, call (202) 267-2675 in accordance with the requirements of 40 CFR 110, 40 CFR 117, and 40 CFR 302 as soon as you have knowledge of the release. You must also, within seven (7) calendar days of knowledge of the release, provide a description of the release, the circumstances leading to the release, and the date of the release. State, tribal, or local requirements may necessitate additional reporting of spills or discharges to local emergency response, public health, or drinking water supply agencies.

### 2.4 CONSTRUCTION DEWATERING REQUIREMENTS

Comply with the following requirements to minimize the discharge of pollutants in ground water or accumulated stormwater that is removed from excavations, trenches, foundations, vaults, or other similar points of accumulation, in accordance with Part 1.2.2.[42]

**2.4.1** Treat dewatering discharges with controls to minimize discharges of pollutants;[43]

**2.4.2** Do not discharge visible floating solids or foam;

**2.4.3** Use an oil-water separator or suitable filtration device (such as a cartridge filter) that is designed to remove oil, grease, or other products if dewatering water is found to contain these materials;

**2.4.4** To the extent feasible, use vegetated, upland areas of the site to infiltrate dewatering water before discharge. You are prohibited from using waters of the U.S. as part of the treatment area;

**2.4.5** At all points where dewatering water is discharged, comply with the velocity dissipation requirements of Part 2.2.11;

**2.4.6** With backwash water, either haul it away for disposal or return it to the beginning of the treatment process; and

**2.4.7** Replace and clean the filter media used in dewatering devices when the pressure differential equals or exceeds the manufacturer's specifications.

## 3 WATER QUALITY-BASED EFFLUENT LIMITATIONS

### 3.1 GENERAL EFFLUENT LIMITATION TO MEET APPLICABLE WATER QUALITY STANDARDS

Discharges must be controlled as necessary to meet applicable water quality standards. Discharges must also comply with any additional state or tribal requirements that are in Part 9.

In the absence of information demonstrating otherwise, EPA expects that compliance with the conditions in this permit will result in stormwater discharges being controlled as necessary to meet applicable water quality standards. If at any time you become aware, or EPA determines, that discharges are not being controlled as necessary to meet applicable water quality standards, you must take corrective action as required in Parts 5.1 and 5.2, and document the corrective actions as required in Part 5.4.

EPA may insist that you install additional controls (to meet the narrative water quality-based effluent limit above) on a site-specific basis, or require you to obtain coverage under an individual permit, if information in your NOI or from other sources indicates that your discharges are not controlled as necessary to meet applicable water quality standards. This includes situations where additional controls are necessary to comply with a wasteload allocation in an EPA-established or approved TMDL.

---

[42] Uncontaminated, clear (non-turbid) dewatering water can be discharged without being routed to a control.

[43] Appropriate controls include sediment basins or sediment traps, sediment socks, dewatering tanks, tube settlers, weir tanks, filtration systems (*e.g., bag or sand filters*), and passive treatment systems that are designed to remove sediment. Appropriate controls to use downstream of dewatering controls to minimize erosion include vegetated buffers, check dams, riprap, and grouted riprap at outlets.

If during your coverage under a previous permit, you were required to install and maintain stormwater controls specifically to meet the assumptions and requirements of an EPA-approved or established TMDL (for any parameter) or to otherwise control your discharge to meet water quality standards, you must continue to implement such controls as part of your coverage under this permit.

## 3.2 DISCHARGE LIMITATIONS FOR SITES DISCHARGING TO SENSITIVE WATERS[44]

For any portion of the site that discharges to a sediment or nutrient-impaired water or to a water that is identified by your state, tribe, or EPA as Tier 2, Tier 2.5, or Tier 3 for antidegradation purposes, you must comply with the inspection frequency specified in 4.3 and you must comply with the stabilization deadline specified in Part 2.2.14.a.iii.(c).[45]

If you discharge to a water that is impaired for a parameter other than a sediment-related parameter or nutrients, EPA will inform you if any additional controls are necessary for your discharge to be controlled as necessary to meet water quality standards, including for it to be consistent with the assumptions of any available wasteload allocation in any applicable TMDL, or if coverage under an individual permit is necessary.

In addition, on a case-by-case basis, EPA may notify operators of new sites or operators of existing sites with increased discharges that additional analyses, stormwater controls, or other measures are necessary to comply with the applicable antidegradation requirements, or notify you that an individual permit application is necessary.

If you discharge to a water that is impaired for polychlorinated biphenyls (PCBs) and are engaging in demolition of any structure with at least 10,000 square feet of floor space built or renovated before January 1, 1980, you must:

---

[44] Sensitive waters include waters that are impaired and Tier 2, Tier 2.5, and Tier 3 waters.

"Impaired waters" are those waters identified by the state, tribe, or EPA as not meeting an applicable water quality standard and (1) requires development of a TMDL (pursuant to section 303(d) of the CWA; or (2) is addressed by an EPA-approved or established TMDL; or (3) is not in either of the above categories but the waterbody is covered by a pollution control program that meets the requirements of 40 CFR 130.7(b)(1). Your construction site will be considered to discharge to an impaired water if the first water of the U.S. to which you discharge is an impaired water for the pollutants contained in the discharge from your site. For discharges that enter a storm sewer system prior to discharge, the first water of the U.S. to which you discharge is the waterbody that receives the stormwater discharge from the storm sewer system. For assistance in determining whether your site discharges to impaired waters, EPA has developed a tool that is available both within the electronic NOI form in NeT, and at https://water.epa.gov/polwaste/npdes/stormwater/discharge.cfm.

Tiers 2, 2.5 and 3 refer to waters either identified by the state as high quality waters or Outstanding National Resource Waters under 40 CFR 131.12(a)(2) and (3). For the purposes of this permit, you are considered to discharge to a Tier 2, Tier 2.5, or Tier 3 water if the first water of the U.S. to which you discharge is identified by a state, tribe, or EPA as Tier 2, Tier 2.5, or Tier 3. For discharges that enter a storm sewer system prior to discharge, the water of the U.S. to which you discharge is the first water of the U.S. that receives the stormwater discharge from the storm sewer system. See list of Tier 2, Tier 2.5, and Tier 3 waters in Appendix F.

EPA may determine on a case-by-case basis that a site discharges to a sensitive water.

[45] If you qualify for any of the reduced inspection frequencies in Part 4.4, you may conduct inspections in accordance with Part 4.4 for any portion of your site that discharges to a sensitive water.

a. Implement controls[46] to minimize the exposure of PCB-containing building materials, including paint, caulk, and pre-1980 fluorescent lighting fixtures, to precipitation and to stormwater; and

b. Ensure that disposal of such materials is performed in compliance with applicable state, federal, and local laws.

# 4 SITE INSPECTION REQUIREMENTS

## 4.1 PERSON(S) RESPONSIBLE FOR INSPECTING SITE

The person(s) inspecting your site may be a person on your staff or a third party you hire to conduct such inspections. You are responsible for ensuring that the person who conducts inspections is a "qualified person."[47]

## 4.2 FREQUENCY OF INSPECTIONS.[48]

At a minimum, you must conduct a site inspection in accordance with one of the two schedules listed below, unless you are subject to the Part 4.3 site inspection frequency for discharges to sensitive waters or qualify for a Part 4.4 reduction in the inspection frequency:

**4.2.1** At least once every seven (7) calendar days; *or*

**4.2.2** Once every 14 calendar days *and* within 24 hours of the occurrence of a storm event of 0.25 inches or greater, or the occurrence of runoff from snowmelt sufficient to cause a discharge.[49] To determine if a storm event of 0.25 inches or greater has occurred on your site, you must either keep a properly maintained rain gauge on your site, or obtain the storm event information from a weather station that is representative of your location. For any day of rainfall during normal business hours that measures 0.25 inches or greater, you must record the total rainfall measured for that day in accordance with Part 4.7.1d.

## 4.3 INCREASE IN INSPECTION FREQUENCY FOR SITES DISCHARGING TO SENSITIVE WATERS.

For any portion of the site that discharges to a sediment or nutrient-impaired water or to a water that is identified by your state, tribe, or EPA as Tier 2, Tier 2.5, or Tier 3 for antidegradation purposes (see Part 3.2), instead of the inspection frequency specified in

---

[46] Examples of controls to minimize exposure of PCBs to precipitation and stormwater include separating work areas from non-work areas and selecting appropriate personal protective equipment and tools, constructing a containment area so that all dust or debris generated by the work remains within the protected area, using tools that minimize dust and heat (<212°F). For additional information, refer to Part 2.3.3 of the CGP Fact Sheet.

[47] A "qualified person" is a person knowledgeable in the principles and practice of erosion and sediment controls and pollution prevention, who possesses the appropriate skills and training to assess conditions at the construction site that could impact stormwater quality, and the appropriate skills and training to assess the effectiveness of any stormwater controls selected and installed to meet the requirements of this permit.

[48] Inspections are only required during the site's normal working hours.

[49] "Within 24 hours of the occurrence of a storm event" means that you must conduct an inspection within 24 hours once a storm event has produced 0.25 inches within a 24-hour period, even if the storm event is still continuing. Thus, if you have elected to inspect bi-weekly in accordance with Part 4.2.2 and there is a storm event at your site that continues for multiple days, and each day of the storm produces 0.25 inches or more of rain, you must conduct an inspection within 24 hours of the first day of the storm and within 24 hours after the end of the storm.

Part 4.2, you must conduct inspections in accordance with the following inspection frequencies:

Once every seven (7) calendar days *and* within 24 hours of the occurrence of a storm event of 0.25 inches or greater, or the occurrence of runoff from snowmelt sufficient to cause a discharge. To determine if a storm event of 0.25 inches or greater has occurred on your site, you must either keep a properly maintained rain gauge on your site, or obtain the storm event information from a weather station that is representative of your location. For any day of rainfall during normal business hours that measures 0.25 inches or greater, you must record the total rainfall measured for that day in accordance with Part 4.7.1d.

## 4.4 REDUCTIONS IN INSPECTION FREQUENCY

### 4.4.1 Stabilized areas.

a. You may reduce the frequency of inspections to twice per month for the first month, no more than 14 calendar days apart, then once per month in any area of your site where the stabilization steps in 2.2.14a have been completed. If construction activity resumes in this portion of the site at a later date, the inspection frequency immediately increases to that required in Parts 4.2 and 4.3, as applicable. You must document the beginning and ending dates of this period in your SWPPP.

b. **Exception.** For "linear construction sites" (as defined in Appendix A) where disturbed portions have undergone final stabilization at the same time active construction continues on others, you may reduce the frequency of inspections to twice per month for the first month, no more than 14 calendar days apart, in any area of your site where the stabilization steps in 2.2.14a have been completed. After the first month, inspect once more within 24 hours of the occurrence of a storm event of 0.25 inches or greater. If there are no issues or evidence of stabilization problems, you may suspend further inspections. If "wash-out" of stabilization materials and/or sediment is observed, following re-stabilization, inspections must resume at the inspection frequency required in Part 4.4.1a Inspections must continue until final stabilization is visually confirmed following a storm event of 0.25 inches or greater.

**4.4.2 Arid, semi-arid, or drought-stricken areas** (as defined in Appendix A). If it is the seasonally dry period or a period in which drought is occurring, you may reduce the frequency of inspections to once per month and within 24 hours of the occurrence of a storm event of 0.25 inches or greater. You must document that you are using this reduced schedule and the beginning and ending dates of the seasonally dry period in your SWPPP. To determine if a storm event of 0.25 inches or greater has occurred on your site, you must either keep a properly maintained rain gauge on your site, or obtain the storm event information from a weather station that is representative of your location. For any day of rainfall during normal business hours that measures 0.25 inches or greater, you must record the total rainfall measured for that day in accordance with Part 4.7.1d.

### 4.4.3 Frozen conditions:

a. If you are suspending construction activities due to frozen conditions, you may temporarily suspend inspections on your site until thawing conditions (as defined in Appendix A) begin to occur if:

   i. Runoff is unlikely due to continuous frozen conditions that are likely to continue at your site for at least three (3) months based on historic seasonal averages. If unexpected weather conditions (such as above freezing temperatures or rain

events) make discharges likely, you must immediately resume your regular inspection frequency as described in Parts 4.2 and 4.3, as applicable;

ii. Land disturbances have been suspended; and

iii. All disturbed areas of the site have been stabilized in accordance with Part 2.2.14a.

b. If you are still conducting construction activities during frozen conditions, you may reduce your inspection frequency to once per month if:

i. Runoff is unlikely due to continuous frozen conditions that are likely to continue at your site for at least three (3) months based on historic seasonal averages. If unexpected weather conditions (such as above freezing temperatures or rain events) make discharges likely, you must immediately resume your regular inspection frequency as described in Parts 4.2 and 4.3, as applicable; and

ii. Except for areas in which you are actively conducting construction activities, disturbed areas of the site have been stabilized in accordance with Part 2.2.14a.

You must document the beginning and ending dates of this period in your SWPPP.

## 4.5 AREAS THAT MUST BE INSPECTED

During your site inspection, you must at a minimum inspect the following areas of your site:

**4.5.1** All areas that have been cleared, graded, or excavated and that have not yet completed stabilization consistent with Part 2.2.14a;

**4.5.2** All stormwater controls (including pollution prevention controls) installed at the site to comply with this permit;[50]

**4.5.3** Material, waste, borrow, and equipment storage and maintenance areas that are covered by this permit;

**4.5.4** All areas where stormwater typically flows within the site, including drainageways designed to divert, convey, and/or treat stormwater;

**4.5.5** All points of discharge from the site; and

**4.5.6** All locations where stabilization measures have been implemented.

You are not required to inspect areas that, at the time of the inspection, are considered unsafe to your inspection personnel.

## 4.6 REQUIREMENTS FOR INSPECTIONS

During your site inspection, you must at a minimum:

**4.6.1** Check whether all stormwater controls *(i.e., erosion and sediment controls and pollution prevention controls)* are properly installed, appear to be operational, and are working as intended to minimize pollutant discharges;

**4.6.2** Check for the presence of conditions that could lead to spills, leaks, or other accumulations of pollutants on the site;

[50] This includes the requirement to inspect for sediment that has been tracked out from the site onto paved roads, sidewalks, or other paved areas consistent with Part 2.2.4.

**4.6.3** Identify any locations where new or modified stormwater controls are necessary to meet the requirements of Parts 2 and/or 3;

**4.6.4** Check for signs of visible erosion and sedimentation *(i.e., sediment deposits)* that have occurred and are attributable to your discharge at points of discharge and, if applicable, the banks of any waters of the U.S. flowing within or immediately adjacent to the site;

**4.6.5** Identify any incidents of noncompliance observed;

**4.6.6** If a discharge is occurring during your inspection:

a. Identify all discharge points at the site; and

b. Observe and document the visual quality of the discharge, and take note of the characteristics of the stormwater discharge, including color; odor; floating, settled, or suspended solids; foam; oil sheen; and other indicators of stormwater pollutants.

**4.6.7** Based on the results of your inspection, complete any necessary maintenance under Part 2.1.4 and corrective action under Part 5.

## 4.7 INSPECTION REPORT

**4.7.1** You must complete an inspection report within 24 hours of completing any site inspection. Each inspection report must include the following:

a. The inspection date;

b. Names and titles of personnel making the inspection;

c. A summary of your inspection findings, covering at a minimum the observations you made in accordance with Part 4.6, including any necessary maintenance or corrective actions;

d. If you are inspecting your site at the frequency specified in Part 4.2.2, Part 4.3, or Part 4.4.1b, and you conducted an inspection because of rainfall measuring 0.25 inches or greater, you must include the applicable rain gauge or weather station readings that triggered the inspection; and

e. If you determined that it is unsafe to inspect a portion of your site, you must describe the reason you found it to be unsafe and specify the locations to which this condition applies.

**4.7.2** Each inspection report must be signed in accordance with Appendix I, Part I.11 of this permit.

**4.7.3** You must keep a copy of all inspection reports at the site or at an easily accessible location, so that it can be made available at the time of an on-site inspection or upon request by EPA.

**4.7.4** You must retain all inspection reports completed for this Part for at least three (3) years from the date that your permit coverage expires or is terminated.

## 4.8 INSPECTIONS BY EPA

You must allow EPA, or an authorized representative of EPA, to conduct the following activities at reasonable times. To the extent that you are utilizing shared controls that are

not on site to comply with this permit, you must make arrangements for EPA to have access at all reasonable times to those areas where the shared controls are located.

**4.8.1** Enter onto all areas of the site, including any construction support activity areas covered by this permit, any off-site areas where shared controls are utilized to comply with this permit, discharge locations, adjoining waterbodies, and locations where records are kept under the conditions of this permit;

**4.8.2** Access and copy any records that must be kept under the conditions of this permit;

**4.8.3** Inspect your construction site, including any construction support activity areas covered by this permit (see Part 1.2.1c), any stormwater controls installed and maintained at the site, and any off-site shared controls utilized to comply with this permit; and

**4.8.4** Sample or monitor for the purpose of ensuring compliance.

## 5 CORRECTIVE ACTIONS

### 5.1 CONDITIONS TRIGGERING CORRECTIVE ACTION.

You must take corrective action to address any of the following conditions identified at your site:

**5.1.1** A stormwater control needs repair or replacement (beyond routine maintenance required under Part 2.1.4); or

**5.1.2** A stormwater control necessary to comply with the requirements of this permit was never installed, or was installed incorrectly; or

**5.1.3** Your discharges are causing an exceedance of applicable water quality standards; or

**5.1.4** A prohibited discharge has occurred (see Part 1.3).

### 5.2 CORRECTIVE ACTION DEADLINES

For any corrective action triggering conditions in Part 5.1, you must:

**5.2.1** Immediately take all reasonable steps to address the condition, including cleaning up any contaminated surfaces so the material will not discharge in subsequent storm events;

**5.2.2** When the problem does not require a new or replacement control or significant repair, the corrective action must be completed by the close of the next business day;

**5.2.3** When the problem requires a new or replacement control or significant repair, install the new or modified control and make it operational, or complete the repair, by no later than seven (7) calendar days from the time of discovery. If it is infeasible to complete the installation or repair within seven (7) calendar days, you must document in your records why it is infeasible to complete the installation or repair within the 7-day timeframe and document your schedule for installing the stormwater control(s) and making it operational as soon as feasible after the 7-day timeframe. Where these actions result in changes to any of the stormwater controls or procedures documented in your SWPPP, you must modify your SWPPP accordingly within seven (7) calendar days of completing this work.

## 5.3 CORRECTIVE ACTION REQUIRED BY EPA

You must comply with any corrective actions required by EPA as a result of permit violations found during an inspection carried out under Part 4.8.

## 5.4 CORRECTIVE ACTION REPORT

For each corrective action taken in accordance with this Part, you must complete a report in accordance with the following:

**5.4.1** Within 24 hours of identifying the corrective action condition, document the specific condition and the date and time it was identified.

**5.4.2** Within 24 hours of completing the corrective action (in accordance with the deadlines in Part 5.2), document the actions taken to address the condition, including whether any SWPPP modifications are required.

**5.4.3** Each corrective action report must be signed in accordance with Appendix I, Part I.11 of this permit.

**5.4.4** You must keep a copy of all corrective action reports at the site or at an easily accessible location, so that it can be made available at the time of an on-site inspection or upon request by EPA.

**5.4.5** You must retain all corrective action reports completed for this Part for at least three (3) years from the date that your permit coverage expires or is terminated.

## 6 STAFF TRAINING REQUIREMENTS

Each operator, or group of multiple operators, must assemble a "stormwater team" to carry out compliance activities associated with the requirements in this permit.

**6.1** Prior to the commencement of construction activities, you must ensure that the following personnel[51] on the stormwater team understand the requirements of this permit and their specific responsibilities with respect to those requirements:

a. Personnel who are responsible for the design, installation, maintenance, and/or repair of stormwater controls (including pollution prevention controls);
b. Personnel responsible for the application and storage of treatment chemicals (if applicable);
c. Personnel who are responsible for conducting inspections as required in Part 4.1; and
d. Personnel who are responsible for taking corrective actions as required in Part 5.

**6.2** You are responsible for ensuring that all activities on the site comply with the requirements of this permit. You are not required to provide or document formal training for subcontractors or other outside service providers, but you must ensure that such personnel understand any requirements of this permit that may be affected by the work they are subcontracted to perform.

[51] If the person requiring training is a new employee who starts after you commence construction activities, you must ensure that this person has the proper understanding as required above prior to assuming particular responsibilities related to compliance with this permit.

For emergency-related projects, the requirement to train personnel prior to commencement of construction activities does not apply, however, such personnel must have the required training prior to NOI submission.

**6.3** At a minimum, members of the stormwater team must be trained to understand the following if related to the scope of their job duties (*e.g., only personnel responsible for conducting inspections need to understand how to conduct inspections*):

a. The permit deadlines associated with installation, maintenance, and removal of stormwater controls and with stabilization;
b. The location of all stormwater controls on the site required by this permit and how they are to be maintained;
c. The proper procedures to follow with respect to the permit's pollution prevention requirements; and
d. When and how to conduct inspections, record applicable findings, and take corrective actions.

**6.4** Each member of the stormwater team must have easy access to an electronic or paper copy of applicable portions of this permit, the most updated copy of your SWPPP, and other relevant documents or information that must be kept with the SWPPP.

## 7 STORMWATER POLLUTION PREVENTION PLAN (SWPPP)

### 7.1 GENERAL REQUIREMENTS

All operators associated with a construction site under this permit must develop a SWPPP consistent with the requirements in Part 7 prior to their submittal of the NOI.[52, 53] The SWPPP must be kept up-to-date throughout coverage under this permit.

If a SWPPP was prepared under a previous version of this permit, the operator must review and update the SWPPP to ensure that this permit's requirements are addressed prior to submitting an NOI for coverage under this permit.

### 7.2 SWPPP CONTENTS

At a minimum, the SWPPP must include the information specified in this Part and as

[52] The SWPPP does not establish the effluent limits that apply to your site's discharges; these limits are established in this permit in Parts 2 and 3.

[53] You have the option of developing a group SWPPP where you are one of several operators at your site. For instance, if both the owner and the general contractor of the construction site are operators and thus are both required to obtain a permit, the owner may be the party undertaking SWPPP development, and the general contractor (or any other operator at the site) can choose to use this same SWPPP, as long as the SWPPP addresses the general contractor's (or other operator's) scope of construction work and functions to be performed under the SWPPP. Regardless of whether there is a group SWPPP or several individual SWPPPs, all operators would be jointly and severally liable for compliance with the permit.

Where there are multiple operators associated with the same site through a common plan of development or sale, operators may assign to themselves various permit-related functions under the SWPPP provided that each SWPPP, or a group SWPPP, documents which operator will perform each function under the SWPPP. However, dividing the functions to be performed under each SWPPP, or a single group SWPPP, does not relieve an individual operator from liability for complying with the permit should another operator fail to implement any measures that are necessary for that individual operator to comply with the permit, e.g., the installation and maintenance of any shared controls. In addition, all operators must ensure, either directly or through coordination with other operators, that their activities do not cause a violation and/or render any other operators' controls and/or any shared controls ineffective. All operators who rely on a shared control to comply with the permit are jointly and severally liable for violations of the permit resulting from the failure to properly install, operate and/or maintain the shared control.

specified in other parts of this permit.

**7.2.1** **All Site Operators.** Include a list of all other operators who will be engaged in construction activities at the site, and the areas of the site over which each operator has control.

**7.2.2** **Stormwater Team.** Identify the personnel (by name or position) that are part of the stormwater team, as well as their individual responsibilities, including which members are responsible for conducting inspections.

**7.2.3** **Nature of Construction Activities.**[54] Include the following:

a. A description of the nature of your construction activities, including the age or dates of past renovations for structures that are undergoing demolition;

b. The size of the property (in acres or length in miles if a linear construction site);

c. The total area expected to be disturbed by the construction activities (to the nearest quarter acre or nearest quarter mile if a linear construction site);

d. A description of any on-site and off-site construction support activity areas covered by this permit (see Part 1.2.1c);

e. The maximum area expected to be disturbed at any one time, including on-site and off-site construction support activity areas;

f. A description and projected schedule for the following:

   i. Commencement of construction activities in each portion of the site, including clearing and grubbing, mass grading, demolition activities, site preparation (*i.e., excavating, cutting and filling*), final grading, and creation of soil and vegetation stockpiles requiring stabilization;

   ii. Temporary or permanent cessation of construction activities in each portion of the site;

   iii. Temporary or final stabilization of exposed areas for each portion of the site; and

   iv. Removal of temporary stormwater controls and construction equipment or vehicles, and the cessation of construction-related pollutant-generating activities.

g. A list and description of all pollutant-generating activities[55] on the site. For each pollutant-generating activity, include an inventory of pollutants or pollutant constituents (*e.g., sediment, fertilizers, pesticides, paints, caulks, sealants, fluorescent light ballasts, contaminated substrates, solvents, fuels*) associated with that activity, which could be discharged in stormwater from your construction site. You must take into account where potential spills and leaks could occur that contribute pollutants to stormwater discharges, and any known hazardous or toxic substances, such as PCBs and asbestos, that will be disturbed or removed during construction;

h. Business days and hours for the project;

i. If you are conducting construction activities in response to a public emergency (see Part 1.4), a description of the cause of the public emergency (*e.g., mud slides,*

---

[54] If plans change due to unforeseen circumstances or for other reasons, the requirement to describe the sequence and estimated dates of construction activities is not meant to "lock in" the operator to meeting these dates. When departures from initial projections are necessary, this should be documented in the SWPPP itself, or in associated records, as appropriate.

[55] Examples of pollutant-generating activities include paving operations; concrete, paint, and stucco washout and waste disposal; solid waste storage and disposal; and dewatering operations.

*earthquake, extreme flooding conditions, widespread disruption in essential public services)*, information substantiating its occurrence *(e.g., state disaster declaration or similar state or local declaration)*, and a description of the construction necessary to reestablish affected public services.

**7.2.4** **Site Map.** Include a legible map, or series of maps, showing the following features of the site:

a. Boundaries of the property;

b. Locations where construction activities will occur, including:

   i. Locations where earth-disturbing activities will occur (note any phasing), including any demolition activities;

   ii. Approximate slopes before and after major grading activities (note any steep slopes (as defined in Appendix A));

   iii. Locations where sediment, soil, or other construction materials will be stockpiled;

   iv. Any water of the U.S. crossings;

   v. Designated points where vehicles will exit onto paved roads;

   vi. Locations of structures and other impervious surfaces upon completion of construction; and

   vii. Locations of on-site and off-site construction support activity areas covered by this permit (see Part 1.2.1c).

c. Locations of all waters of the U.S. within and one mile downstream of the site's discharge point. Also identify if any are listed as impaired, or are identified as a Tier 2, Tier 2.5, or Tier 3 water;

d. Areas of federally listed critical habitat within the site and/or at discharge locations;

e. Type and extent of pre-construction cover on the site (*e.g., vegetative cover, forest, pasture, pavement, structures*);

f. Drainage patterns of stormwater and authorized non-stormwater before and after major grading activities;

g. Stormwater and authorized non-stormwater discharge locations, including:

   i. Locations where stormwater and/or authorized non-stormwater will be discharged to storm drain inlets;[56] and

   ii. Locations where stormwater or authorized non-stormwater will be discharged directly to waters of the U.S.

h. Locations of all potential pollutant-generating activities identified in Part 7.2.3g;

i. Locations of stormwater controls, including natural buffer areas and any shared controls utilized to comply with this permit; and

j. Locations where polymers, flocculants, or other treatment chemicals will be used and stored.

---

[56] The requirement to show storm drain inlets in the immediate vicinity of the site on your site map only applies to those inlets that are easily identifiable from your site or from a publicly accessible area immediately adjacent to your site.

**7.2.5 Non-Stormwater Discharges.** Identify all authorized non-stormwater discharges in Part 1.2.2 that will or may occur.

**7.2.6 Description of Stormwater Controls.**

a. For each of the Part 2.2 erosion and sediment control effluent limits, Part 2.3 pollution prevention effluent limits, and Part 2.4 construction dewatering effluent limits, as applicable to your site, you must include the following:

   i. A description of the specific control(s) to be implemented to meet the effluent limit;

   ii. Any applicable stormwater control design specifications (including references to any manufacturer specifications and/or erosion and sediment control manuals/ordinances relied upon);[57]

   iii. Routine stormwater control maintenance specifications; and

   iv. The projected schedule for stormwater control installation/implementation.

b. You must also include any of the following additional information as applicable.

   i. **Natural buffers and/or equivalent sediment controls** (see Part 2.2.1 and Appendix G). You must include the following:

      (a) The compliance alternative to be implemented;

      (b) If complying with alternative 2, the width of natural buffer retained;

      (c) If complying with alternative 2 or 3, the erosion and sediment control(s) you will use to achieve an equivalent sediment reduction, and any information you relied upon to demonstrate the equivalency;

      (d) If complying with alternative 3, a description of why it is infeasible for you to provide and maintain an undisturbed natural buffer of any size;

      (e) For "linear construction sites" where it is infeasible to implement compliance alternative 1, 2, or 3, a rationale for this determination, and a description of any buffer width retained and/or supplemental erosion and sediment controls installed; and

      (f) A description of any disturbances that are exempt under Part 2.2.1 that occur within 50 feet of a water of the U.S.

   ii. **Perimeter controls for a "linear construction site"** (see Part 2.2.3). For areas where perimeter controls are not feasible, include documentation to support this determination and a description of the other practices that will be implemented to minimize discharges of pollutants in stormwater associated with construction activities.

   Note: Routine maintenance specifications for perimeter controls documented in the SWPPP must include the Part 2.2.3a requirement that sediment be removed before it has accumulated to one-half of the above-ground height of any perimeter control.

   iii. **Sediment track-out controls** (see Parts 2.2.4b and 2.2.4c). Document the specific stabilization techniques and/or controls that will be implemented to remove sediment prior to vehicle exit.

   iv. **Sediment basins** (see Part 2.2.12). In circumstances where it is infeasible to utilize outlet structures that withdraw water from the surface, include documentation to

[57] Design specifications may be found in manufacturer specifications and/or in applicable erosion and sediment control manuals or ordinances. Any departures from such specifications must reflect good engineering practice and must be explained in the SWPPP.

support this determination, including the specific conditions or time periods when this exception will apply.

v. **Treatment chemicals** (see Part 2.2.13), you must include the following:

(a) A listing of the soil types that are expected to be exposed during construction in areas of the project that will drain to chemical treatment systems. Also include a listing of soil types expected to be found in fill material to be used in these same areas, to the extent you have this information prior to construction;

(b) A listing of all treatment chemicals to be used at the site and why the selection of these chemicals is suited to the soil characteristics of your site;

(c) If the applicable EPA Regional Office authorized you to use cationic treatment chemicals for sediment control, include the specific controls and implementation procedures designed to ensure that your use of cationic treatment chemicals will not lead to an exceedance of water quality standards;

(d) The dosage of all treatment chemicals to be used at the site or the methodology to be used to determine dosage;

(e) Information from any applicable Safety Data Sheet (SDS);

(f) Schematic drawings of any chemically enhanced stormwater controls or chemical treatment systems to be used for application of the treatment chemicals;

(g) A description of how chemicals will be stored consistent with Part 2.2.13c;

(h) References to applicable state or local requirements affecting the use of treatment chemicals, and copies of applicable manufacturer's specifications regarding the use of your specific treatment chemicals and/or chemical treatment systems; and

(i) A description of the training that personnel who handle and apply chemicals have received prior to permit coverage, or will receive prior to use of the treatment chemicals at your site.

vi. **Stabilization measures** (see Part 2.2.14). You must include the following:

(a) The specific vegetative and/or non-vegetative practices that will be used;

(b) The stabilization deadline that will be met in accordance with Part 2.2.14.a.i-ii;

(c) If complying with the deadlines for sites in arid, semi-arid, or drought-stricken areas, the beginning and ending dates of the seasonally dry period and the schedule you will follow for initiating and completing vegetative stabilization; and

(d) If complying with deadlines for sites affected by unforeseen circumstances that delay the initiation and/or completion of vegetative stabilization, document the circumstances and the schedule for initiating and completing stabilization.

vii. **Spill prevention and response procedures** (see Part 1.3.5 and Part 2.3). You must include the following:

(a) Procedures for expeditiously stopping, containing, and cleaning up spills, leaks, and other releases. Identify the name or position of the employee(s)

responsible for detection and response of spills or leaks; and

(b) Procedures for notification of appropriate facility personnel, emergency response agencies, and regulatory agencies where a leak, spill, or other release containing a hazardous substance or oil in an amount equal to or in excess of a reportable quantity consistent with Part 2.3.6 and established under either 40 CFR 110, 40 CFR 117, or 40 CFR 302, occurs during a 24-hour period. Contact information must be in locations that are readily accessible and available to all employees.

You may also reference the existence of Spill Prevention Control and Countermeasure (SPCC) plans developed for the construction activity under Part 311 of the CWA, or spill control programs otherwise required by an NPDES permit for the construction activity, provided that you keep a copy of that other plan on site.[58]

viii. **Waste management procedures** (see Part 2.3.3). Describe the procedures you will follow for handling, storing and disposing of all wastes generated at your site consistent with all applicable federal, state, tribal, and local requirements, including clearing and demolition debris, sediment removed from the site, construction and domestic waste, hazardous or toxic waste, and sanitary waste.

ix. **Application of fertilizers** (see Part 2.3.5). Document any departures from the manufacturer specifications where appropriate.

**7.2.7 Procedures for Inspection, Maintenance, and Corrective Action.** Describe the procedures you will follow for maintaining your stormwater controls, conducting site inspections, and, where necessary, taking corrective actions, in accordance with Part 2.1.4, Part 4, and Part 5 of this permit. Also include:

a. The inspection schedule you will follow, which is based on whether your site is subject to Part 4.2 or Part 4.3, or whether your site qualifies for any of the reduced inspection frequencies in Part 4.4;

b. If you will be conducting inspections in accordance with the inspection schedule in Part 4.2.2, Part 4.3, or Part 4.4.1b, the location of the rain gauge or the address of the weather station you will be using to obtain rainfall data;

c. If you will be reducing your inspection frequency in accordance with Part 4.4.1b, the beginning and ending dates of the seasonally defined arid period for your area or the valid period of drought;

d. If you will be reducing your inspection frequency in accordance with Part 4.4.3, the beginning and ending dates of frozen conditions on your site; and

e. Any maintenance or inspection checklists or other forms that will be used.

**7.2.8 Staff Training.** Include documentation that the required personnel were, or will be, trained in accordance with Part 6.

**7.2.9 Compliance with Other Requirements.**

a. **Threatened and Endangered Species Protection.** Include documentation required in Appendix D supporting your eligibility with regard to the protection of threatened and endangered species and designated critical habitat.

[58] Even if you already have an SPCC or other spill prevention plan in existence, your plans will only be considered adequate if they meet all of the requirements of this Part, either as part of your existing plan or supplemented as part of the SWPPP.

b. **Historic Properties.** Include documentation required in Appendix E supporting your eligibility with regard to the protection of historic properties.

c. **Safe Drinking Water Act Underground Injection Control (UIC) Requirements for Certain Subsurface Stormwater Controls.** If you are using any of the following stormwater controls at your site, document any contact you have had with the applicable state agency[59] or EPA Regional Office responsible for implementing the requirements for underground injection wells in the Safe Drinking Water Act and EPA's implementing regulations at 40 CFR 144 -147. Such controls would generally be considered Class V UIC wells:

i. Infiltration trenches (if stormwater is directed to any bored, drilled, driven shaft or dug hole that is deeper than its widest surface dimension, or has a subsurface fluid distribution system);

ii. Commercially manufactured pre-cast or pre-built proprietary subsurface detention vaults, chambers, or other devices designed to capture and infiltrate stormwater flow; and

iii. Drywells, seepage pits, or improved sinkholes (if stormwater is directed to any bored, drilled, driven shaft or dug hole that is deeper than its widest surface dimension, or has a subsurface fluid distribution system).

**7.2.10 SWPPP Certification.** You must sign and date your SWPPP in accordance with Appendix I, Part I.11.

**7.2.11 Post-Authorization Additions to the SWPPP.** Once you are authorized for coverage under this permit, you must include the following documents as part of your SWPPP:

a. A copy of your NOI submitted to EPA along with any correspondence exchanged between you and EPA related to coverage under this permit;

b. A copy of the acknowledgment letter you receive from NeT assigning your NPDES ID (*i.e., permit tracking number*);

c. A copy of this permit (an electronic copy easily available to the stormwater team is also acceptable).

## 7.3 ON-SITE AVAILABILITY OF YOUR SWPPP

You must keep a current copy of your SWPPP at the site or at an easily accessible location so that it can be made available at the time of an on-site inspection or upon request by EPA; a state, tribal, or local agency approving stormwater management plans; the operator of a storm sewer system receiving discharges from the site; or representatives of the U.S. Fish and Wildlife Service (USFWS) or the National Marine Fisheries Service (NMFS).

EPA may provide access to portions of your SWPPP to a member of the public upon request. Confidential Business Information (CBI) will be withheld from the public, but may not be withheld from EPA, USFWS, or NMFS.[60]

[59] For state UIC program contacts, refer to the following EPA website: https://www.epa.gov/uic.

[60] Information covered by a claim of confidentiality will be disclosed by EPA only to the extent of, and by means of, the procedures set forth in 40 CFR Part 2, Subpart B. In general, submitted information protected by a business confidentiality claim may be disclosed to other employees, officers, or authorized representatives of the United States concerned with implementing the CWA. The authorized representatives, including employees of other executive branch agencies, may review CBI during the course of reviewing draft regulations.

If an on-site location is unavailable to keep the SWPPP when no personnel are present, notice of the plan's location must be posted near the main entrance of your construction site.

### 7.4 SWPPP MODIFICATIONS

**7.4.1** You must modify your SWPPP, including the site map(s), within seven (7) days of any of the following conditions:

a. Whenever new operators become active in construction activities on your site, or you make changes to your construction plans, stormwater controls, or other activities at your site that are no longer accurately reflected in your SWPPP. This includes changes made in response to corrective actions triggered under Part 5. You do not need to modify your SWPPP if the estimated dates in Part 7.2.3f change during the course of construction;

b. To reflect areas on your site map where operational control has been transferred (and the date of transfer) since initiating permit coverage;

c. If inspections or investigations by EPA or its authorized representatives determine that SWPPP modifications are necessary for compliance with this permit;

d. Where EPA determines it is necessary to install and/or implement additional controls at your site in order to meet the requirements of this permit, the following must be included in your SWPPP:

   i. A copy of any correspondence describing such measures and requirements; and

   ii. A description of the controls that will be used to meet such requirements.

e. To reflect any revisions to applicable federal, state, tribal, or local requirements that affect the stormwater controls implemented at the site; and

f. If applicable, if a change in chemical treatment systems or chemically enhanced stormwater control is made, including use of a different treatment chemical, different dosage rate, or different area of application.

**7.4.2** You must maintain records showing the dates of all SWPPP modifications. The records must include the name of the person authorizing each change (see Part 7.2.10 above) and a brief summary of all changes.

**7.4.3** All modifications made to the SWPPP consistent with Part 7.4 must be authorized by a person identified in Appendix I, Part I.11.b.

**7.4.4** Upon determining that a modification to your SWPPP is required, if there are multiple operators covered under this permit, you must immediately notify any operators who may be impacted by the change to the SWPPP.

## 8 HOW TO TERMINATE COVERAGE

Until you terminate coverage under this permit, you must comply with all conditions and effluent limitations in the permit. To terminate permit coverage, you must submit to EPA a complete and accurate Notice of Termination (NOT), which certifies that you have met the requirements for terminating in Part 8.

### 8.1 MINIMUM INFORMATION REQUIRED IN NOT

**8.1.1** NPDES ID (*i.e., permit tracking number)* provided by EPA when you received coverage under this permit;

**8.1.2** Basis for submission of the NOT (see Part 8.2);

**8.1.3** Operator contact information;

**8.1.4** Name of site and address (or a description of location if no street address is available); and

**8.1.5** NOT certification.

## 8.2 CONDITIONS FOR TERMINATING CGP COVERAGE

You must terminate CGP coverage only if one or more of the following conditions has occurred:

**8.2.1** You have completed all construction activities at your site and, if applicable, construction support activities covered by this permit (see Part 1.2.1c), and you have met the following requirements:

a. For any areas that (1) were disturbed during construction, (2) are not covered over by permanent structures, and (3) over which you had control during the construction activities, you have met the requirements for final vegetative or non-vegetative stabilization in Part 2.2.14b;

b. You have removed and properly disposed of all construction materials, waste and waste handling devices, and have removed all equipment and vehicles that were used during construction, unless intended for long-term use following your termination of permit coverage;

c. You have removed all stormwater controls that were installed and maintained during construction, except those that are intended for long-term use following your termination of permit coverage or those that are biodegradable; and

d. You have removed all potential pollutants and pollutant-generating activities associated with construction, unless needed for long-term use following your termination of permit coverage; or

**8.2.2** You have transferred control of all areas of the site for which you are responsible under this permit to another operator, and that operator has submitted an NOI and obtained coverage under this permit; or

**8.2.3** Coverage under an individual or alternative general NPDES permit has been obtained.

## 8.3 HOW TO SUBMIT YOUR NOT

You must use EPA's NPDES eReporting Tool (NeT) to electronically prepare and submit your NOT for the 2017 CGP.

To access NeT, go to https://www.epa.gov/npdes/stormwater-discharges-construction-activities#ereporting.

Waivers from electronic reporting may be granted as specified in Part 1.4.1. If the EPA Regional Office grants you approval to use a paper NOT, and you elect to use it, you must complete the form in Appendix K.

## 8.4 DEADLINE FOR SUBMITTING THE NOT

You must submit your NOT within 30 calendar days after any one of the conditions in Part 8.2 occurs.

## 8.5 EFFECTIVE DATE OF TERMINATION OF COVERAGE

Your authorization to discharge under this permit terminates at midnight of the calendar day that a complete NOT is submitted to EPA.

## 9 PERMIT CONDITIONS APPLICABLE TO SPECIFIC STATES, INDIAN COUNTRY LANDS, OR TERRITORIES

The provisions in this Part provide modifications or additions to the applicable conditions of this permit to reflect specific additional conditions required as part of the state or tribal CWA Section 401 certification process, or the Coastal Zone Management Act (CZMA) certification process, or as otherwise established by the permitting authority. The specific additional revisions and requirements only apply to activities in those specific states, Indian country, and areas in certain states subject to construction projects by Federal Operators. States, Indian country, and areas subject to construction by Federal Operators not included in this Part do not have any modifications or additions to the applicable conditions of this permit.

### 9.1 EPA Region 1

#### 9.1.1 NHR100000 State of New Hampshire

a. If you disturb 100,000 square feet or more of contiguous area, you must also apply for an Alteration of Terrain (AoT) permit from DES pursuant to RSA 485- A:17 and Env-Wq 1500. This requirement also applies to a lower disturbance threshold of 50,000 square feet or more when construction occurs within the protected shoreline under the Shoreland Water Quality Protection Act (see RSA 483-B and Env-Wq 1400). A permit application must also be filed if your project disturbs an area of greater than 2,500 square feet, is within 50 feet of any surface water, and has a flow path of 50 feet or longer disturbing a grade of 25 percent or greater. Project sites with disturbances smaller than those discussed above, that have the potential to adversely affect state surface waters, are subject to the conditions of an AoT General Permit by Rule.

b. You must determine that any excavation dewatering discharges are not contaminated before they will be authorized as an allowable non-stormwater discharge under this permit (see Part 1.2.2). The water is considered uncontaminated if there is no groundwater contamination within 1,000 feet of the groundwater dewatering location. Information on groundwater contamination can be generated over the Internet via the NHDES web site http://des.nh.gov/ by using the One Stop Data Mapper at http://des.nh.gov/onestop/gis.htm. If it is determined that the groundwater to be dewatered is near a remediation or other waste site you must apply for the Remediation General Permit (see https://www3.epa.gov/region1/npdes/rgp.html.)

c. You must treat any uncontaminated excavation dewatering discharges as necessary to remove suspended solids and turbidity. The discharges must be sampled at least once per week during weeks when discharges occur. Samples must be analyzed for total suspended solids (TSS) or turbidity and must meet monthly average and daily maximum limits of 50 milligrams per liter (mg/L) and 100 mg/L, respectively for TSS or 33 mg/l and 67 mg/l, respectively for turbidity. TSS (a.k.a. Residue, Nonfilterable) or turbidity sampling and analysis must be performed in accordance with Tables IB and II in 40 CFR 136.3 (http://www.ecfr.gov/cgi-bin/text-idx?SID=0243e3c4283cbd7d8257eb6afc7ce9a2&mc=true&node=se40.25.136_13&r

gn=div8). Records of any sampling and analysis must be maintained and kept with the SWPPP for at least three years after final site stabilization.

d. Construction site owners and operators must consider opportunities for post-construction groundwater recharge using infiltration best management practices (BMPs) during site design and preparation of the SWPPP. If your construction site is in a town that is required to obtain coverage under the NPDES General Permit for discharges from Municipal Separate Storm Sewer Systems (MS4) you may be required to use such practices. The SWPPP must include a description of any on-site infiltration that will be installed as a post-construction stormwater management measure or reasons for not employing such measures such as 1) The facility is located in a wellhead protection area as defined in RSA 485- C:2; or 2) The facility is located in an area where groundwater has been reclassified to GAA, GAl or GA2 pursuant to RSA 485-C and Env-DW 901; or 3) Any areas that would be exempt from the groundwater recharge requirements contained in Env-Wq 1507.04(e), including all land uses or activities considered to be a "High-load Area" (see Env-Wq 1502.26). For design considerations for infiltration measures see Volume II of the NH Stormwater Manual.

e. Appendix F contains a list of Tier 2, or high quality waters. Although there is no official list of tier 2 waters, it can be assumed that all NH surface waters are tier 2 for turbidity unless 1) the surface water that you are proposing to discharge into is listed as impaired for turbidity in the states listing of impaired waters (see Surface Water Quality - Watershed Report Cards at http://des.nh.gov/organization/divisions/water/wmb/swqa/report_cards.htm) or 2) sampling upstream of the proposed discharge location shows turbidity values greater than 10 NTU. A single grab sample collected during dry weather (no precipitation within 48 hours) is acceptable.

f. To ensure compliance with RSA 485-C, RSA 485-A, RSA 485-A:13, I(a), Env-Wq 1700 and Env-Wq 302, the following information may be requested by NHDES. This information must be kept on site unless you receive a written request from NHDES that it be sent to the address shown in Part 9.1.4 (g).

   i. A site map required in Part 7.2.4, showing the type and location of all post-construction infiltration BMPs utilized at the facility or the reason(s) why none were installed;

   ii. A list of all non-stormwater discharges that occur at the facility, including their source locations and the control measures being used (see Part 1.2.2).

   iii. Records of sampling and analysis of TSS required for construction dewatering discharges (see Part 9.1.4 (c)).

g. All required or requested documents must be sent to:

   NH Department of Environmental Services, Wastewater Engineering Bureau, Permits & Compliance Section
   P.O. Box 95
   Concord, NH 03302-0095

### 9.2 EPA Region 3

#### 9.2.1 DCR100000 District of Columbia

a. The permittee must comply with the District of Columbia Water Pollution Control Act of 1984, as amended, (D.C. Official Code §8-103.01 *et seq.*) and its

implementing regulations in Title 21, Chapters 11 and 19 of the District of Columbia Municipal Regulations. Nothing in this permit will be construed to preclude the institution of any legal action or relieve the permitee from any responsibilities, liabilities, or penalties established pursuant to District of Columbia laws and regulations.

b. The permittee must comply with the District of Columbia Stormwater Management, and Soil Erosion and Sediment Control in Chapter 5 of Title 21 of the District of Columbia Municipal Regulations.

c. The permittee must comply with the District of Columbia Flood Management control in Chapter 31 of Title 20 of the District of Columbia Municipal Regulations.

d. The Department may request a copy of the Stormwater Pollution Prevention Plan (SWPPP) and the permittee is required to submit the SWPPP to the Department with 14 days of such request. The Department may conduct an inspection of any facility covered by this permit to ensure compliance with District's law requirements including water quality.

**9.2.2 DER10F000 Areas in the State of Delaware subject to construction by a Federal Operator**

a. Federal agencies engaging in construction activities must submit, to DNREC, a sediment and stormwater management (S&S) plan and obtain approval from DNREC in accordance with 7 Del. C. §4010, 7 DE Admin. Code 5101, and 7 DE Admin. Code 7201.

b. Federal agencies engaging in construction activities must provide for construction review by a certified construction reviewer in accordance with 7 Del. C. §§4010 & 4013 and 7 DE Admin. Code 5101, subsection 6.1.6.

c. Federal agencies engaging in construction activities must certify that all responsible personnel involved in the construction project will have attended the blue card training prior to initiation of any land disturbing activity – *see* 7 Del. C. §§ 4002 & 4014 and 7 DE Admin. Code 5101.

## 9.3 EPA Region 5

### 9.3.1 MNR10I000 Indian country within the State of Minnesota

**9.3.1.1 Fond du Lac Band of Lake Superior Chippewa.** The following conditions apply only to discharges on the Fond du Lac Band of Lake Superior Chippewa Reservation:

a. A copy of the Stormwater Pollution Prevention Plan (SWPPP) must be submitted to the Office of Water Protection at least fifteen (15) days in advance of sending the Notice of Intent (NOI) to EPA. The SWPPP can be submitted electronically to richardgitar@FDLREZ.com or by hardcopy sent to:

Fond du Lac Reservation
Office of Water Protection
1720 Big Lake Road
Cloquet, MN 55720

CGP applicants are encouraged to work with the FDL Office of Water Protection in the identification of all proposed receiving.

b. Copies of the Notice of Intent (NOI) and the Notice of Termination (NOT) must be sent to the Fond du Lac Office of Water Protection at the same time they are submitted to EPA.

c. The turbidity limit shall NOT exceed 10% of natural background within the receiving water(s) as determined by Office of Water Protection staff.

d. Turbidity sampling must take place within 24 hours of a ½-inch or greater rainfall event. The results of the sampling must be reported to the Office of Water Protection within 7 days of the sample collection. All sample reporting must include the date and time, location (GPS: UTM/Zone 15), and NTU. CGP applicants are encouraged to work with the Office of Water Protection in determining the most appropriate location(s) for sampling.

e. Receiving waters with open water must be sampled for turbidity prior to any authorized discharge as determined by Office of Water Protection staff. This requirement only applies to receiving waters in which no ambient turbidity data exists.

f. This Certification does not pertain to any new discharge to Outstanding Reservation Resource Waters (ORRW) as described in §105 b.3. of the Fond du Lac Water Quality Standards (Ordinance #12/98, as amended). Although additional waters may be designated in the future, currently Perch Lake, Rice Portage Lake, Miller Lake, Deadfish Lake, and Jaskari Lake are designated as ORRWs. New dischargers wishing to discharge to an ORRW must obtain an individual permit from EPA for stormwater discharges from large and small construction activities.

g. All work shall be carried out in such a manner as will prevent violations of water quality criteria as stated in the Water Quality Standards of the Fond du Lac Reservation, Ordinance 12/98, as amended. This includes, but is not limited to, the prevention of any discharge that causes a condition in which visible solids, bottom deposits, or turbidity impairs the usefulness of water of the Fond du Lac Reservation for any of the uses designated in the Water Quality Standards of the Fond du Lac Reservation. These uses include wildlife, aquatic life, warm water fisheries, cold water fisheries, subsistence fishing (netting), primary contact recreation, secondary contact recreation, cultural, wild rice areas, aesthetic waters, agriculture, navigation, and commercial.

h. Appropriate steps shall be taken to ensure that petroleum products or other chemical pollutants are prevented from entering waters of the Fond du Lac Reservation. All spills must be reported to the appropriate emergency management agency (National Response Center AND the State Duty Officer), and measures shall be taken immediately to prevent the pollution of waters of the Fond du Lac Reservation, including groundwater. The Fond du Lac Office of Water Protection must also be notified immediately of any spill regardless of size.

i. This certification does not authorize impacts to cultural, historical, or archeological features or sites, or properties that may be eligible for such listing.

**9.3.1.2** **Grand Portage Band of Lake Superior Chippewa.** The following conditions apply only to discharges on the Grand Portage Band of Lake Superior Chippewa Reservation:

a. The CGP authorization is for construction activities that may occur within the exterior boundaries of the Grand Portage Reservation in accordance to the Grand Portage Land Use Ordinance. The CGP regulates stormwater discharges associated with construction sites of one acre or more in size. Only those activities specifically authorized by the CGP are authorized by this certification (the

"Certification"). This Certification does not authorize impacts to cultural, historical, or archeological features or sites, or properties that may be eligible for listing as such.

b. All construction stormwater discharges authorized by the CGP must comply with the Water Quality Standards and Water Resources Ordinance, as well as Applicable Federal Standards (as defined in the Water Resources Ordinance). As such, appropriate steps must be taken to ensure that petroleum products or other chemical pollutants are prevented from entering the Waters of the Reservation (as defined in the Water Resources Ordinance). All spills must be reported to the appropriate emergency-management agency, and measures must be taken to prevent the pollution of the Waters of the Reservation, including groundwater.

c. The 2017 CGP requires inspections and monitoring reports of the construction site stormwater discharges by a qualified person. Monitoring and inspection reports must comply with the minimum requirements contained in the 2017 CGP. The monitoring plan must be prepared and incorporated into the Stormwater Pollution Prevention Plan (the "SWPPP"). A copy of the SWPPP must be submitted to the Board at least 30 days in advance of sending the requisite Notice of Intent to EPA. The SWPPP should be sent to:

   Grand Portage Environmental Resources Board
   P.O. Box 428
   Grand Portage, MN 55605

   Copies of the Notice of Intent and Notice of Termination required under the CGP must be submitted to the Board at the address above at the same time they are submitted to the EPA.

d. If requested by the Grand Portage Environmental Department, the permittee must provide additional information necessary for a case-by-case eligibility determination to assure compliance with the Water Quality Standards and any Applicable Federal Standards.

e. Discharges that the Board has determined to be or that may reasonably be expected to be contributing to a violation of Water Quality Standards or Applicable Federal Standards are not authorized by this Certification.

f. The Board retains full authority provided by the Water Resources Ordinance to ensure compliance with and to enforce the provisions of the Water Resource Ordinance and Water Quality Standards, Applicable Federal Standards, and these Certification conditions.

g. Appeals related to Board actions taken in accordance with any of the preceding conditions may be heard by the Grand Portage Tribal Court.

### 9.3.2 WIR10I000 Indian country within the State of Wisconsin, except the Sokaogon Chippewa (Mole Lake) Community

**9.3.2.1 Bad River Band of Lake Superior Tribe of Chippewa Indians:** The following conditions apply only to discharges on the Bad River Band of the Lake Superior Tribe of Chippewa Indians Reservation:

a. Only those activities specifically authorized by the CGP are authorized by this Certification. This Certification does not authorize impacts to cultural properties, or historical sites, or properties that may be eligible for listing as such.[61, 62]

b. Operators are not eligible to obtain authorization under the CGP for all new discharges to an Outstanding Tribal Resource Water (or Tier 3 water).[63] Outstanding Tribal Resource Waters, or Tier 3 waters, include the following: Kakagon Slough and the lower wetland reaches of its tributaries that support wild rice, Kakagon River, Bad River Slough, Honest John Lake, Bog Lake, a portion of Bad River, from where it enters the Reservation through the confluence with the White River, and Potato River.[64]

c. Projects utilizing cationic treatment chemicals[65] within the Bad River Reservation boundaries are not eligible for coverage under the CGP.[66]

d. All projects which are eligible for coverage under the CGP and are located within the exterior boundaries of the Bad River Reservation shall be implemented in such a manner that is consistent with the Tribe's Water Quality Standards (WQS).[67]

e. An operator proposing to discharge to an Outstanding Resource Water (or Tier 2.5 water) under the CGP must comply with the antidegradation provisions of the Tribe's WQS. Outstanding Resource Waters, or Tier 2.5 waters, include the following: a portion of Bad River, from downstream the confluence with the White River to Lake Superior, White River, Marengo River, Graveyard Creek, Bear Trap Creek, Wood Creek, Brunsweiler River, Tyler Forks, Bell Creek, and Vaughn Creek.[68] The antidegradation demonstration materials described in provision E.4.iii. must be submitted to the following address:

Bad River Tribe's Natural Resources Department
Attn: Water Resources Specialist
P.O. Box 39
Odanah, WI 54861

---

[61] Bad River Band of Lake Superior Tribe of Chippewa Indians Water Quality Standards adopted by Resolution No. 7-6-11-441 (hereafter, Tribe's WQS).

[62] 36 C.F.R. § 800.16(l)(2).

[63] Tribe's WQS: See provisions E.3.ii. and E.4.iv.

[64] Tribe's WQS: See provision E.2.iii.

[65] See definition of cationic treatment chemicals in Appendix A of the CGP.

[66] Tribe's WQS: See provisions E.6.ii.a. and E.6.ii.c.

[67] See footnote 61.

[68] Tribe's WQS: See provision E.2.ii.

f. An operator proposing to discharge to an Exceptional Resource Water (or Tier 2 water) under the CGP must comply with the antidegradation provisions of the Tribe's WQS. Exceptional Resource Waters, or Tier 2 waters, include the following: any surface water within the exterior boundaries of the Reservation that is not specifically classified as an Outstanding Resource Water (Tier 2.5 water) or an Outstanding Tribal Resource Water (Tier 3 water).[69] The antidegradation demonstration materials described in provision E.4.ii. must be submitted to the following address:

Bad River Tribe's Natural Resources Department
Attn: Water Resources Specialist
P.O. Box 39
Odanah, WI 54861

g. A discharge to a surface water within the Bad River Reservation boundaries shall not cause or contribute to an exceedance of the turbidity criterion included in the Tribe's WQS, which states: Turbidity shall not exceed 5 NTU over natural background turbidity when the background turbidity is 50 NTU or less, or turbidity shall not increase more than 10% when the background turbidity is more than 50 NTU.[70]

h. All projects which are eligible for coverage under the CGP within the exterior boundaries of the Bad River Reservation must comply with the Bad River Reservation Wetland and Watercourse Protection Ordinance, or Chapter 323 of the Bad River Tribal Ordinances, including the erosion and sedimentation control, natural buffer, and stabilization requirements. Questions regarding Chapter 323 and requests for permit applications can be directed to the Wetlands Specialist in the Tribe's Natural Resources Department at (715) 682-7123 or wetlands@badriver-nsn.gov.

i. An operator of a project, which is eligible for coverage under the CGP, that would result in an allowable discharge under the CGP occurring within the exterior boundaries of the Bad River Reservation must notify the Tribe prior to the commencing earth-disturbing activities.[71, 72] The operator must submit a copy of the Notice of Intent (NOI) to the following addresses at the same time it is submitted to the U.S. EPA:

Bad River Tribe's Natural Resources Department
Attn: Water Resources Specialist
P.O. Box 39
Odanah, WI 54861

Bad River Tribe's Natural Resources Department
Attn: Tribal Historic Preservation Officer (THPO)
P.O. Box 39
Odanah, WI 54861

[69] Tribe's WQS: See provision E.2.i.

[70] Tribe's WQS: See provision E.7.iii.

[71] See footnote 61.

[72] See footnote 62.

The operator must also submit a copy of the Notice of Termination (NOT) to the above addresses at the same time it is submitted to the U.S. EPA.

j. The THPO must be provided 30 days to comment on the project.[73]

k. The operator must obtain THPO concurrence in writing. This written concurrence will outline measures to be taken to prevent or mitigate effects to historic properties. For more information regarding the specifics of the cultural resources process, see 36 CFR Part 800. A best practice for an operator is to consult with the THPO during the planning stages of an undertaking.[74]

l. An operator of a project, which is eligible for coverage under the CGP, that would result in an allowable discharge under the CGP occurring within the exterior boundaries of the Bad River Reservation must submit a copy of the Stormwater Pollution Prevention Plan (SWPPP) to the following address at the same time as submitting the NOI:[75]

Bad River Tribe's Natural Resources Department
Attn: Water Resources Specialist
P.O. Box 39
Odanah, WI 54861

m. Any corrective action reports that are required under the CGP must be submitted to the following address within one (1) working day of the report completion:[76]

Bad River Tribe's Natural Resources Department
P.O. Box 39
Odanah, WI 54861

n. An operator shall be responsible for meeting any additional permit requirements imposed by the U.S. EPA necessary to comply with the Tribe's antidegradation policies if the discharge point is located upstream of waters designated by the Tribe.[77]

**9.3.2.2 Lac du Flambeau Band of Lake Superior Tribe of Chippewa Indians:** The following conditions apply only to discharges on the Lac du Flambeau Band of the Lake Superior Tribe of Chippewa Indians Reservation:

a. A copy of the Stormwater Pollution Prevention Plan must be submitted to the following office, for the Traival environmental review process, at least thirty (30) days in advance of sending the Notice of Intent (NOI) to EPA:

Lac du Flambeau
Tribal Land Management
P.O. Box 279

[73] 36 C.F.R. § 800.3(c)(4).

[74] 36 C.F.R. § 800.3(b).

[75] See footnote 61.

[76] See footnote 61.

[77] See footnote 61.

Lac du Flambeau, WI 54538

CGP applicants are encouraged to work with the LdF Water Resources Program in the identification of all proposed receiving waters.

b. Copies of the NOI and the Notice of Termination (NOT) must be sent to the LdF Water Resources Program at the same time they are submitted to EPA.

c. All work shall be carried out in such a manner as will prevent violations of water quality criteria as stated in the Water Quality Standards of the Lac du Flambeau Reservation. This includes, but is not limited to, the prevention of any discharge that cause a condition in which visible solids, bottom deposits, or turbidity impairs the usefulness of water of the Lac du Flambeau Reservation for any of the uses designated in the Water Quality Standards of the Lac du Flambeau Reservation.

d. Appropriate steps shall be taken to ensure that petroleum products or other chemical pollutants are prevented from entering waters of the Lac du Flambeau Reservation. All spills must be reported to the appropriate emergency management agency, and measures shall be taken immediately to prevent the pollution of waters of the Lac du Flambeau reservation, including groundwater.

e. This certification does not authorize impacts to cultural, historical, or archeological features or sties, or properties that may be eligible for such listing.

f. Due to the significant ecological and cultural importance of the Lac du Flambeau Reservation, any operator requesting a permit for a point source discharge of pollutants (i.e., discharge) associated with the Stormwater Discharge will need a stormwater pollution prevention plan in place that does not violate Lac du Flambeau Water Quality Standards to protect Reservation Waters.

### 9.4 EPA Region 6

#### 9.4.1 NMR100000 State of New Mexico, except Indian country

a. 20.6.4.13 NMAC General Criteria states: ...Surface waters of the state shall be free of any water contaminant in such quantity and of such duration as may with reasonable probability injure human health, animal or plant life or property, or unreasonably interfere with public welfare or use with property:

b. Bottom Deposits and Suspended or Settleable Solids:

   i. Surface waters of the state shall be free of water contaminants including fine sediment particles (less than two millimeters in diameter), precipitates or organic or inorganic solids from other than natural causes that have settled to form layers on or fill the interstices of the natural or dominant substrate in quantities that damage or impair the normal growth, function or reproduction of aquatic life or significantly alter the physical or chemical properties of the bottom.

   ii. Suspended or settleable solids from other than natural causes shall not be present in surface waters of the state in quantities that damage or impair the normal growth, function or reproduction of aquatic life or adversely affect other designated uses.

c. Floating Solids, Oil and Grease: Surface waters of the state shall be free of oils, scum, grease and other floating materials resulting from other than natural causes that would cause the formation of a visible sheen or visible deposits on the bottom or shoreline, or would damage or impair the normal growth, function or reproduction of human, animal, plant or aquatic life.

d. Color: Color-producing materials resulting from other than natural causes shall not create an aesthetically undesirable condition nor shall color impair the use of the water by desirable aquatic life presently common in surface waters of the state.

e. Toxic Pollutants: Except as provided in 20.6.4.16 N MAC, surface waters of the state shall be free of toxic pollutants from other than natural causes in amounts, concentrations or combinations that affect the propagation of fish or that are toxic to humans, livestock or other animals, fish or other aquatic organisms, wildlife using aquatic environments for habitation or aquatic organisms for food, or that will or can reasonably be expected to bioaccumulate in tissues of fish, shellfish and other aquatic organisms to levels that will impair the health of aquatic organisms or wildlife or result in unacceptable tastes, odors or health risks to human consumers of aquatic organisms.

f. Turbidity: Turbidity attributable to other than natural causes shall not reduce light transmission to the point that the normal growth, function or reproduction of aquatic life is impaired or that will cause substantial visible contrast with the natural appearance of the water. Activities or discharges shall not cause turbidity to increase more than 10 NTU over background turbidity when the background turbidity, measured at a point immediately upstream of the activity, is 50 NTU or less, nor to increase more than 20 percent when the background turbidity is more than 50 NTU. However, limited-duration turbidity increases caused by dredging, construction or other similar activities may be allowed provided all practicable turbidity control techniques have been applied and all appropriate permits, certifications and approvals have been obtained.

g. Total Dissolved Solids (TDS): TDS attributable to other than natural causes shall not damage or impair the normal growth, function or reproduction of animal, plant or aquatic life. TDS shall be measured by either the "calculation method" (sum of constituents) or the filterable residue method. Approved test procedures for these determinations are set forth in 20.6.4.14 NMAC.

h. Dissolved Gases: Surface waters of the state shall be free of nitrogen and other dissolved gases at levels above 110 percent saturation when this supersaturation is attributable to municipal, industrial or other discharges.

*i.* 20.6.4.52 NMAC: *PECOS RIVER BASIN: In order to protect existing and designated uses, it is a goal of the state of New Mexico to prevent increases in TDS in the Pecos River above the following benchmark values, which are expressed as flow-weighted, annual average concentrations, at three USGS gauging stations: at Santa Rosa 500 mg/L; near Artesia 2, 700 mg/L; and near Malaga 3,600 mg/l. The benchmark values serve to guide state action. They are adopted pursuant to the New Mexico Water Quality Act, not the Clean Water Act.*

j. 20.6.4.54 NMAC: *COLORADO RIVER BASIN: For the tributaries of the Colorado river system, the state of New Mexico will cooperate with the Colorado river basin states and the federal government to support and implement the salinity policy and program outlined in the most current "review, water quality standards for salinity, Colorado river system" or equivalent report by the Colorado river salinity control forum.*

k. Segment-specific criteria across the state specify numeric limits for TDS, sulfate and chloride depending on the receiving waterbody, and numeric constituent specific values in 20.6.4.900 NMAC also apply depending on the designated use of the waterbody.

l. If construction dewatering activities are anticipated at a site, permittees must complete the following steps:

i. Investigative information must be documented in the facility SWPPP.

ii. Refer to the GWQB Mapper at https://gis.web.env.nm.gov/GWQB/ AND the PSTB Mapper (Go Mapper) at https://gis.web.env.nm.gov/GoNM/ and check if the following sources are located within the noted distance from your anticipated construct site groundwater dewatering activity:

| ***Project Location Relative to a Source of Potential Groundwater Contamination*** | ***Constituents likely to be required for testing*** |
|---|---|
| *Within 0.5 mile of an open Leaking Underground Storage Tank (LUST) site* | *BTEX (Benzene, Toluene, Ethylbenzene, and Xylene) plus additional parameters depending on site conditions.** |
| *Within 0.5 mile of an open Voluntary Remediation site* | *All parameters listed in Appendix A (or an alternate list approved by the NMED SWQB)*** |
| *Within 0.5 mile of an open RCRA Corrective Action Site* | |
| *Within 0.5 mile of an open Abatement Site* | |
| *Within 0.5 mile of an open Brownfield Site* | |
| *Within 1.0 mile or more of a Superfund site or National Priorities List (NPL) site with associated groundwater contamination.* | |

**For further assistance determining whether dewatering may encounter impacted groundwater, the permittee may contact the NMED Ground Water Quality Bureau at: 505-827-2965.*

****EPA approved-sufficiently sensitive methods must be used - approved methods are listed in 40 CFR Part 136.3.*

ii. Indicate on the NOI that dewatering activities are anticipated. Provide information on flow and potential to encounter impacted groundwater.

iii. Permittee must test the quality of the groundwater according to the chart above. Hardness and pH must also be measured.

iv. Permittee must send test result data to EPA Region 6 and the NMED Surface Water Quality Bureau. If the test data exceed standards, it cannot be discharged from the construction site into surface waters under this permit. Discharge to surface waters must be conducted under a separate NPDES individual permit to ensure proper treatment and disposal.

v. If disposal will be to the ground surface or in an unlined pond, the permittee must submit an NOI to the NMED Ground Water Quality Bureau.

m. State regulations at 20.6.4.8 NMAC state: *No degradation shall be allowed in waters designated by the commission as outstanding national resource waters (ONRWs), except as provided in Subparagraphs (a) through (e) of this paragraph and in Paragraph (4) of this Subsection A.*

n. Operators are not eligible to obtain authorization under this permit for all new and existing storm water discharges to outstanding national resource waters (ONRWs) (also referred to as "Tier 3" waters.)

o. NMED does not believe compliance with the permit necessarily assures that no degradation will occur. Although state WQS provide for temporary and short-term degradation of water quality in an ONRW under very limited circumstances if approved by the Water Quality Control Commission as specified at 20.6.4.8.A NMAC, the approval process required for these activities does not lend itself for use for projects covered under this general permit. This condition is necessary to ensure that no degradation is allowed in ONRWs by requiring proposed storm water discharges to be reviewed under the individual permit process. Tier 3 waters are defined in Appendix F of the proposed permit.

p. EPA regulations at 40 CFR Part 122.44(k) require, in part: *Best management practices (BMPs) to control or abate the discharge of pollutants when:*

> *(3) Numeric effluent limitations are infeasible, or*
>
> *(4) The practices are reasonably necessary to achieve effluent limitations and standards or to carry out the purposes and intent of the CWA.*

q. State regulations at 20.6.4.8.A(2) state in part: ...*Further, the state shall assure that there shall be achieved the highest statutory and regulatory requirements for all new and existing point sources...*

r. State regulations at 20.6.4.8.B NMAC also state:

> (3) assess the probable effect of the effluent on the receiving water relative to its attainable or designated uses and numeric and narrative criteria.

s. Operators who intend to obtain authorization under this permit for new and existing storm water discharges from construction sites must satisfy the following condition: The SWPPP must include site-specific interim and permanent stabilization, managerial, and structural solids, erosion and sediment control best management practices (BMPs) and/or other controls that are designed to prevent to the maximum extent practicable an increase in the sediment yield and flow velocity from pre-construction, pre-development conditions to assure that applicable standards in 20.6.4.NMAC, including the antidegradation policy, or TMDL waste load allocations (WLAs) are met. This requirement applies to discharges both during construction and after construction operations have been completed. The SWPPP must identify and document the rationale for selecting these BMPs and/or other controls. The SWPPP must also describe design specifications, construction specifications, maintenance schedules (including a long term maintenance plan), criteria for inspections, and expected performance and longevity of these BMPs. For sites greater than 5 acres in size, BMP selection must be made based on the use of appropriate soil loss prediction models (i.e. SEDCAD, RUSLE, SEDIMOT, MULTISED, etc.) OR equivalent generally accepted (by professional erosion control specialists) soil loss prediction tools.

t. For all sites, the operator(s) must demonstrate, and include documentation in the SWPPP, that implementation of the site-specific practices will assure that the applicable standards or TMDL WLAs are met, and will result in sediment yields and flow velocities that, to the maximum extent practicable, will not be greater than

the sediment yield levels and flow velocities from preconstruction, pre-development conditions.

u. All SWPPPs must be prepared in accordance with good engineering practices by qualified (e.g. CPESC certified, engineers with appropriate training) erosion control specialists familiar with the use of soil loss prediction models and design of erosion and sediment control systems based on these models (or equivalent soil loss prediction tools). Qualifications of the preparer (e.g., professional certifications, description of appropriate training) must be documented in the SWPPP. The operator(s) must design, implement, and maintain BMPs in the manner specified in the SWPPP.

v. State regulations at 20.6.2.1203 NMAC state: *With respect to any discharge from any facility of oil or other water contaminant, in such quantity as may with reasonable probability injure or be detrimental to human health, animal or plant life, or property, or unreasonably interfere with the public welfare or the use of property, the following notifications and corrective actions are required:*

i. As soon as possible after learning of such a discharge, but in no event more than twenty-four (24) hours thereafter, any person in charge of the facility shall orally notify the Chief of the Ground Water Quality Bureau of the department, or his counterpart in any constituent agency delegated responsibility for enforcement of these rules as to any facility subject to such delegation.

Permittees can call 505-827-9329 for emergencies at any time and 505-476-6000 for non-emergencies during business hours from 5am-5pm, Monday through Friday.

w. EPA regulations at 40 CFR Part 122.44(k) require, in part: *Best management practices (BMPs) to control or abate the discharge of pollutants when:*

*(3) Numeric effluent /imitations are infeasible, or*

*(4) The practices are reasonably necessary to achieve effluent limitations and standards or to carry out the purposes and intent of the CWA.*

x. State regulations at 20.6.4.8.A(2) state in part:...*Further, the state shall assure that there shall be achieved the highest statutory and regulatory requirements for all new and existing point sources...*

**9.4.2 NMR101000 Indian country within the State of New Mexico, except Navajo Reservation Lands that are covered under Arizona permit AZR10000I and Ute Mountain Reservation Lands that are covered under Colorado permit COR10000I.**

**9.4.2.1 Pueblo of Isleta.** The following conditions apply only to discharges on the Pueblo of Isleta Reservation:

a. CGP at 1.3 Prohibited discharges: Stormwater discharges associated with construction activity that EPA or the Pueblo of Isleta, prior to authorization under this perm it, determines will cause, have the reasonable potential to cause, or may reasonably be expected to contribute to a violation or excursion of any applicable water quality standard, including the antidegradation policy, or the impairment of a designated use of receiving waters are not authorized by this permit.

b. CGP at 1.4.1 How to Submit Your NOI: The operator shall provide a copy of the Notice of Intent ("NOI") to the Pueblo of Isleta at the same time it is submitted to the

U.S. Environmental Protection Agency, for projects occurring within the exterior boundaries of the Pueblo of Isleta. The operator shall also notify the Pueblo of Isleta when it has submitted the Notice of Termination ("NOT"). The NOI and NOT shall be sent to the Pueblo of Isleta at the following address:

Water Quality Control Officer
Pueblo of Isleta
Environment Division
PO Box 1270
Isleta, NM 87022
(505) 869-7565
E-mail: POI36871@isletapueblo.com

Overnight/Express Mail Delivery
Pueblo of Isleta
Environment Division
6 Sagebrush St.
Albuquerque, NM 87105

c. CGP at 1.5 Requirement to post a notice of your permit coverage: Amend to read: "You must post a sign or other notice of your permit coverage at a safe, publicly accessible location in close proximity to the construction site. The notice must be located so that it is visible from the public road or tribal road that is nearest to the active part of the construction site..."

d. CGP at 7.2.6 Description of stormwater controls: The SWPPP will be considered to be incomplete if the operator has not coordinated requirements under this Part with the Pueblo of Isleta Public Services Department.

e. CGP I.12.6.1 at pg.I-6 of 8. The Pueblo of Isleta requests notification within 10 hours (rather than 24 hrs.) if health or the environment become endangered.

f. CGP at I.12.2 Anticipated noncompliance: Amend to read: "You must give advance notice to EPA and the Pueblo of Isleta at the address indicated in 1.4.1(a) of any planned changes in the permitted facility or activity which may results in noncompliance with permit requirements."

g. CGP at I.12.6.1: Any noncompliance for projects within the exterior boundaries of the Pueblo of Isleta which may endanger health or the environment shall be reported directly to the EPA Regional Office [(see contacts at https://www2.epa.gov/national-pollutant-discharge-elimination-system-npdes/contact-us-stormwater#regional)l and to the Pueblo of Isleta Water Quality Control Officer. Any information must be provided orally with n 12 hours of the time you become aware of the circumstances. Other requirements of this Part for a written submission apply. Electronic communication (E-mail) shall be provided as soon as practical. Verbal notice shall be provided to:

Water Quality Control Officer
Pueblo of Isleta
E-mail: POI36871@isletapueblo.com
(505) 869-7565
(505) 263-5425 cellular
(505) 869-3030 Police Dispatch

h. CGP at 2.2 Erosion and sediment control requirements: Erosion and sediment controls shall be designed to retain sediment on-site.

i. CGP at 2.2 Under Sediment control requirements, Standard Permit Condition Duty to Mitigate Volumes of sediment at or over (five) 5 cubic yards must be removed and placed for disposal within a tribally approved sediment Disposal Site, located on Pueblo of Isleta lands. CGP 2.2 at pg. 8.

j. Under Minimize erosion, a permittee must secure permission from the Pueblo or affected Pueblo of Isleta land assignment owner if a dissipation device needs to be placed up- or down- elevation of a given construction site. CGP 2.2.11 at pg. 11.

k. CGP at 2.3.6 Emergency spill notification requirements: You must notify the Pueblo of Isleta Water Quality Control Officer and National Response Center (NRC) [at (800) 424-8802 or, in the Washington, DC metropolitan area, call (202) 267-2675 in accordance with the requirements of 40 CFR 110, 40 CFR 117, and 40 CFR 302] as soon as you have knowledge of the release. Verbal and electronic notice shall be provided as specified in I.12.6.1

l. CGP at C.3 Equivalent analysis waiver: Parties wishing to apply for an Equivalent Analysis Waiver (see Appendix D, Section C) must provide a copy of the waiver analysis to the Pueblo of Isleta Water Quality Control Officer at the address indicated in 1.4.1 (a).

**9.4.2.2** **Pueblo of Sandia.** The following conditions apply only to discharges on the Pueblo of Sandia Reservation:

a. Only those activities specifically authorized by the CGP are authorized by the Pueblo of Sandia's Water Quality certification. The Pueblo of Sandia's Water Quality Certification does not authorize impact to cultural properties, historical sites or properties that may be eligible as such.

b. Copies of all Notices of Intent (NOI) submitted to the EPA must also be sent concurrently to the Pueblo of Sandia at the following address. Discharges are not authorized by this permit unless an accurate and complete NOI has been submitted to the Pueblo of Sandia, either by mail or electronically.

Regular U.S. Delivery Mail:
Pueblo of Sandia Environment Department
Attention: Scott Bulgrin, Water Quality Manager
481 Sandia Loop
Bernalillo, New Mexico 87004

Electronically:
sbulgrin@sandiapueblo.nsn.us

c. Any correspondences between the applicant and EPA related to analytical data, written reports, corrective action, enforcement, monitoring, or an adverse incident written reports should likewise be routed to the Pueblo of Sandia at the above address.

d. The Stormwater Pollution Prevention Plan (SWPPP) must be available to the Pueblo of Sandia Environment Department either electronically or hard copy upon request for review. The SWPPP must be made available at least fourteen (14) days before construction begins. The fourteen (14) day period will give Pueblo staff time to become familiar with the project site, prepare for construction site inspections, and

determine compliance with the Pueblo of Sandia Water Quality Standards. Failure to provide a SWPPP to the Pueblo of Sandia may result in the delay or denial of the construction project.

e. If requested by the Pueblo of Sandia Environment Department, the permittee must provide additional information necessary for a case-by-case eligibility determination to assure compliance with the Pueblo of Sandia Water Quality Standards and/or applicable Federal Standards not authorized by this certification.

f. An "Authorization to Proceed Letter" with site specific mitigation requirements may be sent out to the permittee when a review of the NOI and SWPPP, on a case- by-case basis is completed by the Pueblo of Sandia Environment Department. This approval will allow the application to proceed if all mitigation requirements are met.

g. The Pueblo of Sandia will not allow Small construction Waivers (Appendix C) or the Rainfall Erosivity Waiver (Appendix C.1) to be granted for any small construction activities.

h. Before submitting a Notice of Termination (NOT) to the EPA, permittees must clearly demonstrate to the Pueblo of Sandia Environment Department through a site visit or documentation that requirements for site stabilization have been met and any temporary erosion control structures have been removed. A short letter stating the NOT is acceptable and all requirements have been met will be sent to the permittee to add to the permittee's NOT submission to EPA.

i. Copies of all NOT submitted to the EPA must also be sent concurrently to the Pueblo of Sandia through the mail or electronically.

<u>Regular U.S. Delivery Mail:</u>
Pueblo of Sandia Environment Department
Attention: Scott Bulgrin, Water Quality Manager
481 Sandia Loop
Bernalillo, New Mexico 87004

<u>Electronically:</u>
sbulgrin@sandiapueblo.nsn.us

j. The Pueblo of Sandia may require the permittee to perform water quality monitoring for pH, turbidity, and total suspended solids (TSS) during the permit term if the discharge is to a surface water leading to the Rio Grande for the protection of public health and the environment.

**9.4.2.3** **Pueblo of Santa Ana.** The following conditions apply only to discharges on the Pueblo of Santa Ana Reservation:

a. The operator shall provide a copy of the Notice of Intent (NOI) to the Pueblo of Santa Ana (the Pueblo), at the same time it is submitted to the U.S. Environmental Protection Agency (EPA), for projects with discharges onto the lands of the Pueblo as defined in the Pueblo of Santa Ana Water Quality Standards.

b. The operator shall provide a copy of the Stormwater Pollution Prevention Plan (SWPPP), at the same time that an NOI is submitted to the EPA, to the Pueblo for

projects with discharges onto the lands of the Pueblo as defined in the Pueblo of Santa Ana Water Quality Standards.

c. The operator shall provide a copy of the SWPPP, copies of inspections reports, and copies of corrective action reports to the Pueblo at the address below for review, upon request.

d. The NOI, SWPPP and Notice of Termination (NOT) shall be sent to the Pueblo at the following address:

Pueblo of Santa Ana Department of Natural Resources,
Attention: Water Quality Program Specialist
2 Dove Road
Santa Ana Pueblo, NM, 87004

e. Discharges are not authorized by this permit unless an accurate and complete NOI and SWPPP have been submitted to the Pueblo. Failure to provide an accurate and complete NOI and SWPPP may result in a denial of the discharge permit or groundbreaking or construction delay.

f. The operator will not proceed with site work until authorized by the Pueblo. The Pueblo requires review of the complete and final SWPPP by the Pueblo before authorization to proceed. The Pueblo will provide an "authorization to proceed" notice after review and approval of the SWPPP.

g. Before submitting a NOT, permittees must certify to the Pueblo's Department of Natural Resources in writing that requirements for site stabilization have been met, and any temporary erosion control structures have been removed. Documentation of the Pueblo's review that such requirements have been reviewed and met will be provided for the permittee to add to the permittee's NOT submission to EPA. Copies of all NOT submitted to the EPA must also be sent to the Pueblo at the address provided above.

**9.4.2.4** **Pueblo of Santa Clara.** The following conditions apply only to discharges on the Pueblo of Santa Clara Reservation:

a. The operator must provide a copy of the Notice of Intent (NOI) and Notice of Termination (NOT) to the Santa Clara Pueblo Governor's Office at the same time it is provided to the US Environmental Protection Agency.

b. A copy of the Storm water Pollution Prevention Plan shall be made available to the Pueblo of Santa Clara staff upon request.

**9.4.2.5** **Pueblo of Tesuque.** The following conditions apply only to discharges on the Pueblo of Tesuque Reservation:

a. The operator shall provide a copy of the Notice of Intent (NOI) to the Pueblo of Tesuque Governor's Office and Environment Department at same time it is submitted to the Environmental Protection Agency, for projects occurring within the exterior boundaries of our tribal lands. The operator shall also notify the Pueblo of Tesuque Governor's Office and Environment Department when it submitted the Notice of Termination. The NOI and NOT shall be sent to the Pueblo of Tesuque Governor's Office and Environment Department at the following address:

Pueblo of Tesuque
Office of the Governor

Route 42 Box 360-T
Santa Fe, NM 87506 or
email: governor@pueblooftesuque.org

b. The operator shall also provide a copy of the Stormwater Pollution Prevention Plan, copies of inspections reports, and copies of corrective action reports to staff in the Pueblo of Tesuque Environment Department.

**9.4.2.6** **Taos Pueblo**. The following conditions apply only to discharges on the Taos Pueblo Reservation:

a. The operator shall provide a copy of the Notice of Intent (NOI) to the Taos Pueblo Governor's Office, War Chief's Office and Environmental Office, at the same time it is submitted to the U.S. Environmental Protection Agency, for projects occurring within the exterior boundaries of Taos Pueblo. The operator shall also notify Taos Pueblo when it has submitted the Notice of Termination (NOT). The NOI and NOT shall be sent to the Taos Pueblo at the following addresses:

i. Taos Pueblo Governor's Office
P.O. Box 1846
Taos NM 87571

ii. Taos Pueblo War Chief's Office
P.O. Box 2596
Taos NM 87571

iii. Environmental Office
Attn: Program Manger
P.O. Box 1846
Taos NM 87571

b. Taos Pueblo requests that in the event Indian artifacts or human remains are inadvertently discovered on projects occurring near or on Taos Pueblo lands that consultation with the tribal Governor's Office occur at the earliest possible time.

c. The operator shall provide a copy of the Stormwater Pollution Prevention Plan, copies of inspections reports, and copies of corrective action reports to staff in the Taos Pueblo Environmental Office for review and copy, upon request.

**9.4.2.7** **Ohkay Owingeh.** The following conditions apply only to discharges on the Ohkay Owingeh Reservation:

a. Prior to commencement of any construction activity on Ohkay Owingeh Lands requiring permit coverage under EPA's Construction General Permit, the operator(s) shall submit to Ohkay Owingeh Office of Environmental Affairs, a copy of the electronic "Notice of Intent," submitted to the Environmental Protection Agency, immediately following EPA's electronic notification that the NOI has been received. A copy of the Stormwater Pollution Prevention Plan(s) must be made available to the Ohkay Owingeh Office of Environmental Affairs upon the tribe's request either electronically or hard copy. Operator(s) shall also submit to Ohkay Owingeh Office of Environmental Affairs a copy of the electronic Notice of Termination (NOT) submitted to the Environmental Protection Agency. Documents shall be submitted to Ohkay Owingeh at the following address:

Ohkay Owingeh Office of Environment Affairs
Attention: Environmental Programs Manager

P.O. Box 717
Ohkay Owingeh, New Mexico 87566
Office # 505.852.4212
Fax # 505.852.1432
Electronic mail: naomi.archuleta@ohkay.org

b. Ohkay Owingeh will not allow the Rainfall Erosivity Waivers (see Appendix C) to be granted for any small construction activities.

c. All vegetation used to prevent soil loss, seeding or planting of the disturbed area(s) to meet the vegetative stabilization requirements must utilize native seeds/vegetation commonly known to the area. All temporary erosion control structures, such as silt fences must be removed as soon as stabilization requirements are met.

**9.4.3 OKR10I000 Indian country within the State of Oklahoma**

**9.4.3.1 Pawnee Nation.** The following conditions apply only to discharges within Pawnee Indian country:

a. Copies of the Notice of Intent (NOI) and Notice of Termination (NOT) must be provided to the Pawnee Nation at the same time it is submitted to the Environmental Protection Agency to the following address:

Pawnee Nation Department of Environmental Conservation and Safety
P.O. Box 470
Pawnee, OK 74058
Or email to mmatlock@pawneenation.org

b. The Storm Water Pollution Prevention Plan must be available to Departmental inspectors upon request.

c. The Department must be notified at 918.762.3655 immediately upon discovery of any noncompliance with any provision of the permit conditions.

**9.4.4 OKR10F000 Discharges in the State of Oklahoma that are not under the authority of the Oklahoma Department of Environmental Quality, including activities associated with oil and gas exploration, drilling, operations, and pipelines (includes SIC Groups 13 and 46, and SIC codes 492 and 5171), and point source discharges associated with agricultural production, services, and silviculture (includes SIC Groups 01, 02, 07, 08, 09).**

a. For activities located within the watershed of any Oklahoma Scenic River, including the Illinois River, Flint Creek, Barren Fork Creek, Upper Mountain Fork, Little Lee Creek, and Lee Creek or any water or watershed designated "ORW" in Oklahoma's Water Quality Standards, this permit may only be used to authorize discharges from temporary construction activities. Certification is denied for any on-going activities such as sand and gravel mining or any other mineral mining.

b. For activities located within the watershed of any Oklahoma Scenic River, including the Illinois River, Flint Creek, Barren Fork Creek, Upper Mountain Fork, Little Lee Creek, and Lee Creek or any water or watershed designated "ORW" in Oklahoma's Water Quality Standards, certification is denied for any discharges originating from support activities, including concrete or asphalt batch plants, equipment staging yards, material storage areas, excavated material disposal areas, or borrow areas.

c. In order to company with Oklahoma's Water Quality Standards, these conditions and restrictions also apply to any construction projects located wholly or partially on Indian Country lands within the State of Oklahoma.

## 9.5 EPA Region 8

### 9.5.1 MTR101000 Indian country within the State of Montana

**9.5.1.1 The Confederated Salish and Kootenai Tribes of the Flathead Nation.** The following conditions apply only to discharges on the Confederated Salish and Kootenai Tribes of the Flathead Nation Reservation:

a. Permittees must submit the Stormwater Pollution Prevention Plan (SWPPP) to the Confederated Salish and Kootenai Tribes at least 30 days before construction starts.

b. Before submitting the Notice of Termination (NOT), permittees must clearly demonstrate to an appointed Tribal staff person during an onsite inspection that requirements for site stabilization have been met.

c. The permittee must send a copy of the Notice of Intent (NOI) and the NOT to CSKT.

d. Permittees may submit their SWPPPs, NOIs and NOTs electronically to: clintf@cskt.org.

e. Written SWPPPs, NOIs and NOTs may be mailed to:

Clint Folden, Water Quality Regulatory Specialist
Confederated Salish and Kootenai Tribes
Natural Resources Department
P.O. Box 278
Pablo, MT 59855

## 9.6 EPA Region 9

### 9.6.1 CAR101000 Indian country within the State of California

**9.6.1.1 Twenty-Nine Palms Band of Mission Indians.** The following conditions apply only to discharges on the Twenty-Nine Palms Band of Mission Indians Reservation:

a. At the time the applicant submits its Notice of Intent (NOI) to the EPA, the applicant must concurrently submit written notification of the NOI and a copy of the Stormwater Pollution Prevention Plan (SWPPP) to the Twenty-Nine Palms Band of Mission Indians at the address below:

Tribal Environmental Coordinator
Twenty-Nine Palms Band of Mission Indians
46-200 Harrison Place
Coachella, CA 92236

b. The applicant must also concurrently submit to the Tribal Environmental Coordinator written notification of any other forms or information submitted to the EPA, including waivers, reporting, and Notice of Termination (NOT).

c. Permitted entities under the CGP must keep the Tribal EPA informed of authorized discharges under the CGP by submitting written information about the type, quantity, frequency and location, intended purpose, and potential human health

and/or environmental effects of their activities. These requirements are pursuant to Section 4 of the Twenty-Nine Palms Band of Mission Indians Water Pollution Control Ordinance (022405A). This information may be submitted to Tribal EPA in the form of Stormwater Pollution Prevention Plans (SWPPPs), monitoring reports, or other reports as required under the CGP. Spills, leaks, or unpermitted discharges must be reported in writing to Tribal EPA within 24 hours of the incident.

**9.6.2** **GUR100000 Island of Guam.** The following conditions apply only to discharges on the Island of Guam:

a. Any earth-moving operations which require a permit must be obtained from the Department of Public Works (DPW) with clearance approval from various Government of Guam Agencies including Guam EPA prior to the start of any earth-moving activity.

b. In the event that the construction sites are within the Guam Sole Source Aquifer, the construction site owner and operator must consider opportunities to facilitate groundwater recharge for construction and post-construction implementing infiltration Best Management Practices. Stormwater disposal systems shall be designed and operated within the boundaries of the project. Stormwater systems shall not be permitted within any Wellhead Protection Zone unless the discharge meets the Guam Water Quality Standards within the zone. Waters discharged within the identified category G-2 recharge zone shall receive treatment to the degree required to protect the drinking water quality prior to it entering the category G-1 resource zone.

c. All conditions and requirements set forth in the 22 Guam Administrative Rules and Regulations (GARR), Division II, Water Control, Chapter 10, Guam Soil Erosion and Sediment Control Regulations (GSESCR) that are more protective than the CGP regarding construction activities must be complied with.

d. All standards and requirements set forth in the 22 GARR, Division II, Water Control, Chapter 5, *Guam Water Quality Standards (GWQS) 2001 Revisions*, must be complied with to include reporting GWQS exceedance to Guam EPA.

e. All operators/owners of any property development or earth moving activities shall comply with the erosion control pre-construction and post-construction BMP design performance standards and criteria set forth in the 2006 CNMI and Guam Stormwater Management Manual.

f. All conditions and requirements regarding dewatering activities set forth in 22 Guam Administrative Rules and Regulations Chapter 7, Water Resources Development and Operating Regulations must be complied with to include securing permits with Guam EPA prior to the start of any dewatering activities.

g. If a project to be developed is covered under the Federal Stormwater Regulations (40 CFR Parts 122 & 123), a Notice of Intent (NOI) to discharge stormwater to the surface and marine waters of Guam must be submitted to the U.S. EPA and a copy furnished to Guam EPA, pursuant to Section 10, 104(B)(5)(d) 22GAR, Division II, Chapter 10.

h. Guam EPA shall apply the Buffer Requirements listed in Appendix G of the CGP NPDES Permit for construction activities as it pertains to Waters of the U.S. in Guam. Guam EPA shall also apply the same buffer requirements for sinkholes in Guam.

i. When Guam EPA, through its permit review process, identifies that the proposed construction activity is close proximity to marine waters, contractors and owners will

be informed that any activity that may impair water quality are required to stop during peak coral spawning periods as per the Guam Coral Spawning Construction Moratoriums.

j. The Proposed Construction General Permit must set appropriate measures and conditions to protect Guam's Threatened and Endangered Species and Outstanding Resource Waters of exceptional recreational or ecological significance as determined by the Guam EPA Administrator as per *Guam Water Quality Standards 2001 Revisions*, §5102, Categories of Waters, D. Outstanding Resource Waters.

k. When Guam EPA through its permit review process identifies that proposed construction activity is in close proximity to any Section 303d impaired waters, which includes marine waters and surface waters, shall ensure that construction activity does not increase the impaired water's ambient parameters.

l. When Rainfall Erosivity and TMDL Waivers reflected in the CGP, Appendix C, are submitted to the U.S. EPA, Guam EPA will review waivers on a project by project basis.

m. Prior to submission of the Notice of Termination (NOT) to the U.S. EPA, permittees must clearly demonstration to Guam EPA that the project site has met all soil stabilization requirements and removal of any temporary erosion control as outlined in the GSESCR.

### 9.7 EPA Region 10

#### 9.7.1 IDR100000 State of Idaho, except Indian country

a. *Idaho's Antidegradation Policy*. The WQS contain an antidegradation policy providing three levels of protection to water bodies in Idaho (IDAPA 58.01.02.051).

1. Tier I Protection. The first level of protection applies to all water bodies subject to Clean Water Act jurisdiction and ensures that existing uses of a water body and the level of water quality necessary to protect those existing uses will be maintained and protected (IDAPA 58.01.02.051.01; 58.01.02.052.01). Additionally, a Tier 1 review is performed for all new or reissued permits or licenses (IDAPA 58.01.02.052.05).
2. Tier II Protection. The second level of protection applies to those water bodies considered high quality and ensures that no lowering of water quality will be allowed unless deemed necessary to accommodate important economic or social development (IDAPA 58.01.02.051.02; 58.01.02.052.08).
3. Tier III Protection. The third level of protection applies to water bodies that have been designated outstanding resource waters and requires that activities not cause a lowering of water quality (IDAPA 58.01.02.051.03; 58.01.02.052.09).

DEQ is employing a water body by water body approach to implementing Idaho's antidegradation policy. This approach means that any water body fully supporting its beneficial uses will be considered high quality (IDAPA 58.01.02.052.05.a). Any water body not fully supporting its beneficial uses will be provided Tier I protection for that use, unless specific circumstances warranting Tier II protection are met (IDAPA 58.01.02.052.05.c). The most recent federally approved Integrated Report and supporting data are used to determine support status and the tier of protection (IDAPA 58.01.02.052.05).

b. *Pollutants of Concern.* The primary pollutants of concern associated with stormwater discharges from construction activities are sediment, typically

measured as total suspended solids and turbidity. Other potential pollutants include the following: phosphorus, nitrogen, pesticides, organics, metals, PCBs, petroleum products, construction chemicals, and solid wastes.

c. *Receiving Water Body Level of Protection.* The CGP provides coverage to construction activities throughout the entire State of Idaho. Because of the statewide applicability, all of the jurisdictional waters within Idaho could potentially receive discharges either directly or indirectly from activities covered under the CGP. DEQ applies a water body by water body approach to determine the level of antidegradation a water body will receive.

All waters in Idaho that receive discharges from activities authorized under the CGP will receive, at minimum Tier I antidegradation protection because Idaho's antidegradation policy applies to all waters of the state. Water bodies that fully support their aquatic life or recreational uses are considered to be *high quality waters* and will receive Tier II antidegradation protection.

Although Idaho does not currently have any Tier III designated outstanding resource waters (ORWs) designated, it is possible for a water body to be designated as an ORW during the life of the CGP. Because of this potential, the antidegradation review also assesses whether the permit complies with the outstanding resource water requirements of Idaho's antidegradation policy.

To determine the support status of the receiving water body, persons filing a Notice of Intent (NOI) for coverage under this general permit must use the most recent EPA-approved Integrated Report, available on Idaho DEQ's website: http://www.deq.idaho.gov/water-quality/surface-water/monitoring-assessment/integrated-report/.

High quality waters are identified in Categories 1 and 2 of the Integrated Report. If a water body is in either Category 1 or 2, it is a Tier II water body.

Unassessed waters are identified as Category 3 of DEQ's Integrated Report. These waters require a case-by-case determination to be made by DEQ based on available information at the time of the application for permit coverage. If a water body is unassessed, the applicant is directed to contact DEQ for assistance in filing the NOI.

Impaired waters are identified in Categories 4 and 5 of the Integrated Report. Category 4(a) contains impaired waters for which a TMDL has been approved by EPA. Category 4(b) contains impaired waters for which controls other than a TMDL have been approved by EPA. Category 5 contains waters which have been identified as "impaired," for which a TMDL is needed. These waters are Tier I waters, for the use which is impaired. With the exception, if the aquatic life uses are impaired for any of these three pollutants—dissolved oxygen, pH, or temperature—and the biological or aquatic habitat parameters show a health, balanced biological community, then the water body shall receive Tier II protection, in addition to Tier I protection, for aquatic life uses (IDAPA 58.01.02.052.05.c.i.).

DEQ's webpage also has a link to the state's map-based Integrated Report which presents information from the Integrated Report in a searchable, map-based format: http://www.deq.idaho.gov/assistance-resources/maps-data/.

Water bodies can be in multiple categories for different causes. If assistance is

needed in using these tools, or if additional information/clarification regarding the support status of the receiving water body is desired, the operator is directed to make contact with the appropriate DEQ regional office of the State office in the table below:

| Regional and State Office | Address | Phone Number | Email |
|---|---|---|---|
| Boise | 1445 N. Orchard Rd., Boise 83706 | 208-373-0550 | Kati.carberry@deq.idaho.gov |
| Coeur d'Alene | 2110 Ironwood Parkway, Coeur D'Alene 83814 | 208-769-1422 | June.bergquist@deq.idaho.gov |
| Idaho Falls | 900 N. Skyline, Suite B., Idaho Falls 83402 | 208-528-2650 | Troy.saffle@deq.idaho.gov |
| Lewiston | 1118 "F" St., Lewiston 83501 | 208-799-4370 | Mark.sellet@deq.idaho.gov |
| Pocatello | 444 Hospital way, #300 Pocatello 83201 | 208-236-6160 | Lynn.vanevery@deq.idaho.gov |
| Twin Falls | 650 Addison Ave., W., Suite 110, Twin Falls 83301 | 208-736-2190 | Balthasar.buhidar@deq.idaho.gov |
| State Office | 1410 N. Hilton Rd., Boise 83706 | 208-373-0502 | Nicole.deinarowicz@deq.idaho.gov |

d. *Turbidity Monitoring.* The permittee must conduct turbidity monitoring during construction activities and thereafter on days where there is a direct discharge of pollutants from an unstabilized portion of the site which is causing a visible plume to a water of the U.S.

A properly and regularly calibrated turbidimeter is required for measurements analyzed in the field (preferred method), but grab samples may be collected and taken to a laboratory for analysis. If the permittee can demonstrate that there will be no direct discharge from the construction site, then turbidity monitoring is not required. When monitoring is required, a sample must be taken at an undisturbed area immediately upstream of the project area to establish background turbidity levels for the monitoring event. Background turbidity, location, date and time must be recorded prior to monitoring downstream of the project area. A sample must also be taken immediately downstream from any point of discharge and *within* any visible plume. The turbidity, location, date and time must be recorded. The

downstream sample must be taken immediately following the upstream sample in order to obtain meaningful and representative results.

Results from the compliance point sampling or observation[78] must be compared to the background levels to determine whether project activities are causing an exceedance of state WQS. If the downstream turbidity is 50 NTUs or more than the upstream turbidity, then the project is causing an exceedance of WQS. *Any exceedance of the turbidity standard must be reporting to the appropriate DEQ regional office within 24 hours. The following six (6) steps should be followed to ensure compliance with the turbidity standard:*

1. If a visible plume is observed, quantify the plume by collecting turbidity measurements from within the plume and compare the results to Idaho's instantaneous numeric turbidity criterion (50 NTU over the background).
2. If turbidity is less than 50 NTU instantaneously over the background turbidity; continue monitoring as long as the plume is visible. If turbidity exceeds background turbidity by more than 50 NTU instantaneously then stop all earth disturbing construction activities and proceed to step 3.
3. Take immediate action to address the cause of the exceedance. That may include inspection the condition of project BMPs. If the BMPs are functioning to their fullest capability, then the permittee must modify project activities and/or BMPs to correct the exceedance.
4. Notify the appropriate DEQ regional office within 24 hours.
5. Possibly increase monitoring frequency until state water quality standards are met.
6. Continue earth disturbing construction activities once turbidity readings return to within 50 NTU instantaneously <u>and</u> 25 NTU for more than ten consecutive days over the background turbidity.

Copies of daily logs for turbidity monitoring must be available to DEQ upon request. The report must describe all exceedances and subsequent actions taken, including the effectiveness of the action.

e. *Reporting of Discharges Containing Hazardous Materials or Petroleum Products.* All spills of hazardous material, deleterious material or petroleum products which may impact waters (ground and surface) of the state shall be immediately reported. Call 911 if immediate assistance is required to control, contain or clean up the spill. If no assistance is needed in cleaning up the spill, contact the appropriate DEQ regional office in the table below during normal working hours or Idaho State Communications Center after normal working hours. If the spilled volume is above federal reportable quantities, contact the National Repose Center.

For immediate assistance: Call 911

National Response Center: (800) 424-8802

[78] A visual observation is only acceptable to determine whether BMPs are functioning properly. If a plume is observed, the project may be causing an exceedance of WQS and the permittee must collect turbidity data and inspect the condition of the projects BMPs. If the BMPs appear to be functioning to their fullest capability and the turbidity is 50 NTUs or more than the upstream turbidity, then the permittee must modify the activity or implement additional BMPs (this may also include modifying existing BMPs).

Idaho State Communications Center: (208) 632-8000

| Regional office | Toll Free Phone Number | Phone Number |
|---|---|---|
| Boise | 888-800-3480 | 208-373-0321 |
| Coeur d'Alene | 877-370-0017 | 208-769-1422 |
| Idaho Falls | 800-232-4635 | 208-528-2650 |
| Lewiston | 977-547-3304 | 208-799-4370 |
| Pocatello | 888-655-6160 | 208-236-6160 |
| Twin Falls | 800-270-1663 | 208-736-2190 |

**9.7.2 IDR101000 Indian country within the State of Idaho, except Duck Valley Reservation lands (see Region 9)**

**9.7.2.1** **Shoshone-Bannock Tribes.** The following conditions apply only to discharges on the Shoshone-Bannock Reservation:

f. Each operator shall submit a signed hard copy of the Notice of Intent (NOI) to the Shoshone-Bannock Tribes Water Resources Department at the same time it is submitted electronically to the Environmental Protection Agency (EPA) and shall provide the Shoshone-Bannock Tribes Water Resources Department the acknowledgement of receipt of the NOI from the EPA within 7 calendar days of receipt from the EPA.

**9.7.3** **WAR10F000 Areas in the State of Washington, except those located on Indian country, subject to construction activity by a Federal Operator.** The following conditions apply only to discharges on federal facilities in the State of Washington:

a. Discharges shall not cause or contribute to a violation of surface water quality standards (Chapter 173-201A WAC), groundwater quality standards (Chapter 173-200 WAC), sediment management standards (Chapter 173-204 WAC), and human health-based criteria in the National Toxics Rule (40 CFR Part 131.36). Discharges that are not in compliance with these standards are not authorized.

b. Prior to the discharge of stormwater and non-storm water to waters of the State, the Permittee must apply all known, available, and reasonable methods of prevention, control, and treatment (AKART). This includes the preparation and implementation of an adequate SWPPP, with all appropriate BMPs installed and maintained in accordance with the SWPPP and the terms and conditions of this permit.

c. Permittees who discharge to segments of waterbodies listed as impaired by the State of Washington under Section 303(d) of the Clean Water Act for turbidity, fine sediment, phosphorus, or pH must comply with the following numeric effluent limits:

| Parameter Identified in 303(d) Listing | Parameter Sampled | Unit | Analytical Method | Numeric Effluent Limit |
|---|---|---|---|---|
| • Turbidity<br>• Fine Sediment<br>• Phosphorus | Turbidity | NTU | SM2130 or EPA 180.1 | 25 NTUs at the point where the stormwater is discharged from the site. |
| High pH | pH | Su | pH meter | In the range of |

| | | | | |
|---|---|---|---|---|
| | | | | 6.5 – 8.5 |

d. All references and requirements associated with Section 303(d) of the Clean Water Act mean the most current EPA approved listing of impaired waters that exists on February 16, 2017, or the date when the operator's complete permit application is received by EPA, whichever is later.

e. Discharges to waterbodies subject to an applicable Total Maximum Daily Load (TMDL) for turbidity, fine sediment, high pH, or phosphorus, shall be consistent with the assumptions and requirements of the TMDL.

i. Where an applicable TMDL sets specific waste load allocations or requirements for discharges covered by this permit, discharges shall be consistent with any specific waste load allocations or requirements establish by the applicable TMDL.

ii. Where an applicable TMDL has established a general waste load allocation for construction stormwater discharges, but no specific requirements have been identified, compliance with this permit will be assumed to be consistent with the approved TMDL.

iii. Where an applicable TMDL has not specified a waste load allocation for construction stormwater discharges, but has not excluded these discharges, compliance with this permit will be assumed to be consistent with the approved TMDL.

iv. Where an applicable TMDL specifically precludes or prohibits discharges from construction activity, the operator is not eligible for coverage under this permit.

v. Applicable TMDL means a TMDL for turbidity, fine sediment, high pH, or phosphorus, which has been completed and approved by EPA prior to February 16, 2017, or prior to the date the operator's complete NOI is received by EPA, whichever is later.

**9.7.4 WAR101000 Indian country within the State of Washington**

**9.7.4.1 Confederated Tribes of the Colville Reservation.** The following conditions apply only to discharges on the Colville Indian Reservation (CIR) and on other Tribal trust lands or allotments of the Confederated Tribes of the Colville Reservation:

a. A copy of the Stormwater Pollution Prevention Plan must be submitted to the following office at least thirty (30) days in advance of sending the Notice of Intent (NOI) to EPA:

Environmental Trust Department
Confederated Tribes of the Colville Reservation
PO Box 150
Nesepelem, WA 99155

b. Copies of the Notice of Intent (NOI) and Notice of Termination (NOT) must be sent to the ETD at the same time they are submitted to EPA.

c. Discharges to Omak Creek, the Okanogan River, and Columbia River downstream of Chief Joseph Dam may affect threatened or endangered species, and shall only be permitted in adherence with Appendix D of the CGP.

d. All work shall be carried out in such a manner as will prevent violations of water quality criteria as stated in Chapter 4-8 Water Quality Standards of the Colville Law and Order Code, as amended.

e. Appropriate steps shall be taken to ensure that petroleum products or other chemical pollutants are prevented from entering waters of the CIR. All spills must be reported to the appropriate emergency management agency and the ETD, and measures shall be taken immediately to prevent the pollution of waters of the CIR, including groundwater.

f. Stormwater site inspections shall be conducted at least once every 7 calendar days, within 24-hours of the occurrence of a rain event of 0.25 inches or greater in a 24-hour period, and daily during periods of saturated ground surface or snowmelt with accompanying surface runoff.

g. Results of discharge sampling must be reported to the ETD within 7 days of sample collection. All sample reporting must include the date and time, location, and individual performing the sampling.

h. Any corrective action reports that are required under the CGP must be submitted to the ETD at the above address within one (1) working day of the report completion.

i. This certification does not authorize impacts to cultural, historical, or archeological features or sites, or proprieties that may be eligible for such listing.

**9.7.4.2** **Lummi Nation.** The following conditions apply only to discharges on the Lummi Reservation:

a. The Lummi Nation reserves the right to modify this 401 certification if the final version of the NPDES General Permit for Storm Water Discharges Associated with Construction Activity (CGP) on tribal lands in the State of Washington (Permit No. WAR10I000) is substantively different than the draft version of the proposed permit that was made available for public comments during April 2016. The Lummi Nation will determine if the final version of the NPDES CGP is substantively different than the draft version following review of the final version once the EPA makes it available.

b. This certification does not exempt and is provisional upon compliance with other applicable statutes and codes administered by federal and Lummi tribal agencies. Pursuant to Lummi Code of Laws (LCL) 17.05.020(a), the operator must also obtain a land use permit from the Lummi Planning Department as provided in Title 15 of the Lummi Code of Laws and regulations adopted thereunder.

c. Pursuant to LCL 17.05.020(a), each operator shall develop and submit a Storm Water Pollution Prevention Plan to the Lummi Water Resources Division for review and approval by the Water Resources Manager prior to beginning any discharge activities.

d. Pursuant to LCL Title 17, each operator shall be responsible for achieving compliance with the Water Quality Standards for Surface Waters of the Lummi Indian Reservation (Lummi Administrative Regulations [LAR] 17 LAR 07.010 through 17 LAR 07.210 together with supplements and amendments thereto).

e. Each operator shall submit a signed hard copy of the Notice of Intent (NOI) to the Lummi Water Resources Division at the same time it is submitted electronically to the Environmental Protection Agency (EPA) and shall provide the Lummi Water Resources Division the acknowledgement of receipt of the NOI from the EPA and

the associated NPDES tracking number provided by the EPA within 7 calendar days of receipt from the EPA.

f. Each operator shall submit a signed hard copy of the Notice of Termination (NOT) to the Lummi Water Resources Division at the same time it is submitted electronically to the EPA and shall provide the Lummi Water Resources Division the EPA acknowledgement of receipt of the NOT.

g. Storm Water Pollution Prevention Plans, Notice of Intent, Notice of Termination and associated correspondence with the EPA shall be submitted to:

Lummi Natural Resources Department
ATTN: Water Resources Manager
2665 Kwina Road
Bellingham, WA 98226-9298

**9.7.4.3** **Makah Tribe.** The following conditions apply only to discharges on the Makah Reservation:

a. The operator shall be responsible for achieving compliance with the Makah Tribe's Water Quality Standards.

b. The operator shall submit a Storm Water Pollution Prevention Plan to the Makah Tribe Water Quality Program and Makah Fisheries Habitat Division for review and approval at least thirty (30) days prior to beginning any discharge activities.

c. The operator shall submit a copy of the Notice of Intent to the Makah Tribe Water Quality Program and Makah Fisheries Habitat Division at the same time it is submitted to EPA.

d. Storm Water Pollution Prevention Plans and Notices of Intent shall be submitted to:

Aaron Parker
Makah Fisheries Management Water Quality Specialist
(360) 645-3162
Cell 206-356-0319
Aaron.parker@makah.com
PO Box 115
Neah Bay WA 98357

**9.7.4.4** **Puyallup Tribe of Indians.** The following conditions apply only to discharges on the Puyallup Tribe of Indians Reservation:

a. Each permittee shall be responsible for achieving compliance with the Puyallup Tribe's Water Quality Standards, including antidegradation provisions. The Puyallup Natural Resources Department will conduct an antidegradation review for permitted activities that have the potential to lower water quality. The antidegradation review will be consistent with the Tribe's Antidegradation Implementation Procedures. The Tribe may also impose additional controls on a site-specific basis, or request EPA to require the operator obtain coverage under an individual permit, if information in the NOI or from other sources indicates that the operator's discharges are not controlled as necessary to meet applicable water quality standards.

b. The permittee shall be responsible for meeting any additional permit requirements imposed by EPA necessary to comply with the Puyallup Tribe's antidegradation

policies if the discharge point is located within 1 linear mile upstream of waters designated by the Tribe.

c. Each permittee shall submit a copy of the Notice of Intent (NOI) to be covered by the general permit to Char Naylor (char.naylor@puyalluptribe.com) and Russ Ladley (russ.ladley@puyalluptribe.com) by email or at the address listed below at the same time it is submitted to EPA.

Puyallup Tribe of Indians
3009 E. Portland Avenue
Tacoma, WA 98404
ATTN: Russ Ladley and Char Naylor

d. All supporting documentation and certifications in the NOI related to coverage under the general permit for Endangered Species Act purposes shall be submitted to the Tribe's Resource Protection Manager (russ.ladley@puyalluptribe.com) and Char Naylor (char.naylor@puyalluptribe.com) for review.

e. If EPA requires coverage under an individual or alternative permit, the permittee shall submit a copy of the permit to Russ Ladley and Char Naylor at the address listed above.

f. The permittee shall submit all stormwater pollution prevention plans to Char Naylor for review and approval prior to beginning any activities resulting in a discharge to tribal waters.

g. The permittee shall conduct benchmark monitoring for turbidity (or transparency) and, in the event of significant concrete work or engineered soils, pH monitoring as well. Monitoring, benchmarks, and reporting requirements contained in Condition S.4. (pp.13-20) of the Washington State Construction Stormwater General Permit, effective January 1, 2016, shall apply, as applicable.

h. The permittee shall notify Char Naylor (253-680-5520) and Russ Ladley (253-680-5560) prior to conducting inspections at construction sites generating storm water discharged to tribal waters.

i. Treat dewatering discharges with controls necessary to minimize discharges of pollutants in order to minimize the discharge of pollutants to groundwater or surface waters from stormwater that is removed from excavations, trenches, foundations, vaults, or other storage areas. Examples of appropriate controls include sediment basins or sediment traps, sediment socks, dewatering tanks, tube settlers, weir tanks, and filtration systems (e.g., bag or sand filters) that are designed to remove sediment.

   To the extent feasible, utilize vegetated, upland areas of the site to infiltrate dewatering water before discharge. At all points where dewatering water is discharged, comply with the velocity dissipation requirements of Part 2.2.11 of EPA's 2016 General Construction Stormwater Permit. Examples of velocity dissipation devices include check dams, sediment traps, riprap, and grouted riprap at outlets.

j. The permittee shall provide and maintain natural buffers to the maximum extent possible (and/or equivalent erosion and sediment controls) when tribal waters are located within 100 feet of the site's earth disturbances. If infeasible to provide and maintain an undisturbed 100 foot natural buffer, erosion and sediment controls to achieve the sediment load reduction equivalent to a 100-foot undisturbed natural buffer shall be required.

**9.7.4.5 Spokane Tribe of Indians.** The following conditions apply only to discharges on the Spokane Tribe Reservation:

a. Pursuant to Tribal Law and Order Code (TLOC) Chapter 30 each operator shall be responsible for achieving compliance with the Surface Water Quality Standards of the Spokane Tribe. The operator shall notify the Spokane Tribe, Water Control Board (WCB) of any spills of hazardous material and;

b. Each operator shall submit a signed hard copy of the Notice of Intent (NOI) to the WCB at the same time it is submitted to EPA.

c. The permittee shall allow the Tribal Water Control Board or its designee to inspect and sample at the construction site as needed.

d. Each operator shall submit a signed copy of the Notice of Termination (NOT) to the WCB at the same time it is submitted to EPA.

The correspondence address for the Spokane Tribe Water Control Board is:

Water Control Board
c/o. Brian Crossley
P0 Box 480
Wellpinit WA 99040
(509)626-4409
crossley@spokanetribe.com

**9.7.4.6 Swinomish Indian Tribal Community.** The following conditions apply only to discharges on the Swinomish Reservation:

a. Owners and operators seeking coverage under this permit who intend to discharge to Regulated Surface Waters must submit a copy of the Notice of Intent (NOI) to the DEP at the same time the NOI is submitted to EPA.

b. Owners and operators seeking coverage under this permit must also submit a Stormwater Pollution Prevention Plan to the DEP for review and approval by DEP prior to beginning any discharge activities.

c. Owners and operators must also submit to the DEP Changes in NOI and/or Notices of Termination at the same time they are submitted to EPA.

**9.7.4.7 Tulalip Tribes.** The following conditions apply only to discharges on the Tulalip Reservation:

a. This certification does not exempt and is provisional upon compliance with other applicable statues and codes administered by federal and Tulalip tribal agencies. Pursuant to Tulalip Tribes code of law, the operator must also obtain a land use permit from the Tulalip Tribes Planning Department as provided in Title 7 of the Tulalip Tribal Code (http://www.codepublishing.com/WA/Tulalip/?Tulalip02/Tulalip0205.html).

b. Each CGP operator shall be responsible for achieving compliance with Tulalip Tribes Water Quality Standards.

c. Each CGP operator shall submit their Stormwater Pollution Prevention Plan (SWPPP) to the:

Tulalip Natural & Cultural Resources Department
Tulalip Tribes
6406 Marine Drive
Tulalip, WA 98271